**EXHIBIT A**

RECEIVED

MAR 1 4 2023

OFFICE OF THE
GENERAL COUNSEL

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**CONFORMED COPY
ORIGINAL FILED**
Superior Court of California
County of Los Angeles

**MAR 0 6 2023**

David W. Slayton, Executive Officer/Clerk of Court

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, INC.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

DIANE K. GODFREY

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Stanley Mosk Courthouse<br><br>111 N. Hill St. Los Angeles CA 90012 | CASE NUMBER:<br>*(Número del Caso):* **23STCV04785** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Diane K. Godfrey, Esq., #115665 2769 Castle Hill Court, Apt 34, Sacramento CA 95821 916 696 6692

| DATE: **MAR 0 6 2023** | Clerk, by G. ROBINSON | , Deputy |
|---|---|---|
| *(Fecha)* David W. Slayton | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* Stanford Health Care, Inc.

    under: ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
    ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
    ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
    ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

For your protection and privacy, please press the Clear
This Form button after you have printed the form.

[ Print this form ]   [ Save this form ]   [ Clear this form ]

DOCTORS MEDICAL CENTER OF MODESTO
INC.,  TENET CALIFORNIA INC., DIGNITY
HEALTH MEDICAL FOUNDATION, INC.,
PROVIDENCE MEDICAL FOUNDATION, INC .
WALMART INC., MCNAUGHTON
NEWSPAPERS, INC., ANIMAL LEGAL
DEFENSE FUND, INC., LOS ANGELES TIMES,
FEDERAL EXPRESS COMPANY INC.,
THE UPS STORE, INC., LIVERMORE
OPTOMETRY, INC., GAGNON VISION
MEDICAL GROUP, INC., DENTAL BOARD
OF CALIFORNIA,   CALIFORNIA BOARD OF
BARBERING AND COSMETOLOGY,
CALIFORNIA  BOARD OF OPTOMETRY,
MEDICAL BOARD OF CALIFORNIA,
BOARD, RAY STONE INC., CALIFORNIA
BOARD OF PHARMACY, CALIFORNIA
PHYSICIAN BOARD, and DOES 1-50,
DEFENDANTS.

1  DIANE K. GODFREY, ESQ., CSB #115665
2  Attorney at law
   2769 Castle Hill Court, Apt. 34
3  Sacramento CA 95821
   (916) 696-6692
4  dianegodfreylaw@gmail.com
5  Plaintiff *in propria persona*

**CONFORMED COPY**
**ORIGINAL FILED**
Superior Court of California
County of Los Angeles

MAR 0 6 2023

David W. Slayton, Executive Officer/Clerk of Court

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF LOS ANGELES–UNLIMITED JURISDICTION

10

11 DIANE K. GODFREY,                        ) CASE NO.  23STCV04785
                                            ) VERIFIED
12         Plaintiff,                        )  COMPLAINT FOR CIVIL RICO
                                            ) 18 USC §1964[c]; 18 USC §1347;
13 vs.                                       ) [HEALTH CARE FRAUD] 18
                                            ) USC §1341 [MAIL FRAUD];
14                                          ) 18 USC section 1209(e)(1); 2-3;
   REGENTS OF UNIVERSITY OF CALIFORNIA,     ) [ACCESS DEVICE FRAUD]
15 STANFORD HEALTH CARE, INC.,              ) BRIBERY (18 USC section 1961);
   DOCTORS MEDICAL CENTER OF MODESTO,       ) MONEY LAUNDERING
16 INC.,  TENET CALIFORNIA INC., DIGNITY    ) (18 USC section 1956); BANK FRAUD
   HEALTH MEDICAL FOUNDATION, INC.,         ) (18 USC section 1344; COPYRIGHT
17 PROVIDENCE MEDICAL FOUNDATION, INC .     ) INFRINGEMENT (17 USC section
18 WALMART INC., MCNAUGHTON                 ) 106(e); 506(a)(1)(A); USE OF
   NEWSPAPERS, INC., ANIMAL LEGAL           ) INTERSTATE COMMERCE FACILITIES
19 DEFENSE FUND, INC., LOS ANGELES TIMES,   ) IN THE COMMISSION OF MURDER
20 FEDERAL EXPRESS COMPANY INC.,            ) FOR HIRE (18 USC section 1958(a)];
   THE UPS STORE, INC., LIVERMORE           ) FRAUD–SUPPRESSION OF FACT;
21 OPTOMETRY, INC., GAGNON VISION           ) BREACH OF WRITTEN CONTRACT;
   MEDICAL GROUP, INC., DENTAL BOARD        ) DECLARATORY RELIEF; BREACH
22 OF CALIFORNIA,   CALIFORNIA BOARD OF     ) OF IMPLIED WARRANTY OF
23 PHARMACY, CALIFORNIA BOARD OF            ) HABITABILITY; MAINTENANCE OF
   BARBERING AND COSMETOLOGY,               ) NUISANCE; CONSPIRACY; WIRE
24 CALIFORNIA  BOARD OF OPTOMETRY,          ) FRAUD (18 USC §1343)
   MEDICAL BOARD OF CALIFORNIA,             ) KIDNAPPING (18 USC §1201)
25 CALIFORNIA PHYSICIANS ASSISTANT          ) THEFT FROM INTERSTATE OR
26 BOARD, RAY STONE INC., and DOES 1- 50,   ) FOREIGN SHIPMENT BY CARRIER
27                                          ) (18 USC section 659)
                    DEFENDANTS.             )JURY TRIAL REQUESTED
28 _____

PRELIMINARY ALLEGATIONS

1. Plaintiff is, and at all times herein mentioned was, a resident of the County of Sacramento, California. Plaintiff is also an attorney at law, licensed to practice in the State of California, and on active status, since December 3, 1984.

2. As alleged more fully infra, on information and belief, plaintiff is a victim of a satanic cult, formed and/or joined by movie and film actors Kevin Costner, Don Johnson, and Harrison Ford, and other co-conspirators, as well as numerous elected officials who deliberately ignored plaintiffs' letters reporting violent crimes, including, but not limited to, kidnapping, attempted murder, sexual battery, and animal torture causing death. As part of cult activities, defendants and co-conspirators subjected plaintiff to repeated counts of kidnapping, during which she was transported repeatedly while unconscious during extended periods of time, stabbed with needles, poisoned, subjected to sexual battery while unconscious, and her small pet animals tortured to death. Small animal torture, part of cult rituals, also consisted of animal sacrifice, rape, brainwashing, and kidnapping of an innocent female victim. Plaintiff also became the victim of an extensive and extended pattern of organized crime under the Racketeer Influenced and Corrupt Organizations Act.

3. Plaintiff alleges that employees of the Federal Bureau of Investigation formed a criminal conspiracy in or about the 1980's, and continuing to the present day, with open-ended continuity, including past and/or current FBI employees, movie and film actors Kevin Costner, Don Johnson, and Harrison Ford, to deprive plaintiff of her civil rights, including but not limited to, rights set forth under the Victims Rights Acts in California and federal law, rights to services, including medical, dental, vision, veterinary, and other professional services, and rights accorded

1

1   to crime victims under state and federal law, and to commit violent crimes, including rape,

2   kidnapping, and repeated attempted murders. Since the formation of the conspiracy in the late

3   1980's, the original conspirators added numerous other co-conspirators, forming an ever-growing

4   conspiracy, which even included elected officials. The conspiracy involved the commission of

5   more and more crimes against plaintiff, already a crime victim when most offenses were

6   committed.  Each co-conspirator adopted as their own crimes committed by other co-

7   conspirators, within the ambit of the conspiracy.  Each member of the conspiracy became liable

8   for all of the acts committed by others pursuant to the conspiracy, and in furtherance of the main

9   purpose of the conspiracy, with open-ended continuity.

10   4. Plaintiff further alleges that movie and film actors Costner, Johnson, and Ford, in addition to

11   employment with the FBI, also were and/or are members of the U.S. Military. On information

12   and belief, plaintiff alleges that these three, as well as Spencer Wright, also a former or current

13   deputy sheriff in Sacramento County,  are members of the United States Air Force.

14   5. On October 8, 2018, as part of nightly terror raids on plaintiff's apartment, plaintiff became the

15   victim of an attempted murder. Plaintiff later determined Spencer Wright committed this crime.

16   Although plaintiff reported the attempted murder to the Sacramento County Sheriff's Department

17   and the FBI, no one investigated the case.

18   6. On July 15, 2019, the County of Sacramento filed a "Petition for Workplace Violence" against

19   plaintiff. The petition, filed under case #34-2019-7006097, falsely claimed plaintiff had

20   "assaulted" Spencer Wright, on an unspecified date. The petition fails to include any details as to

21   how the alleged assault occurred, instead giving the purported location of the alleged assault as

22   901 G Street, Sacramento CA 95814. This address is the location of the Sacramento County

2

District Attorney, County counsel Lisa Travis and Peter Zilaff filed the petition, without any supporting evidence, constituting the filing of false papers, a felony under California law.

7. On July 16, 2019, the court issued a Temporary Restraining Order against plaintiff herein. The TRO was issued ex parte, without any supporting evidence, and no declarations accompanied the petition. A judicial officer signed the TRO. The signature, difficult to decipher, seems to read "Shaim Roub." The TRO temporarily restrained plaintiff from any contact with Wright, and included a long list of prohibited actions, listed on Judicial Council form WV-110, p. 2. The list included an order requiring plaintiff to remain at least two hundred yards away from Wright. Plaintiff is and was a self-employed attorney and never worked with Spencer Wright.

8. On information and belief, plaintiff understood Wright's workplace at the time as the Sacramento County Sheriff's Department, not the District Attorney's. Beginning in July, 2018, and continuing for more than a year, Wright led a team of people who nightly terrorized plaintiff in her home, crimes repeatedly reported to the Sheriff's Department, Sacramento County District Attorney Anne Marie Schubert, and the FBI. No one ever investigated. This pattern of violent crime, occurring every night for more than a year, demonstrated an open-ended continuity of criminal  activity, with the threat of continuing crime, as further violent crimes were committed against plaintiff, infra, and which also involved other victims.

9. At a hearing on September 13, 2019, no one appeared to testify on behalf of the County. Wright did not appear, nor did he ever file a declaration in support of the petition. At the hearing, the court denied the petition for permanent restraining order.  The petition and all of the documents filed with the court as part of the petition came about as the result of extensive bribery of judicial officers, and the county counsel who filed the petition. On information and belief,

3

plaintiff alleges that Costner, Ford, and Johnson  paid these bribes.

10. On August 26, 2019, plaintiff reported the federal crimes of computer hacking to Christopher Wray, FBI Director; MacGregor Scott, then U.S. Attorney, Eastern District, Sacramento; and Sean Ragan, FBI Roseville, CA. None of these officials ever responded to plaintiff's letter. Since reporting these crimes, plaintiff has discovered that actors Ford, Costner, and Johnson [hereinafter, sometimes referred to as "the actors"] committed the computer hacking crimes. These events and other crimes convinced plaintiff that Johnson, Ford, and Costner are and/or were, FBI agents.

11. In 1990 and 1991, plaintiff became a victim of a series of crimes committed by other attorneys. These attorneys used plaintiff's name to prosecute a civil case, without her knowledge and consent, committing a series of state and federal crimes, including a) felony insurance fraud, in violation of California Penal Code §550(a)(1); [formerly CA Penal Code §549]: b) forgery, in violation of CA Penal Code §470(a); c) procuring or offering false or forged instrument in violation of California Penal Code  §115(a); d) preparing false documentary evidence, in violation of California Penal Code §134; e) possession of forged items with intent to defraud; in violation of California Penal Code §475(a) f) perjury, in violation of California Penal Code §118; g) Grand theft, in violation of California Penal Code §487; h) Violations of Racketeer Influenced and Corrupt Organizations Act (RICO) (USCA § 1961, et seq.); i) Federal mail fraud (USCA §1341); j) Federal wire fraud (USCA §1342); k) Receipt of stolen property; (California Penal Code §496); i) Conspiracy to commit all or some of the above crimes, in violation of CA Penal Code §182, and 18 USC §371;) aiding and abetting all or some of the above crimes, in violation of CA Penal Code  §31; 18 USC §2(a).

12. After years of investigation, plaintiff reported these crimes to Assistant U.S. Attorney C. Ben Burch in Oakland, California, on January 25, 2005.  "The actors" and others employed by the FBI decided to conduct an investigation of these white collar crimes.  Although the case was allegedly investigated, none of the victims, including plaintiff, were ever contacted,  by federal law enforcement, including, but not limited to, FBI agents, or U.S. Attorneys, or anyone else purportedly investigating the case. Those purportedly investigating never reported the case to the California State Bar, or District Attorneys, even though crimes were committed within their jurisdiction.

13. Over time, plaintiff realized the "investigation" amounted to a fraud, designed to ruin plaintiff's legal career, by spreading malicious gossip throughout the legal community in California, and beyond, and by deliberately failing and refusing to prosecute the guilty. On information and belief, plaintiff alleges that thousands of attorneys in California have heard this gossip, with a current understanding that although the white collar crimes committed in 1990 and 1991 may have been investigated, no one was ever prosecuted.

14. In or about 2010, plaintiff learned that other victims of these white collar crimes, committed in 1990 and 1991, included two insurance companies, Farmers Insurance, and Chubb Insurance Company. The name of the other individual victim is withheld herein, but the two insurance companies carried insurance policies on this individual victim. On information and belief, in or about 1990 and 1991, this other individual victim tendered his defense to Chubb Insurance Company, that carried an "umbrella" policy.  Chubb Insurance house counsel, known as the Law Firm of Baraban & Teske, in Pasadena, California, are believed to have defended this other victim under this umbrella policy.

15. In 2012, plaintiff made two attempts to reach Attorney Jeffrey Baraban, by phone. Plaintiff also mailed letters to him in 2022; these letters are believed stolen. In the interim, plaintiff remained a victim of ongoing federal racketeering crimes.

16. On August 30, 2019, through September 3, 2019, actors Costner, Ford, and Johnson, together with Sacramento County Deputy Sheriff Spencer Wright, and numerous other co-conspirators, committed the violent crimes of kidnapping, sexual battery, and animal torture and cruelty causing death of the animals (collectively, "the kidnapping crimes.") On information and belief, plaintiff also alleges she became a victim of rape, as an unconscious victim. These violent crimes followed those committed beginning in July, 2018, and continuing into August, 2019.

These co-conspirators committed numerous crimes, including but not limited to the following:

Violation of California Vehicle Code section 487 (grand theft auto);
Tampering with a vehicle (Vehicle Code section 10852);
Prohibited interception of wire, oral, or electronic transmissions prohibited.(18 USC section 2511)
Felony animal cruelty under California Penal Code section 597(a), (b), (f)
Violations of Racketeer Influenced and Corrupt Organizations Act (RICO) (USCA § 1961, et seq.);
Sexual battery, in violation of California Penal Code section 243.4(a)
Rape, in violation of California Penal Code section 261(a)(4)(A) [unconscious victim at time of act].
Federal mail fraud (USCA §1341);
Federal wire fraud (USCA §1342);
Receipt of stolen property; (California Penal Code §496;)
Theft of animals (California Penal Code §487f(a), (b)(1)
Conspiracy to commit all or some of the above crimes, in violation of CA Penal Code §182, and 18 USC §371;
Aiding and abetting all or some of the above crimes, in violation of CA Penal Code §31; 18 USC §2(a).
Attempted murder, in violation of California Penal Code §664/187;
Conspiracy to commit murder, in violation of 18 USC 1117 and California Penal Code §182;
Conspiracy against rights, in violation of 18 USC §241;
Kidnapping, in violation of 18 USC §1201(a)(1) and California Penal Code §§207, 208, and 209.
Violation of California Welfare & Institutions Code §5150, in its entirety;

Violation of California Welfare & Institutions Code §§5152 (a), (b), and [c];

Additional federal crimes committed against me by federal agents include the following:
Criminal copyright infringement, in violation of 18 USC §2319; and 18 USC §506;
18 USC §373 [solicitation to commit a crime of violence];
Racketeering activity, consisting of kidnapping and attempted murder, in violation of 18 USC §1961(1); racketeering activity, in violation of 18 USC section §1961, consisting of
[a] retaliation against a victim, in violation of 18 USC §1513;
[b] criminal copyright infringement, in violation of 17 USC § 506(a)(1)(A),  (B), and [C];
Money laundering, in violation of 18 USC section 1956;
Bank fraud, in violation of 18 USC section 1344;
False imprisonment, in violation of Penal Code section 236.

As set forth in these statutes, all of plaintiff's rights as a victim were violated:
California Constitution, Article I, §28(b); Violation of Victims' Rights Acts;
18 USC §3771 (Crime Victims' Rights);
Victims' Rights and Restitution Act 42 USC §10607[c];
34 USC §2141 (services to victims).

17. Beginning in March, 2020, plaintiff repeatedly reported these crimes to numerous elected officials, including, but not limited to: a) March 7, 2020: then U.S. Attorney General William Barr; b) March 7, 2020, Birgit Fladager, D.A., Stanislaus County; c] January 19, 2021, President Joseph Biden, with copies to V.P. Kamala Harris, Senate Minority Leader Mitch McConnell, Chief of Staff Ron Klain,  and Speaker of the House Nancy Pelosi. Under a separate cover, Plaintiff sent a copy of her letter of January 19, 2021 directed to President Biden to Scott Pelley of CBS News, and the Anderson Cooper of CNN.  Plaintiff believes these two copies of letters were stolen.

18. Plaintiff's other letters reporting the crimes included: d) February 8, 2021, Lieutenant Governor Eleni Kounlakis, reporting kidnapping and other crimes; e) February 11, 2021, Governor Gavin Newsom, reporting crimes; f) April 19, 2021, President Joseph Biden, with copies to V.P. Kamala Harris, Chief of Staff Ron Klain, Attorney General Merritt Garland, and Anderson Cooper of CNN.

7

19. Plaintiff also reported the crimes to the following additional elected officials: g) June 17, 2021, Kimberly Lewis, D.A., Merced County; h) 3-7-2022, Rob Bonta, California Attorney General; h) 3-14-2022, Vernon Warnke, Sheriff, Merced County, with copies to Chief Brandon Gillespie, Modesto Police Department; Rob Bonta, California Attorney General, and Merritt Garland, U.S. Attorney General; I) 4-11-2022 to Scott Jones, Sheriff, Sacramento County, with copies to Anne Marie Schubert, D.A., Sacramento County; Rob Bonta, California Attorney General j)Buck Condit, Stanislaus County Board of Supervisors, Rodrigo Espinosa, Merced County Board of Supervisors, and Rich Drummond, Sacramento County Board of Supervisors, dated 10-17-2022, with hand-delivered documents to Espinosa and Condit on November 14, 2022.  None of these elected officials ever answered plaintiff's letters.

20.  On or about September10, 2020, at 6:00 a.m. Don Johnson entered plaintiff's bedroom via live transmission, facilitated by special equipment placed on the roof of plaintiff's apartment building. The live transmission showed Johnson loosely bound to a desk, smirking at plaintiff. After approximately 60 seconds, Johnson disappeared, and was immediately replaced by a film transmission featuring Kevin Costner, sticking his tongue out at plaintiff, and gagging. This intrusion was one of many made by Costner over a two-year period, including a live transmission featuring Costner at a barbecue, at 2:30 a.m. on a later date.  The two actors flaunted the fact that although plaintiff had reported the crimes to U.S. Attorney General William Barr and Stanislaus County California District Attorney Birgit Fladager, no arrests had been made.

21. The September 10, 2020 intrusion also constituted a burglary, elder abuse,  and trespassing under California law. The two men mocked plaintiff's attempts to report the crimes, at that time limited to Barr and Fladager, neither of whom ever answered plaintiff's letters. Their conduct

implied they knew about plaintiff's unsuccessful attempts to report the crimes, never to be

investigated or prosecuted.

22. On January 4, 2021, plaintiff reported the Costner-Johnson September 10, 2020 crimes to

Scott Pelley of CBS News, via Priority Mail with tracking. Plaintiff had also written to Pelley on

several prior occasions, beginning on March 6, 2020. On information and belief, plaintiff alleges

that this letter, together with others to CBS news, became the subjects of federal mail theft, and

plaintiff has never heard from either Pelley or anyone else with CBS.  These thefts are part of a

pattern of ongoing federal mail theft, demonstrating an open-ended continuity of these crimes,

with the ongoing threats of continued criminal activity.

23. Costner has made a number of other physical intrusions into plaintiff's apartment, using

special technology to create live transmissions. One such transmission showed Costner

barbecuing at 2:30 a.m.; another included a film clip from "For Love of the Game", a Universal

production.  On information and belief, plaintiff alleges that Deputy Sheriff Spencer Wright

facilitated these intrusions using special equipment placed on the roof of plaintiff's building.

Wright may also have been employed by the FBI, and a member of the U.S. Air Force.

24. In July, 2022, plaintiff traveled to Washington, D.C., in an attempt to make contact with

President Biden. Through e-mail inquiry, plaintiff learned the name of the Catholic church Biden

attended. Plaintiff went to this church and spoke to a priest there, showing him documents

demonstrating ongoing criminal activity and her attempts to report the crimes to the U.S.

military. Plaintiff never heard from this priest, and on information and belief, alleges the priest

spoke to Biden, who invoked the priest-penitent privilege regarding these crimes. The Biden

administration has never answered plaintiff's, sent to different members of the administration

9

over a period of time.

25. On October 27, 2022, plaintiff hand-delivered a large file folder of documents to then Republican Candidate for California Governor , California Senator Brian Dahle. Dahle at that time was scheduled for an interview with "Cal Matters", in downtown Sacramento, information plaintiff learned as a member of the Sacramento Press Club. Plaintiff spoke briefly to Dahle as he entered the building. Plaintiff handed the file folder to Dahle. The file folder contained two letters to Dahle, one dated October 22, 2022 and the other dated October 27, 2022. The lengthy and detailed letters discussed the case in detail, and the file folder included extensive documents.

26. Among other requests, plaintiff asked Dahle to contact the U.S. Military or the Secret Service,  since plaintiff had already attempted these contacts many times without success. As of the filing of this complaint, plaintiff has never heard from Dahle, and the documents she hand-delivered to him have never been returned.   The letters focused heavily on Kevin Costner as plaintiff's number one suspect of federal mail theft and other crimes.  Dahle has done nothing to report these crimes, committed against numerous victims, constituting an open-ended continuity, with threats of continuing crimes,  as set forth in detail in the letters plaintiff handed to him.

27. Because none of the elected or government officials took any action to investigate the crimes, or charge, arrest, or incarcerate "the actors", these co-conspirators, along with others, have committed numerous and ongoing state and federal crimes. The extensive pattern of an open-ended continuity of crime and threats of continuing criminal activity have generated this litigation. Elected officials have conspired to ignored plaintiff's letters, written over a three- year period of time, reporting the crimes committed by cult members committed against plaintiff over decades. The crimes were ignored, and never either investigated, or prosecuted. Any reports

plaintiff made of crimes against her would be ignored, a pattern that started in 2005.

28. Plaintiff also mailed numerous other letters, attempting to report the crimes, and asking for help in initiating criminal prosecution. On April 24, 2021, plaintiff wrote to Randall Eliason, an expert in white collar crime and a professor at George Washington University in Washington D.C. Plaintiff also sent a copy of this letter to Anderson Cooper of CNN. Neither ever responded; plaintiff believes USPS employees stole these letters. At a later time, plaintiff attempted follow-up with Eliason via an elaborate set of e-mails sent to George Washington University, all of which became the subject of computer hacking.

29. On October 5, 2021, plaintiff also wrote to Todd Spitzer, Orange County District Attorney, and former Los Angeles County District Attorneys Marcia Clark and Christopher Darden; on October 27, 2022 to Congressman Alan Lowenthal, and approximately forty-four (44) other U.S. Congress representatives, all from California; on October 30, 2021 to Jim Costa and other congresspersons. Plaintiff received only one response to all of these letters, an e-mail from Ami Bera, M.D., which plaintiff believes was a forgery. On information and belief, plaintiff alleges employees of the US Postal Service stole all of these letters.

30. On June 14, 2022, plaintiff hand-delivered correspondence, together with numerous other letters, to the Congressional office of U.S. Congressman Lou Correa, 2323 N. Broadway, Suite 319, Santa Ana CA 92706. (Plaintiff had previously attempted to reach Correa as one of the U.S. Congressional Representatives she wrote to on October 27, 2021.) Plaintiff handed the sealed documents to his secretary, who stated she would scan and e-mail the papers to Correa in Washington, D.C. Correa's secretary, name unknown, accepted a bribe or bribes not to transmit the documents to Correa, and agreed to mail the documents to the briber instead. On information

and belief, plaintiff alleges all of this correspondence became the subjects of federal mail fraud

Plaintiff has never heard from Congressman Correa.

31. Plaintiff also wrote to the following, on the listed dates: David Pevier, Securities & Exchange Commission: December 29, 2021, expressing concerns about Tenet Health Care and WALMART;  January 12, 2022: Jo Ann Jenkins, AARP;  January 12, 2022 Asa Hutchison, National Governors Association; plaintiff never heard from any of these people and believes all of these letters became the subjects of federal mail theft.

LETTERS TO MILITARY OFFICIALS AND THE PENTAGON:

32. Beginning in February 19, 2021, plaintiff wrote to the following military officials within the Pentagon, and at Travis Air Force Base, California:  General James McConville, U.S. Army, February 19, 2021, with copy to President Joseph Biden; Letter dated April 19, 2021 to General James McConville, U.S. Army, Pentagon; Letter to Frank Kendall, Secretary of the Air Force, Pentagon, dated 12-20-2021; Letter of December 20, 2021 to General David Berger, U.S. Marine Corps., Pentagon; Letter of December 20, 2021 to Carlos Del Toro, Secretary of the Navy, Pentagon; Letter of December 20, 2021 to Secretary Frank Kendall, U.S. Air Force, Pentagon Letter dated 6-16-2022 to Col. Corey A. Simmons, Travis AFB. Plaintiff received no responses to any of these letters, believed to have become the subjects of federal mail theft.

33. On the morning of June 15, 2022, plaintiff attempted to hand deliver letters to Frank Kendall, Secretary of the U.S. Air Force, and Carlos del Toro, Secretary of the U.S. Navy, at local recruiting stations at 3291 Truxel Rd. in Sacramento. Recruiting officers at both locations refused to take the letters from plaintiff, who asked them to send the letters to the Pentagon. On information and belief, these military personnel may have accepted bribes from actor Kevin

Costner.  Thereafter, plaintiff sent five copies of the same letter, from different locations, to Col

Corey Simmons at Travis AFB. All five copies of the letters were stolen, probably at the USPS

location at Travis, and plaintiff never reached Col. Simmons.

34. On October 30, 2022, plaintiff sent a certified letter to U.S.  Secretary of Defense Lloyd

Austin at the Pentagon. The USPS website indicated plaintiff's letter "had been picked up", and a

returned mail receipt sent back to plaintiff was initialed. Plaintiff has never heard from the

Department of Defense, or anyone else with the U.S. Military. On information and belief,

plaintiff alleges that employees of the USPS branch nearest her home accepted a bribe or series

of bribes to divert and steal this mailpiece, along with many others, returning these mailpieces to

the briber, believed to be Kevin Costner, instead. In addition, plaintiff believes the return mail

receipt, allegedly from the Department of Defense, may have been forged by USPS employee.

On November 2, 2022, plaintiff wrote to the U.S. Postal Inspection Service in San Francisco,

regarding the theft of the Pentagon mail. This letter, to the U.S. Postal Inspection Service, also

became the subject of federal mail theft, again showing a open-ended continuity of criminal

activity, with an ongoing threat of continued crime.

LETTERS AND E-MAILS TO JOURNALISTS:

35. Beginning in March, 2020,  plaintiff also reported the crimes to journalists, including the

following letters, sent on the following dates:   March 6, 2020 to Scott Pelley, CBS News;

March 9, 2020 to Scott Pelley, CBS News;  Susan Zirinsky, CBS News, September 10, 2020;

Crista D'Aliamonte, Viacom/CBS, November 5, 2020; January 4, 2021, Scott Pelley, CBS News,

reporting crimes committed  by actors Don Johnson and Kevin Costner; January 18, 2021, Scott

Pelley, CBS News; May 19, 2021, Scott Lebar, Sacramento Bee;  June 19, 2021 to Scott Lebar,

13

Sacramento Bee; July 10, 2021, Scott Lebar, Sacramento Bee; 12-20-2021, Scott Pelley, CBS News; 3-3-2022 to Scott Lebar of Sacramento Bee;  June 3, 2021, Scott Lebar, Sacramento Bee; 3-21-2022, Executive Editor, Sacramento Bee;  4-16-2022, Scott Pelley; April 17, 2022, Miles O'Brien; 5-9-2022, Scott Pelley;  July 2, 2022,  Sacramento Bee; 11-14-2022,  Jeanne Meserve, former CNN anchor. Plaintiff believes employees of the USPS stole all of these letters.

36. On March 4, 2021, plaintiff sent e-mails to the following journalists: a) Scott Kraft and Chris Argentieri, Los Angeles Times; b) Cameron Barr, Washington Post; c) Katie Dowd, San Francisco Chronicle. Plaintiff received no responses and believes all e-mails were hacked.

37. On or about March 3, 2022, plaintiff contacted reporter Robert Salonga, with Bay Area News/Mercury news, via telephone.  Plaintiff explained she had a large story involving corruption in both the Gavin Newsom and Joe Biden Administrations. Salonga stated he would not be handling the story, but referred plaintiff to Editor Mike Frankel. Plaintiff sent e-mails to Frankel, which were never answered. On information and belief, plaintiff alleges Frankel may have accepted bribes, not to pursue the story, part of a series of individuals who accepted bribes, demonstrating an open-ended continuity of crime, and the threat of continuing criminal activity.

LETTERS TO POLICE DEPARTMENTS:

38.  December 11, 2021, Chief Brandon Gillespie, Modesto Police Department; Vernon Warnke, Sheriff, Merced County, 3-14-2022. Plaintiff received no response to either of these letters. On Friday, March 11, 2022, Plaintiff made personal visits to these departments, but was unable to talk to anyone who would take a report. One deputy sheriff at the Merced Sheriff's Department refused to do so.

LETTERS TO FORMER PRESIDENTS AND SECRETARY OF STATE HILLARY CLINTON, AND CHESLEY ("SULLY") SULLENBERGER:

39. Beginning in June, 2020, plaintiff wrote the following letters to former presidents, reporting the crimes: June 26, 2020 to Former President Barach Obama; September 10, 2020, Former President Barach Obama; August 20, 2021, Former President Bill Clinton; Former U.S. President Bill Clinton, 10-1-2022; Former President Barach Obama, dated 10-4-2022; Former President Barach Obama, dated 10-6-2022.  All of these letters were stolen.   Plaintiff also wrote to Former Secretary of State Hillary Clinton, mailed via Priority Mail on February 17, 2022. The theft of these letters constitute open-ended criminal activity, with ongoing threats of continued such activity.

40. On August 4, 2021, plaintiff sent a letter to Chesley Sullenberger, c/o his publisher, Harper Collins, in New York. Plaintiff received no response; this letter also became the subject of federal mail theft. Sullenberger, discussed below, can confirm the presence of at least Don Johnson and Harrison Ford in a hospital in Modesto, where Ford, Johnson and Costner held plaintiff as a kidnap victim. Sullenberger himself played no part in the kidnapping.

LETTERS TO ENTERTAINMENT COMMUNITY:

41. On August 26, 2019, plaintiff sent a letter to Dick Cavett, c/o his publisher, Henry Holt Co. Plaintiff received no response, and believes USPS employees stole that letter. Plaintiff tried again to reach Cavett on April 16, 2022; USPS returned this letter as a bad address. At a later time, plaintiff checked the Henry Holt address and found it had changed. On November 14, 2022, plaintiff sent another letter to Cavett c/o his publisher, Henry Holt, and received no reply. Plaintiff sent the November 14, 2022 letter, along with four others, from the Modesto, California

post office discussed infra, and apparently stolen from that post office.

42. On September 3, 2021, plaintiff wrote to Reed Hastings, CEO of Netflix, Lesley Freeman of MGM, and Jeff Shell, CEO of NBC/ Universal, reporting copyright infringement crimes committed during the course of the kidnapping. USPS personnel also stole these letters. On July 25, 2022, in the early afternoon, plaintiff made a personal visit to Netflix in Los Gatos, California, with the intention of hand-delivering a letter to CEO Reed Hastings. Plaintiff told the employees she wanted to report hacking of the Netflix website, through hacking of plaintiff's computer. The firewall of plaintiff's computer had been breached. Employees informed plaintiff Hastings was not in, and "rarely there." Plaintiff sent the letter to Hastings via certified mail, and never received a response. Again, plaintiff believes the USPS stole this letter, never received by Hastings.

43. Beginning on or about January 15, 2022, plaintiff wrote a series of letters to the following: 1) David Rubin, President Academy of Motion Pictures Arts and Sciences; 2) Fran Drescher, President, SAG/AFTRA; and 3) Ron Howard, 2nd V.P., Directors' Guild of America, attempting to report the violent crimes committed by Academy members Johnson, Ford, and Costner. Plaintiff received no response to any of these letters; stolen by USPS employees.

44. On March 7, 2022, plaintiff attempted to mail a series of letters to various police departments, reporting stolen mail, as follows: a) Sal Becerra, Captain, LA County Sheriff's Department, 27050 Agoura Rd., Calabasas CA 91302 (regarding letters of 10-5-2021 and 12-4-2021 to Marcia Clark; b) Mark Stainbrook, Chief of Police, Beverly Hills Police Department, regarding letter of 1-15-2022 to David Rubin of the Academy of Motion Picture Arts and Sciences; and letter of 9-3-2021 to Lesley Freeman, MGM; c) Michael Parish, Cotati Police

16

Department, regarding letter of 2-29-2021 to Animal Legal Defense Fund; d) Michael Moore Chief of Police, LAPD, regarding letters of January 15, 2022 to David Rubin, Academy of Motion Picture Arts and Sciences, Fran Drescher, SAG/AFTRA, and Ron Howard, DGA; e) Michael Moore, Chief of Police, LAPD, regarding letters of October 5, 2021, and December 4, 2021, addressed to Christopher Darden; f) Jamie Fields, Chief of Police, Los Gatos Police Department, regarding letter of 9-3-2021 to Reed Hastings, CEO, Netflix; g) Larry Boone, Chief of Police, Norfolk, VA Police Department, regarding letter of 2-5-2021 to Ingrid Newkirk, President of PETA; h) letter to Robert Jonsen, Chief of Police, regarding letter of 5-21-2021 to David Entwhistle, CEO, Stanford University Medical Center; i) Robert Contee, Chief of Police, Metropolitan Police Department, Washington, D.C., regarding letters of 6-26-2020 and 9-10-2020 to Barach Obama; and letter of January 12, 2022 to Jo Ann Jenkins of AARP, and Asa Hutchison, National Governor's Association; j) letter to William Scott, Chief of Police, San Francisco Police Department, regarding letters of 5-25-2021 to Joshua Adler, M.D., of UCSF, and 8-18-2021 to Mark Laret, M.D., of UCSF. Plaintiff received no responses to any of these letters, which themselves became the subjects of federal mail theft. An extensive pattern of federal mail theft has demonstrated open-ended continuity of crime, and the ongoing threat of continuing criminal activity.

45. On July 27, 2022, plaintiff sent a letter via e-mail to Attorney Tamar Buchakjian, Academy of Motion Pictures Arts and Sciences. Plaintiff never received a response; her e-mail was hacked, and the letter stolen.

46. Plaintiff also attempted contact via U.S. mail with a number of talent agents, including the following: a) 11-20-2019:  Harrison Ford's agents: Mr. Darren Boghosian, Jim Berkus, Tracey

Jacobs, at United Talent Agency, 9336 Civic Center Drive, Beverly Hills CA 90210; b) May 10, 2020: Mr. Robert Redford  (3 different letters sent to three addresses), including Sundance Institute, Park City UT 84068; c) August 11, 2021:Jane Fonda, c/o Mr. Ben Day Creative Artists Agency, 2000 Avenue of the Stars, Los Angeles CA 90067; d) 8-12-2021: Martin Sheen, Estevez Sheen Productions 99 S. Raymond Avenue, Suite 601, Pasadena CA 91105; e) Jeff Bridges, c/o David Schiff; MGMT Entertainment, 9220 Sunset Blvd. Suite 106, West Hollywood CA 90069; f) Beau Bridges c/o Mr. Fred Specktor,  Creative Artists Agency, 2000 Avenue of the Stars, Los Angeles CA 90067; g) August 13, 2021:  Mr. Clint Eastwood Malpaso Entertainment, 4000 Warner Blvd., Bldg. 81, Suite 100 Burbank CA 91522-0811; h) Mr. Tom Hanks, Playtone, PO Box 7340, Santa Monica CA 90406; i) August 13, 2021: Mr. Andy Garcia, CineSon Entertainment, 4519 Varna Avenue, Sherman Oaks CA 91423; Michael Douglas, Producer, Further Films, 62 W. 45th St. Suite 901, New York NY 10036; j) August 14, 2021:  Mr. Jim Carrey, JC 23 Entertainment, 11812 San Vicente Blvd. , Los Angeles CA 90049; Dan Ackroyd, c/o Mr. Fred Specktor, c/o Creative Artists Agency, 2000 Avenue of the Stars, Los Angeles CA 90067; Martin Short, c/o Mr. Marc Gurvitz, Brillstein Entertainment Partners, 9150 Wilshire Blvd., Suite 350, Beverly Hills CA 90210; Steve Martin, c/o Mr. Danny Greenberg, William Morris Endeavor, 9601 Wilshire Blvd., 8th fl. Beverly Hills CA 90210; k) August 16, 2021: William Shatner, c/o Mr. Harry Gold Talent Works, 3500  W. Olive Blvd., Burbank CA 91505; John Goodman, c/o Mr. Bob Gersh,  The Gersh Agency, 9465 Wilshire Blvd. 6th fl., Beverly Hills CA 90212;  Kurt Russell, c/o Mr. Darren Boghosian, Representative, United Talent Agency, 9336 Civic Center Drive, Beverly Hills CA 90210; Nick Nolte, c/o Franklin Latt, CAA, 2000 Avenue of the Stars, Los Angeles, CA 90067; l) August 18, 2021:  Ms. Barbra Streisand,

c/o Mr. Dick Guttman, c/o Guttman Associates, 118 S. Beverly Drive, Beverly Hills CA 90212

47. Plaintiff received no response to any of these letters, and believes USPS employees accepted bribes to steal these letters, committing federal mail theft, and sent them to Costner instead. The extensive federal mail theft, and other crimes, were intended to conceal the true identities of these actors as satanic cult members, and as persons guilty of extended federal racketeering as well as a series of state and federal felonies. The extensive federal mail fraud, sending the letters to Costner instead of to their intended addressees, shows continuing, open-ended criminal activity and continuity, with the threat of continuing criminal activity.

48. On October 17, 2022, plaintiff wrote to Joe Concha of WOR Tonight, New York. Plaintiff received no response, and believes USPS employees stole this letter.

49. On or about November 7, 2022, plaintiff traveled from Sacramento to Los Angeles, and Beverly Bills, California, to hand-deliver letters of that date to the Academy ( David Rubin), SAG/AFTRA (Fran Drescher), and the DGA (Ron Howard). At SAG, a security guard directed plaintiff to a desk behind glass doors, to the left of the entry; she handed the envelope to an employee. At the DGA, plaintiff entered the building and was directed to a security guard sitting at a desk in the middle of the room. He sent her to the mail room in the basement, where she spoke with a Mexican employee, who informed her he could not send Ron Howard mail to his home. Plaintiff assured him the envelope concerned DGA business. At the Academy, plaintiff spoke with a man who stepped out of a locked building. A number of people sat behind a long desk within the building. The man with whom plaintiff spoke placed her envelope on a table, stating someone would pick it up later. In each instance, plaintiff handed her letters in sealed manila envelopes to employees of those businesses. As of the filing of this

litigation, plaintiff has received no response from any of the intended recipients or businesses. Consistent with a pattern of federal mail theft, these individuals accepted bribes, and stole the letters, in lieu of actually delivering the correspondence to their employers. In so doing, they committed commercial bribery under California law. Plaintiff believes they mailed the letters to Costner instead of delivering them to their employers. This also demonstrated an open-ended continuity of continued criminal activity.

50. Plaintiff alleges that each of the employees who took these manila envelopes from her accepted a bribe or bribes from co-conspirators Johnson, Ford and/or Costner, so that knowledge of their satanic cult activities and violent crimes would remain hidden from the Academy, SAG/AFTRA, and or the Directors Guild of America. As of the filing of this litigation, plaintiff has never received a response from any of these businesses. Plaintiff further alleges that each of these employees sent the documents to Costner, using the U.S. mail to do so. On November 8, 2022, plaintiff also attempted an e-mail follow-up with Ron Howard at Imagine Entertainment. She received no response, and believes this e-mail was hacked.

51. In late 2022, Plaintiff also mailed a series of other letters to Fran Drescher, SAG/AFTRA. David Rubin, Academy of Motion Picture Arts and Sciences, and the DGA, and never received responses. All these letters became additional subjects of federal mail theft.

52. On November 14, 2022, plaintiff once again attempted to reach Ron Howard, this time through Imagine Entertainment. Plaintiff took a manila envelope addressed to Ron Howard at Imagine to the Modesto Post Office, Kearny Street, Modesto, along with several other letters, including letters to Jeffrey Baraban and Jeanne Meserve. The USPS returned the Ron Howard letter to plaintiff, crossed out the postage, and covered the address to Howard. Plaintiff retains

this unopened envelope in her possession, deliberately stolen and diverted by postal employees. Instead of returning the letter to Costner, a pattern plaintiff believes has existed for some time, the USPS at that branch sent the Ron Howard letter back to plaintiff. Plaintiff has made no further efforts to send these letters.

53. Plaintiff has made several attempts to report postal theft within the USPS, without success. These letters also became subjects of postal theft. These include correspondence to Louis DeJoy, Postmaster General of the U.S., and Criminal Investigation Service Center, Attention: Mail Fraud; sent via regular mail on 10-1-2022, and a letter to the San Francisco Office of the Inspector General.

54. Plaintiff also attempted to send several letters to foreign addressees, including Amal Clooney in London; the London Police, on March 3, 2022; Liz Truss, then UK Prime Minister, and; Andy Yen, CEO of Proton, in Switzerland; on October 3, 2022, and Philippa Webb, in London, on 10-7-2022. Plaintiff sent all letters from the "Town and Country" post office listed below, and stolen from that post office.

55. Plaintiff cannot use the USPS, because every letter concerning these crimes has been stolen. The postal thefts started in August, 2019, and have continued until the recent past, showing open-ended continuity of criminal activity, with the ongoing threat of additional crime. Plaintiff has visited at least nine (9) different Northern California post offices, with the same results. At least two hundred letters, sent over a three-year period of time, became repeated subjects of federal mail theft. In many instances, plaintiff used certified and priority mail with tracking, and retains records of these mailings, with information as to tracking numbers and postal clerk numbers. Plaintiff visited the following postal locations, with most letters stolen from the "Town

and Country" branch: 1) Town & Country Branch, 2929 Fulton, Avenue, Sacramento CA 95821; 2) Royal Oaks, 2000 Royal Oaks Drive, Sacramento CA 95813-9998; 3) Cernon Branch, 98 Cernon St., Vacaville 95688-9998; 4) Hamilton Branch, 380 Hamilton Avenue, Palo Alto CA 94301-9991;5) Arden Branch, 2801 Arden Way, Sacramento CA 95825-9996; 6) Broadway Branch, 2121 Broadway, Sacramento CA 95818; 7) Modesto Branch, 715 Kearny Avenue, Modesto, CA 95350; 8) Carmichael Branch, 6929 Fair Oak Blvd., Carmichael CA 95608-9998; 9) Fort Bragg, CA branch: 203 N. Franklin St., Fort Bragg CA 95437.

56. Plaintiff's letters to the Internal Revenue Service, Secret Service, Securities & Exchange Commission, and the FDA, sent via US Mail, were never answered. Letters to the IRS included special forms, Form 3949-A, "Information Referral" concerning unreported income. The forms named Kevin Costner, Don Johnson, and Harrison Ford as individuals who paid bribes to the various individuals reported on these forms. Plaintiff attempted to mail these forms twice, most recently on October1, 2022, and never received responses from the IRS.  Plaintiff believes USPS employees stole envelopes containing these forms.  Letters to the Postal Service itself, reporting federal mail theft of correspondence reporting other crimes,  were also never answered, and all of these mailpieces became themselves the subject of federal mail theft.  The theft of letters to federal agencies also demonstrates an open-ended continuity of crime, with the ongoing threat of additional crime.

57. In the recent past, plaintiff also attempted to report federal mail theft using on-line forms. These forms were hacked, and plaintiff has not received a response from USPS officials. On information and belief, plaintiff alleges that and for most of the past three years, Kevin Costner has maintained a constant on-line presence, hacking numerous e-mails and websites, including

22

military websites located within the California, through which plaintiff attempted to send messages. Repeated hacking has prevented plaintiff from using e-mail to communicate, and websites she has used in attempts to communicate have failed to reach their intended recipients. The crimes involving the U.S. mail, e-mail, and website communications demonstrate continued criminal activity, and open-ended continuity, with  threats of continuing criminal activity.

58. On information and belief, plaintiff also alleges Costner is responsible for repeatedly hacking the USPS website, committing the federal crime of computer hacking, making it look as if delivery of mailed letters had actually delivered. Plaintiff has used Priority Mail with tracking on numerous occasions, but has never heard from any of the addressees. Costner may also have hacked the FedEx website, making it appear that deliveries, alleged further infra, were actually made. Plaintiff would describe Costner as a "master hacker" , a skill Costner may have developed as an FBI employee, making Costner and anyone he bribes to join him ongoing threats to individuals and businesses, showing an open-ended continuity of criminal activity.

59.  Defendants, and each of them, together with alleged co-conspirators, also  made plaintiff, a female, a victim of federal hate crimes, as defined under 18 USC 249(a)(2)(A)(ii)(ll).

60. Defendant REGENTS OF UNIVERSITY OF CALIFORNIA is a corporation established under the California Constitution, Article IX, section 9.

61. Defendant DOCTORS MEDICAL CENTER OF MODESTO, INC. is a California corporation, with its principal place of business in Modesto, Stanislaus County, California.

62.  Defendant TENET CALIFORNIA INC. is a Delaware corporation with its principal place of business in Dallas, Texas, and owns DOCTORS MEDICAL CENTER OF MODESTO, INC., and Emanuel Hospital.

63. Defendant STANFORD HEALTH CARE INC. is a nonprofit California Corporation–Public Benefit, with its principal place of business in Stanford, California.

64. Defendant DIGNITY HEALTH MEDICAL FOUNDATION, INC., is a  California corporation with its principal place of business in Rancho Cordova, CA.

65. Defendant PROVIDENCE MEDICAL FOUNDATION, INC., is a California corporation with its principal place of business in Anaheim, CA.

66. Defendant WALMART INC., is a Delaware corporation, with its principal place of business in Bentonville, AR.

67. Defendant CALIFORNIA BOARD OF PHARMACY is a division of the California Department of Consumer Affairs, located in Sacramento, California.

68. Defendant CALIFORNIA PHYSICIANS ASSISTANT BOARD is a division of the Department of Consumer Affairs, located in Sacramento, California.

69. Defendant GAGNON VISION MEDICAL GROUP, INC. dba Valley Eye Care, is a California corporation licensed to do and doing business in Alameda County, California

70. Defendant MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper is a corporation established under the California Constitution, Article IX, section 9.

71. Defendant ANIMAL LEGAL DEFENSE FUND, INC. is a California non-profit corporation with its principal place of business in Cotati, California.

72. Defendant FEDERAL EXPRESS COMPANY INC., aka FED EX, is a Delaware corporation licensed to do and doing business in California, with its principal place of business in Memphis, TN.

73. Defendant CALIFORNIA STATE BOARD OF OPTOMETRY is a division of the

California

74. Defendant THE UPS STORE, INC. is a Delaware corporation licensed to do and doing business in California, with its principal place of business in San Diego County, California.

75. Defendant LOS ANGELES TIMES, a CALIFORNIA TIMES PUBLICATION, is a California newspaper, business form unknown, with its principal place of business in Los Angeles County, California.

76. Defendant LIVERMORE OPTOMETRY, INC., is a California corporation licensed to do and doing business in Alameda County, California.

77. Defendant DENTAL BOARD OF CALIFORNIA is a division of the California Department of Consumer Affairs, located in Sacramento, California.

78. Defendant CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY is a division of the California Department of Consumer Affairs, located in Sacramento, California.

79. Defendant MEDICAL BOARD OF CALIFORNIA is a division of the Department of Consumer Affairs, located in Sacramento, California.

80. Defendant RAY STONE INC. is a California corporation, with its principal place of business in Sacramento County, California.

81. Defendants DOES 1 THROUGH 50 are sued herein under fictitious names. Their true names and capacities are unknown to plaintiff. When their true names and capacities are ascertained, plaintiff will amend this complaint by inserting their true names and capacities herein. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that plaintiff's damages as herein alleged were proximately caused by those defendants.

25

82. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, defendants, and each of them, including Defendant Does 1 through 50, inclusive,  were acting in the scope of their authority as agents, servants, and employees and with the permission and consent of their co-defendants.

83. Plaintiff alleges that the following individuals, among others, acted acted various time as agents on behalf of all of the defendants in this case, and as co-conspirators (hereinafter referred to as "co-conspirators"): Kevin Costner, Don Johnson, Harrison Ford, Spencer Wright, Joseph Gerald Johnson, M.D., Samir Jayraj Seth, M.D., Gina Garcia, Thang-Giang Vu, M.D., Melanie Henry, M.D., Deepali Dhar, M.D., Robert Barandica, M.D.,  Kelly Nicole Roszczynialski, M.D., Nona Zandinejad; Westside Ambulance; Michael Courtney; Clarence Morse; Rebecca Kidwell; ; Pro Transport; CHP Officer Enrique Alvarez, Evelyn Edelmuth, M.D.; Olive del Pilar, M.D.; Manh duc Pham, M.D.; Five Star Registration; Becky Van Riper, D.V.M.; Steitz Towing; Shelby Rivas; Jennifer Amaya, Jennifer Martinez , and "Marty", RAY STONE INC., employee, last name unknown;  California Senator Brian Dahle; Niello Volkswagen,  Pro Transport-1, LLC; CEP America, owned by Vituity; Rash Curtis & Associates; Professional Bureau of Collections of Maryland, Inc.; Lisa A  Travis; Peter C. Zilaff; Shaim Roeub (spelling uncertain); County of Sacramento. Most if not all of these individuals and businesses accepted bribes, paid by "the actors."    Some of the individuals named may have U.S. military affiliations.

FIRST CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : HEALTH CARE FRAUD (18 USC SECTION 1347; MAIL FRAUD (18 USC SECTIONS 1341; 1961; 18 USC section 1029(e)(1); (2)-(3). ACCESS DEVICE FRAUD (18 USC SECTION 1961;18 USC section 1029(e)(1); (2)-(3); BRIBERY (18

26

USC SECTION 1961); California Penal Code section 641.3 (Commercial Bribery); MONEY LAUNDERING (18 USC section 1956; BANK FRAUD 18 USC section 1344

AGAINST DEFENDANT REGENTS OF UNIVERSITY OF CALIFORNIA

84. Plaintiff repeats and realleges paragraphs 1 through 83, inclusive, and incorporates same by reference, as though set forth in full herein.

85. This cause of action asserts claims against defendants for violations of 18 USC section 1962[c] for conducting the affairs of the "Health Care Fraud Enterprise" through a pattern of racketeering activity. Plaintiff alleges a continuing conspiracy between and among all of the defendants, commencing in or about July, 2014, and continuing into 2023.

PATTERN OF RACKETEERING ACTIVITY:

86. A "racketeering activity" is among other things, any act indictable under 18 USC section 1961, including the following: HEALTH CARE FRAUD (18 USC SECTION 1341; MAIL FRAUD (18 USC SECTIONS 1341; 1961; 18 USC section 1029(e)(1); (2)-(3); WIRE FRAUD; ACCESS DEVICE FRAUD (18 USC SECTION 1961;18 USC section 1029(e)(1); (2)-(3); BRIBERY (18 USC SECTION 1961), based on CALIFORNIA PENAL CODE SECTION 641.3 (Commercial Bribery); MONEY LAUNDERING (18 USC section 1956; BANK FRAUD 18 USC section 1344.

87. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c], and through the misuse of health care insurance funds.

88. The overarching purpose of the "Health Care Fraud Enterprise": to deprive plaintiff of health

27

care, and ultimately cause plaintiff's death, while billing MediCal and Medicare, along with

plaintiff, for services purportedly rendered, using plaintiff's MediCal and Medicare benefits for

procedures and tests never performed, and, in each instance, never providing either accurate

diagnoses, or any treatment, and to render plaintiff either dead, or permanently disabled.  Plaintiff

alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC

section 1964[d], commencing in or about 2014 and continuing, showing an open-ended

continuity of crime, with ongoing threats of continued criminal activity. Plaintiff suspected the

2014 crimes in or about 2022.  Plaintiff further alleged that the co-conspirators and defendants

herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and

Harrison Ford, as inducements to enter into the "Health Care Fraud Enterprise" described herein.

Plaintiff further alleges that until in or about 2022, plaintiff was unaware of the existence of the

"Health Care Fraud Enterprise", believing instead that she had experienced "bad luck" with

health care providers.

89. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive

plaintiff of medical care and treatment, defendants have engaged in the following pattern of

racketeering activity:

90. In 2014, plaintiff sought medical care from defendant U.S. DAVIS MEDICAL CENTER

(REGENTS OF UNIVERSITY OF CALIFORNIA) Plaintiff had suffered a back injury in 2006,

and suffered permanent disability as a result.  In or about July, 2014, Doctors Joseph Gerald

Johnson, M.D., Samir Jayraj Seth, M.D. at UC DAVIS MEDICAL CENTER allegedly ordered a

magnetic resonance imaging scan (MRI). These doctors assured plaintiff, who still suffered

significant symptoms, that the MRI showed nothing of concern.They diagnosed "lumbar

28

radiculopathy," Matthew Robinsky, M.D., allegedly read the MRI. In reality, these doctors accepted bribes to mislead plaintiff and provide the wrong diagnoses, and no real treatment. On information and belief, plaintiff alleges no MRI was performed at all, pursuant to agreement with bribers.

91. Due to plaintiff's continuing complaints of pain, various treatment options were discussed in a July 2014 report sent to plaintiff. Although plaintiff expressed interested in an epidural injection for treatment of chronic pain and disability, employees in the doctors' offices , and medical records, informed plaintiff of an alleged UC DAVIS office policy requiring a driver to take plaintiff home after the procedure. Although said doctors never discussed this policy with plaintiff at any time, let alone when doctors mentioned various treatment options, UC DAVIS employees and their medical records, still in plaintiff's possession, claimed that the disabling effect of pre-operative or pre-procedure sedation would prevent her from driving, and implied that such sedation was necessary. These doctors accepted bribes to fabricate a reason not to treat plaintiff.

92. UC DAVIS refused to perform an epidural injection because plaintiff did not have a driver to take her home after the procedure was performed, and allegedly could not drive herself due to the effects of pre-procedure sedation. UC DAVIS offered no other treatment alternatives. UC DAVIS MEDICAL CENTER billed MediCal for the MRI, but offered plaintiff no treatment, instead dropping her as a patient in or about August, 2014. The involved doctors accepted bribes to drop plaintiff as a patient, and to pretend to help, but in reality, to fail and refuse to offer, and withdraw, any real medical assistance.

93. On April 25, 2017, plaintiff again sought medical care, this time from UCSF MEDICAL

CENTER (REGENTS OF UNIVERSITY OF CALIFORNIA), seen as a patient in the UCSF MEDICAL CENTER Pain Management Department. At that time, UCSF Pain Management Specialist Melanie Henry, M.D. recommended an epidural spinal injection, assuring plaintiff she would not require pre-procedure sedation, and that plaintiff could drive safely home after the procedure. Henry recommended a particular type of injection, later changed to a different procedure, without any discussion with plaintiff.

94. During the course of plaintiff's office visit at UCSF, she gave Dr. Henry a diskette containing the MRI purportedly performed at UC DAVIS in 2014. Henry returned the diskette to plaintiff, and it remains in plaintiff's possession. In 2022, plaintiff realized that in 2017, however, desktop computers, then on information and belief in use at UCSF, did not contain a slot for insertion of a three by five diskette, the computer media provided to plaintiff by UC DAVIS. Although documents provided to plaintiff after her initial UCSF visit discussed the ordering of an MRI, Dr. Henry never ordered this scan, instead performing an invasive, dangerous procedure, without a current imaging study. On information and belief, Henry accepted bribes not to provide any accurate diagnosis or treatment to plaintiff, and not to perform an MRI. On information and belief, plaintiff further alleges that Henry accepted bribes to attempt to or actually cause plaintiff permanent paralysis, by performing an invasive spinal procedure without a current imaging study.

95. On May 9, 2017, plaintiff appeared at a scheduled appointment, for an epidural lumbar injection. An unidentified nurse, along with Drs. Henry and Deepali Daar, attended plaintiff's appointment. Although medical records claim otherwise, (these records do not include a consent form) UCSF never gave plaintiff a consent form to sign, and the risks of the procedure never

30

discussed. Dr. Daar performed the procedure. At one point, Henry told Daar, "You're getting too close to the nerve." On information and belief, plaintiff further alleges that Henry and Daar accepted bribes to cause plaintiff permanent paralysis, by performing an invasive spinal procedure without a current imaging study. On further information and belief, although medical records claim doctors injected plaintiff's back with drugs, UCSF doctors used no drugs at all during the purported procedure.

96. Medical records generated in 2021 falsely state the performance of a "c-arm fluoroscopy" during the course of plaintiff's visit, allegedly taking two hours, on the same date as the lumbar epidural injection. Medical records describe the "c-arm fluoroscopy" as a "radiology exam" but the records do not include a radiologist's report, and no one performed a "fluoroscopy" on the date of the epidural injection. The epidural procedure itself, changed from one procedure to another, according to medical records, took thirty minutes or less. Defendant REGENTS (UCSF) billed Medicare for the alleged treatment rendered to plaintiff.

97. In addition, although medical records generated in 2021 claim plaintiff signed a written consent form, UCSF did not include these forms within the medical records, and UCSF employees never gave plaintiff such a form to sign. Instead, doctors involved in this procedure falsely alleged in records that doctors fully discussed all of the risks with plaintiff.

98. The epidural injection immediately failed, and plaintiff's pain and disability remained the same. Henry and Daar knew the treatment would fail, and never obtained an accurate diagnosis, due to the failure to order an MRI. Henry accepted bribes so that plaintiff would end up in the same, or worse condition, possibly permanently paralyzed, without any medical treatment or diagnosis. The actions of Henry and Daar constitute violent crimes committed in aid of

31

racketeering activity, in violation of 18 USC section 1959(a), including attempted maiming. [18 USC section 1959(a)(2), and (b) (1), (2).]

99. Medical records from UCSF also allege that in addition to Dr. Henry,  Thang-Giang Vu, M.D., saw plaintiff on April 25, 2017. In reality, Vu was not present at the time of plaintiff's initial visit on that date, and plaintiff never saw Vu. Plaintiff's appointment was with Melanie Henry, M.D., the only doctor she saw on that day.  Vu was not present at either of plaintiff's visits at UCSF Pain Management Department. Vu was hired at a much later time to prepare false medical records, and accepted bribes to do so.

100. On May 25, 2021, after receiving medical records generated and mailed to her in April, 2021, plaintiff wrote to Joshua Adler, M.D., Executive VP and Chief Clinical Director, UCSF Health, expressing concerns about the contents of the medical records recently sent to her, including the allegation that Vu had been part of plaintiff's appointment. Plaintiff never received a response from Adler, and on information and belief, alleges her letter to him became the subject of federal mail theft, stolen by USPS employees.

101. On August 18, 2021,  plaintiff wrote to Mark Laret, M.D., CEO and President, UCSF Health, in follow up to her letter to Dr. Adler.  Plaintiff has never received a response from either doctor, and on information and belief, alleges US Postal Service employees stole these letters,  to prevent UCSF officials from learning of these crimes.

102. As a direct and proximate result of defendants' illegal conduct as alleged herein, plaintiff suffered damages to her property in that defendants fraudulently billed plaintiff, and plaintiff's Medicare benefits (plaintiff's property), and plaintiff's premiums (also her property) were used to finance access device fraud, and health care fraud, in violation of these statutes, both predicate

acts under RICO. In short, defendants converted plaintiffs' Medicare premiums and benefits into health care fraud and access device fraud.

RICO CONSPIRACY (18 USC SECTION 1962[d])

103. As set forth above, defendants REGENTS OF UNIVERSITY OF CALIFORNIA and the other co-conspirators associated with this enterprise and agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the health care fraud enterprise through a pattern of racketeering activity in violation of 18 USC section 1962[d], and commit violent crimes in aid of racketeering activity, in violation of 18 USC 1959(a).

104. Defendants REGENTS OF UNIVERSITY OF CALIFORNIA (UC DAVIS and UCSF), committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

105. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff was denied, and lost, all benefits billed to and paid from MediCal and Medicare, and the premiums indirectly financed bribery, and other predicate acts, including health care fraud, mail fraud, and access device fraud. Plaintiff received no meaningful medical care, instead placed in medical jeopardy, as a result of the health care fraud and violent crimes, including attempted maiming, committed in aid of racketeering activity enterprise. The medical/health care crimes, actually started in 2006, show an open-ended continuity of crime, continued to the present day, with ongoing threats of continued criminal activity, occurring as recently as February, 2023.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

SECOND CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, WIRE FRAUD, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956; BANK FRAUD (18 USC section 1344.)

AGAINST DEFENDANTS TENET CALIFORNIA, DOCTORS HOSPITAL OF MODESTO INC., RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA,

PATTERN OF RACKETEERING ACTIVITY:

106. Plaintiff repeats and realleges paragraphs 1 through 105 and incorporates same by reference herein, as though set forth in full. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping /Murder for Hire " Enterprise described herein.

107. In July, 2019, plaintiff began experiencing strange symptoms which she could not explain. Plaintiff now attributes her symptoms to poison, placed in drinking water on repeated occasions by Gina Garcia, then the manager of her apartment complex, owned by co-defendant RAY STONE, INC. A co-conspirator or co-conspirators, possibly medical doctors or someone with a military background,  designed a poison, consisting of special drugs, to make plaintiff amenable to brainwashing.

108. In August, 2019, plaintiff took her vehicle to  Niello Volkswagen, Sacramento, CA, for

servicing. Unbeknownst to plaintiff at the time, Niello employees stole plaintiff's vehicle, and took it to a nearby location for modifications,  including, but not limited to, installation of special software or other technical equipment which allowed others to watch plaintiff's activities, to project cartoon-like images from the car windows, and which allowed others to control plaintiff's vehicle, forcing it to stop at a pre-arranged location. When Niello returned plaintiff's vehicle to her on that day, plaintiff did not realize these modifications to the car had taken place. On information and belief, co-conspirators aided Niello in tampering with plaintiff's car, and accepted bribes to do so, part of an ongoing and continued conspiracy, showing an open-ended continuity, with ongoing threats of criminal activity.

KIDNAPPING:

109.  On the morning of August 30, 2019, plaintiff heard voices outside stating, "This is the FBI. Get ready to leave in fifteen minutes." Plaintiff heard the same message at least twice more, and then told to leave her apartment with only her pets. Plaintiff left with her two pets, small rabbits, in pet carriers. Her cat, whom she could not find, stayed in the apartment.

110. Plaintiff ended up driving all day, entering the Central Valley on what she believes was Highway 99. After nightfall, she heard a strange sound and her car suddenly stopped running on the side of the road. She tried to call for help, but her cellular phone wouldn't work; she couldn't reach anyone.  As she stepped out of her car, a CHP officer approached her, and told her she seemed not in control of her faculties. Plaintiff turned to walk back to her car; then heard someone tell her "Don't turn around; your car is exploding."  Plaintiff saw a small explosion out of the corner of her eye. Someone then rendered plaintiff unconscious.

111.  Her captors transported an unconscious plaintiff, who next remembers stepping out of the back of a van. Someone , apparently a CHP officer stated, "You've been altered." Plaintiff heard someone else say, "Get those rabbits."   Between the time plaintiff heard "Don't turn around", until the time she heard "You've been altered," someone rendered her unconscious.

112. After stepping out of the van, someone again rendered plaintiff unconscious. Her captors then transported plaintiff again, while unconscious. Plaintiff next remembers laying on a gurney, while she wore a hospital gown, which someone put her in while unconscious. Plaintiff believes her kidnappers transported her to a private home.

113. A man, supposedly a doctor, and on information and belief, Robert Barandica, M.D., stood next to plaintiff as she lay on the gurney and stated, "You look pretty good for someone  thrown out of an airplane." [A scene in the MGM film, "Mulholland Falls", in which the Jennifer Connolly character was killed by being thrown out of an airplane, inspired this comment.] Plaintiff had viewed this film on Netflix in July, 2019, information obtained by co-conspirators via computer hacking.] A few minutes later, a woman glanced at plaintiff's legs and stated, "Looks like we need a rape kit."  After this, her captors again rendered plaintiff unconscious.

114. Plaintiff believes her captors rendered her unconscious, and without clothing, for many hours during the evening and early morning hours of August 30 to August 31, 2019. Plaintiff believes she became an unconscious "centerpiece" of satanic cult activities, throughout the evening and night. Plaintiff also believes a number of people attended these activities. Rendered unconscious during these satanic rituals, plaintiff could not identify her captors, or attackers, a decision deliberately made. Repeated states of unconsciousness, with consciousness for brief periods of time, constitute attempted murders. The uses of drugs to cause these periods of

36

unconscious, and then brief consciousness, constitute deadly activities committed against an

unconscious victim. Plaintiff has no idea who comprised her audience during these activities.

115. Again rendered unconscious, and transported, plaintiff next remembers stepping out of yet

another van, this time from the center of the vehicle. As she stepped out of the vehicle, numerous

people, whom plaintiff cannot identify, surrounded her. Plaintiff entered the back of a building,

[at the time, she didn't know what type of building], while numerous other people held her in a

room for at least twenty to thirty minutes.  During this time, her captors, apparently employees of

a hospital who never identified themselves by name,  subjected her to interrogation. These people

solicited answers from plaintiff, given due to extensive brainwashing committed against plaintiff

as an unconscious, or semi-conscious victim.

116. Her captors then led plaintiff into the next room. To her left, approximately ten feet away,

actor Harrison Ford, wearing a blue headdress, pointed a gun at her from behind a glass door. Her

captors forced plaintiff to obey commands, including a order to stand at a particular place, with

her feet touching objects on the floor, while Ford pointed his gun in her direction.

117. Her captors then placed plaintiff in a room for the night, and gave her no toiletries or other

necessities. Plaintiff's purse had been taken away from her before she entered this alleged

hospital. No doctor ever talked to her.

118. The following day, August 31, 2019, plaintiff was left alone, and again, no one talked to her.

That evening, from her hospital bed, plaintiff recognized famed aviator and aviation hero

Chesley Sullenberger in the hallway, and saw him talking to actor Don Johnson. Plaintiff heard

Sullenberger ask, "Who is she?" Plaintiff then spoke briefly to Sullenberger. Although

Sullenberger witnessed both actors Don Johnson and Harrison Ford in the hallway, Sullenberger

37

played no part in the capture and kidnapping of plaintiff. An employee tried to hide Sullenberg's identity by placing a fan in front of his face. Sullenberger disappeared down the hallway.

119.  On information and belief, Johnson, Ford, Costner, and Sullenberger were taking part at that time in a military-sponsored program, bringing military personnel to this hospital for purported treatment. At the time plaintiff saw Sullenberger, he had brought at least one patient to the hospital. Plaintiff occupied the hospital room previously reserved for that patient. Despite plaintiff's repeated attempts to contact them, the U.S. Military knows nothing about the crimes committed against plaintiff, while the three actors visited the hospital, in part on military business.

120. After actors Don Johnson and Harrison Ford (wearing the same headdress as the previous night) entered her hospital room, neither introduced themselves, nor did they explain their presence. Johnson did most of the talking. Johnson's first words were, "Kevin Costner isn't here tonight."

121.  Johnson then made a series of statements, first informing plaintiff that plaintiff's pets [two pet rabbits] "had been tortured...we were unable to save them."

122. Johnson also made statements which revealed information only available to the Federal Bureau of Investigation, in part concerning plaintiff's application for bar membership in the State of Wyoming, for the February, 1984 bar exam. Implying that plaintiff had actually passed the Exam, Johnson stated plaintiff's Wyoming Bar Exam results "had been suppressed".

123.  Johnson also claimed their physical location as Jackson, Wyoming, on what he called a "hospital ship", and also claimed their location as Harrison Ford's ranch in Wyoming. Johnson misrepresented plaintiff's real location, a hospital in Modesto, California.

124. Johnson also spoke at length about his and Ford's visit to plaintiff's apartment on Friday, August 30, 2019, after plaintiff left. Without plaintiff's knowledge or consent, Gina Garcia, then manager of plaintiff's apartment complex, (owned by defendant RAY STONE, INC.), allowed them entry in plaintiff's absence. Johnson stated he and Ford had taken copyrighted material, consisting of a novel and screenplay, ("the property", or "the intellectual property") both owned by plaintiff, out of her apartment, and consulted a literary agent, whom plaintiff had contacted herself at an earlier time, about selling the property. Johnson stated the literary agent, Paula Munier, of Talcott Notch Agency in Connecticut, had valued the property, at twenty-five million dollars ($25,000,000),  and that the book "would be a runaway best seller." Johnson further claimed  "deals were being made", and "every actor in Hollywood" wanted to play the lead in plaintiff's screenplay.  Johnson and Ford stole these materials from plaintiff's apartment, and never returned them. They also stole flash drives while in plaintiff's apartment. Her captors intended the theft of plaintiff's intellectual property, including flashdrives containing copies of the IP, to prevent plaintiff from selling or producing any of it.

125. Johnson and Ford spent at least twenty minutes in plaintiff's hospital room, never explaining their presence, or their authority within that hospital. Neither was a hospital employee. Johnson falsely represented that plaintiff was there "for rehabilitation" from torture inflicted on her at an earlier time. Aside from crimes committed as alleged in this lawsuit,  plaintiff is unaware of any such "torture".  Johnson also claimed plaintiff might be asked to go on an FBI mission, which could be dangerous, and that she had been on other such missions in the past. This is false. Johnson also falsely stated that plaintiff would have "a rendezvous" with a famous musician, whose name is withheld for privacy reasons. This is also false.

39

126. Johnson also informed plaintiff that "Nona" [Zandinia], a former hairdresser of plaintiff's] thought plaintiff "needed a trim", and, on the previous night, had performed a "bikini wax" on plaintiff (while an unconscious victim.) This connects with the remark, alleged above, to wit, "Looks like we need a rape kit." The woman making this remark intended to inform plaintiff that she, while unconscious, became the victim of rape. Johnson also stated that, although while plaintiff "looked good", she needed to lose weight. "We're your brothers. If we don't tell you, who will?" Johnson said.

127. Standing close to plaintiff, and leering at her, Johnson also stated the ending of the Kevin Costner film, "For Love of the Game", could be digitally altered to change Costner for another man, whose name is withheld, and to change Kelly Preston for plaintiff. This film is a Universal production. This other man is also the person with whom plaintiff would supposedly have a romantic rendezvous while held captive, an absurd idea that mocked the mutual interest between plaintiff and this unidentified man.

128. Johnson also informed plaintiff that Becky Van Riper, D.V.M. waited at Harrison Ford's ranch in Wyoming, and would care for plaintiff's pets, the same pets that Johnson stated had been tortured to death. Van Riper, a veterinarian that plaintiff had consulted about these same rabbits in the past, later claimed she had no contact information for Harrison Ford. Plaintiff's pets have never been returned to plaintiff, and were killed. A few months post-kidnapping, plaintiff received an emailed photograph of one of the pet's carriers, containing a substance that looked like black scrambled eggs. The message sent by this picture: this photograph depicted the animals' remains.

129. After twenty to thirty minutes, Johnson and Ford left her hospital room.

130. On Sunday morning, September 1, 2019,  plaintiff saw Spencer Wright marching outside her hospital window. At the time, the TRO falsely issued against plaintiff by the County of Sacramento remained in effect, requiring her to stay away from Wright. During the course of her hospital stay, a forced incarceration, an unidentified female forcibly injected her in the arm with a clear liquid, describing it as plaintiff's medication.[1]  Plaintiff had repeatedly asked about her medications; this clear liquid, never identified, did not constitute one of them.

131. During the course of her incarceration,  Plaintiff's captors moved her four different times, from one bed to another, without explanation. All of the above crimes constitute violent crimes in aid of racketeering activity, in violation of 18 USC section 1959(a). The food provided to plaintiff tasted awful; plaintiff believes her captors laced the food with poison as a way of continually drugging plaintiff. Employees handed her serving plates with plaintiff's name on them, suggesting that plaintiff got something different from everyone else.

132. On Sunday, September 1, 2019, employees moved plaintiff  into what they described as the "hospital" portion of the building, consisting of numerous beds. No one discussed these moves, or the reasons for them, with plaintiff . An unidentified woman handed plaintiff a document described as "Notification of Certification" purportedly certifying plaintiff as "gravely disabled–plaintiff does not have a safe plan", and falsely describing plaintiff as suffering from "chronic alcoholism". Plaintiff is not an alcoholic and does not imbibe alcohol. This document possibly constituted a last-ditched attempt to justify her incarceration, alleged information never provided to Medicare.

133. Later that day, hospital personnel again moved plaintiff, this time to a room shared by

---

[1]This violates California Welfare & Institutions Code section 5152[c].

41

someone else. After, left alone by staff, and without medication, for the remainder of the Labor Day Holiday week-end, an employee led plaintiff to a meeting with two women in the afternoon of Tuesday, September 3, 2019. At that time, these two women, neither of which identified herself, indicating they would release plaintiff from the hospital. One of the two women, later identified as "Evelyn Edelmuth", allegedly a medical doctor, gave plaintiff two prescriptions for medications plaintiff had never mentioned to her or anyone else. Without plaintiff's knowledge or consent, Edelmuth had obtained prescription information from Manh Duc Pham, M.D., a UC DAVIS doctor plaintiff had consulted in the past, named in the documents Edelmuth provided plaintiff. Medical records obtained from UC DAVIS reflect that hemoglobin test results (ordered by Pham) became part of documents handed to her when plaintiff left the hospital on Tuesday, September 3, 2019. The test results were dated 8-23-2019, just days prior to plaintiff's kidnapping. In addition, documents provided to plaintiff stated she should "follow up" with Pham upon her release from DBHC. Plaintiff never provided Pham's name, or any information, to DBHC. The illegal providing of this information is a crime under 42 USC section 1320d-6 (a)(2), (3). Edelmuth also gave her a post-it with the name and address of a local motel, Red Lion, in Modesto.

134. Plaintiff then met with a female employee in another conference room. At that time, the employee gave plaintiff a number of documents, including a series of blank consent forms, that plaintiff had never signed. (The documents also included pages and pages of discussion about the two prescriptions Edelmuth gave plaintiff. ) With almost no exceptions, the documents given to plaintiff had the name "DOCTORS MEDICAL CENTER OF MODESTO" on the top. All documents included the name "Oliv del Pilar, M.D.," as the admitting doctor. Plaintiff never met,

42

and had no contact of any kind, with, del Pilar.

135.  This same employee claimed they were making arrangements for a ride to the local motel. Plaintiff stepped into a jeep outside the hospital. An unknown woman, who never gave plaintiff her name, offered plaintiff a drink consisting of a pink liquid. Plaintiff declined this drink, and believes it contained poison.  Plaintiff believes her captors released her, with the intention of capturing her again, and committed further violent crimes, possibly murder, after the proffered drink rendered her unconscious.

136. After a couple of minutes, plaintiff heard a sound similar to what she heard when her own car stopped running on Friday night, August 30, 2019. Plaintiff told the driver of this vehicle that she wouldn't wait, and stepped out of the car.

137.  Plaintiff made her way to the Modesto Police Department, with the intention of reporting the kidnapping to the police. At the time she arrived, she found the station closed. She spoke to a police officer, occupied with someone else,  and asked about locating her car, left on the freeway; the officer directed her to the CHP.   Due to the medical fraud alleged herein, plaintiff had a physical disability that prevented her from standing on the sidewalk for any lengthy of time to wait for the police officer to become available.

138. After her release from the hospital, and while staying in a motel on the night of September 3, 2019, plaintiff discovered extensive bruising covering her lower arms, as the result of repeated needle sticks on an unconscious victim. These crimes constituted attempted murder, through the use of interstate commerce facilities [forcibly transporting an unconscious plaintiff on repeated occasions] in the commission of murder for hire, in violation of 18 USC section 1958(a).

139. After telephoning the CHP, they stated "Steitz Tow" had her car at a tow yard in Los Banos,

43

California. The following day, Steitz Towing informed her it would cost $1,010.00 to recover her car, consisting of tow and storage fees, for a car towed away from a unconscious victim. At the same time, her captors took her car away from her, and removed her two pets rabbits from the car, and, according to Don Johnson, tortured the animals to death. Plaintiff's pets were never accounted for, nor returned.

140. The next day, plaintiff traveled to Steitz Tow in Los Banos.  Plaintiff told a Steitz Tow employee she wanted to take the car to a dealer for inspection, but he attempted to discourage her from doing so, instead stating the car had run out of gas, describing it as "bone dry", and had run out of gas. Plaintiff had attempted to get gas during the trip on Friday, August 30, 2019, but special effects installed in the car prevented plaintiff from doing so.

141. After returning home on Thursday, September 5, 2019, plaintiff took her rent check to Manager Gina Garcia, who stated, "You're not supposed to have that many pets." In making this statement, Garcia revealed her own involvement in these crimes.  Johnson, Ford, Costner, and other co-conspirators, had stolen and killed plaintiff's pets aduring the course of the kidnapping.

142. Plaintiff also found several notices in the mail, generated by the grand theft of plaintiff's vehicle, illegally towed by Steitz Tow in and to Los Banos, California. The mailpieces included an almost illegible "Notice of Stored Vehicle" prepared by the California Highway Patrol. Plaintiff also received a "Notice of Pending Lien Sale", stating the car would be sold at a lien sale on September 5, 2019. Steitz Tow impounded and stored her car,  at the rate of $60.00 per day. Steitz charged plaintiff for eight days of storage, at $480.00, $460.00 for the tow, and $70.00 for the lien.

143. On September 10, 2019, plaintiff took her car to Niello Volkswagen in Sacramento. Plaintiff

44

did not realize for some time that Niello employees had accepted bribes to modify the car in preparation for a kidnapping, and did not know this when she took the car to Niello on September 10, 2019. Without these modifications, the kidnapping could not have happened in the same way. Thus, Niello played a key role in these crimes. Mechanics tested the car and, according to the invoice, found "multiple faults in the system all pertaining to running out of gas. Cleared the faults and set basic settings to the system. Tested vehicle and found fuel trims returned to normal percentage and is operating as designed at this time." The invoice listed Ronald Stevenson as the service advisor. Niello charged plaintiff $145.00 for this work, which either removed the software previously installed in the car, and/or falsely charged plaintiff for work not needed on the car. If the car did need this work, her kidnappers caused this themselves.

144.  On March 7, 2020, plaintiff reported the kidnapping crimes to then U.S. Attorney General William Barr, and sent a copy of the same letter to Stanislaus County District Attorney Birgit Fladager. Plaintiff sent these letters via certified mail, return receipt requested, and received signed receipts in the mail. Plaintiff never heard from either Barr or Fladager.

145.  Beginning in March, 2020, plaintiff's efforts to report the kidnapping crimes included dozens of letters written to various people, including numerous elected officials: U.S. President Joseph Biden, California Governor Gavin Newsom, and Lt. Governor Eleni Kounlakis. Plaintiff never received a response to any of these letters, and no one has ever investigated these crimes.

146. Because of something plaintiff heard Johnson say during the course of her kidnapping, plaintiff believed the three actors, and Spencer Wright, had military affiliations. Beginning in February, 2021, plaintiff also contacted the U.S. Military at the Pentagon, asking for a determination of military jurisdiction over Don Johnson, Harrison Ford, Kevin Costner, and

45

Spencer Wright, who also appeared outside plaintiff's hospital window during the course of the kidnapping. Plaintiff never received a response to any of these letters, believed stolen by U.S. Postal Service employees. Plaintiff also wrote to Travis AFB, and never heard from them; she believes these letters were also stolen.

147. On information and belief, plaintiff alleges that three of the co-conspirators, Johnson, Ford, and Costner, and possibly Wright, have U.S. military affiliations.  In order to determine their possible jurisdiction, plaintiff's efforts to report the kidnapping crimes included repeated correspondence to the U.S. Military, beginning with a letter dated February 19,  2021 to James McConville, Chief of Staff, U.S. Army Pentagon. Plaintiff also sent a copy of this letter  to President Biden. Plaintiff received no response.

148. Over a period of approximately two years, plaintiff also sent a series of other letters to all four branches of the U.S. Military at the Pentagon, and received no responses. In June, 2022, in an effort to circumvent federal mail theft,  plaintiff sent five copies of the same letter, from five different locations, to Col. Corey Simmons of Travis Air Force Base.  Plaintiff received no responses, and believes these letters became the subjects of federal mail theft by USPS employees.  Ongoing and extensive federal mail theft again demonstrated an open-ended continuing of crime, with ongoing threats of continuing criminal activity.

149. In June, 2022,  plaintiff attempted a phone follow-up with Travis AFB. Instead of routing plaintiff's call to Simmons or his subordinate, plaintiff's call was diverted to the Public Affairs Department.  Someone named "Heather" claimed letters such as plaintiff's "could take weeks to arrive." This individual never called back, nor did she make any attempt to take a message for Col. Simmons.

150. On June 15, 2022, plaintiff visited two different recruiting stations in the Sacramento Area Personnel, including two women at the U.S. Naval Recruiting office, and two men at the U.S. Air Force refused to accept correspondence from plaintiff that she prepared for the Pentagon, directed to Carlos del Toro of the U.S. Navy and Frank Kendall of the U.S. Air Force.

151. Plaintiff also made extensive efforts to access Travis AFB through other means, but all attempts failed. On information and belief, plaintiff alleges that mail intended for the Pentagon, and Travis AFB, became the subjects of federal mail theft. In addition, the telephone call to Travis AFB, diverted to the "Public Affairs Department", may have been diverted elsewhere, so that plaintiff didn't reaching the Base at all.

RICO CONSPIRACY (18 USC SECTION 1962[d])

152. As set forth above, defendants TENET CALIFORNIA, DOCTORS MEDICAL CENTER OF MODESTO INC., RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the "health care fraud" and "kidnapping/murder" enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d], and agreed to commit health care fraud, murder for hire or attempted murder for hire, in violation of 18 USC section 1958, and commit violent crimes in aid of racketeering activities, in violation of 18 USC section 1959.

153. Defendants TENET CALIFORNIA, DOCTORS MEDICAL CENTER OF MODESTO INC., RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, and co-conspirators committed and caused to be committed a series of overt acts in furtherance of the

conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

154. As a proximate result of defendants' and co-conspirators' violations of 18 USC section 1962[d], defendants fraudulently billed Medicare (plaintiff's property), and plaintiff. In addition, Medicare premiums indirectly financed bribery, and other predicate acts, including kidnapping, health care fraud and access device fraud. Extensive bribery also showed an open ended continuity of crime, with the ongoing threat of continuing criminal activity.

155. As a further direct and proximate result of the conspiracy, her captors stole plaintiff's personal property, including her pets, her vehicle, a 2019 Volkswagen Jetta, and copyrighted materials, consisted of a novel and a screenplay, valued at $25,000,000.00 (twenty-five million dollars.)

156. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

THIRD CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]): BRIBERY, ACCESS DEVICE FRAUD, WIRE FRAUD, MAIL FRAUD, MONEY LAUNDERING (18 USC section 1956); BANK FRAUD (18 USC section 1344); KIDNAPPING (18 USC 1201)

(AGAINST DEFENDANTS DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA)

157. Plaintiff repeats and realleges paragraphs 1 through 156 and incorporates same by reference herein, as though set forth in full.

48

According to bills mailed to plaintiff, Pro Transport-1, an ambulance service, purportedly transported plaintiff from Emanuel Hospital, not a legal entity, and apparently unaccredited, to Doctors Behavioral Center, also not a legal entity, on August 31, 2019, after midnight.

162.  Pro Transport-1 billed numerous times for their alleged services. Plaintiff received the following billings via U.S. mail, all of which constituted federal mail fraud: 1) Billing from Pro Transport dated 10-18-2019 in the amount of $2,672.26; 2) Billing from Pro Transport-1 dated 2-5-2020, in the amount of $71. 23; 3) Billing dated 3-9-2020 from Professional Bureau of Collections of Maryland, Inc., a collection agency acting on behalf of Pro Transport-1; and giving an address of PO Box 4157, Greenwood CO 80155. Plaintiff disputed all of these bills, and  paid none of them.

163. DOCTORS  MEDICAL CENTER OF MODESTO billed Medicare for $11,781.97, covering the alleged service dates of 9-2-2019 to 9-3-2019, and mailed plaintiff a bill with a due date of 11-21-2019.  This bill, which lists plaintiff's social security number (plaintiff never provided this information, stolen from her purse, and constituting access device fraud) includes purported charges for laboratory services in the amount of $2,872.34; $1,364.22 for behavioral social service, $6,453.00 for room and nursing care, and $1,092.51 for pharmacy. Plaintiff never received any of these services at DOCTORS MEDICAL CENTER. DBMC, where plaintiff captors incarcerated her, instead refused to provide her necessary and regular medications during her forced stay. DBMC  would also have no ability to provide ths medication: they are not a medical hospital.

164. This $11,781.97 bill lists insurance as "Medicare Psych." However, DOCTORS MEDICAL CENTER OF MODESTO, which never treated plaintiff, and which plaintiff never visited, is not

a psychiatric facility. Instead, plaintiff 's captors held her as a prisoner in Doctors Behavioral

Health Center (DBHC) in Modesto, an unaccredited facility, from August 30, 2019 to September

3, 2019. The DOCTORS MEDICAL CENTER billing constitutes a fraudulent attempt to collect

for time plaintiff's captors forced her to spend, against her will, at a different facility, and to

finance other racketeering activities, including the commission of violent crimes, in violation of

18 USC section 1959. On information and belief, plaintiff's investigation shows that Doctors

Behavior Health Center is not a legal entity, not an accredited facility, and billed under a *different*

*name*. Medicare denied this billing in its entirety, leaving only plaintiff's deductible, in the

amount of $1,364.00. Plaintiff never paid this money.

165. On October 22, 2019, and November 25, 2019, DOCTORS MEDICAL CENTER sent

plaintiff a bill for her deductible, in the amount of $1,364.00.  DOCTORS sent a third  bill on

December 16, 2019, and a fourth, dated 1-20-2020.  Plaintiff never paid anything on this bill.

These charges constitute access device fraud, since defendants used her social security number

(at that time, no longer used by Medicare) to submit this billing to Medicare, without her

permission, and without medical cause. The use of the U.S. mail to to send fraudulent billings

also constitutes federal mail fraud. All of the fraudulent bills repeatedly mailed to plaintiff show

an open-ended continuity of crime, with ongoing threats of continuing criminal activity,

consisting in part of federal mail fraud.

166. In addition, DOCTORS ignored Medicare requirements for a purported psychiatric stay.

Federal law required DBHC to establish a medical need for psychiatric services in order to

submit billings to Medicare.[2]  DBHC failed to submit such certification, and Medicare denied

---

[2] 42 USC section 1395f(a), (1), (A).

51

their claim in its entirety.  No one provided plaintiff behavioral social services, nor nursing care, neither of which she needed.

167. Aside from the time of her forced entry early Saturday morning, August 31, 2019, during which time DBHC employees harassed and frightened plaintiff, while holding her against her will, at gunpoint, the staff paid little attention to plaintiff. Her captors jailed plaintiff in Doctors Behavioral Health Center, located at 1505 Claus Road, Modesto, California, a different address from DOCTORS MEDICAL CENTER, at 1441 Florida Avenue, Modesto, CA 95350.

168. Medicare requires certification and re-certification by a physician for inpatient psychiatric services to Medicare beneficiaries. A physician must provide the initial certification at the time of admission or as soon thereafter as is reasonable and practicable, documenting that the inpatient psychiatric hospitalization is reasonably and medically necessary for treatment expected to improve the patient's condition, or for a diagnostic study.[3] No doctor ever provided any such certification, and Defendants and co-conspirators billed some charges to Medicare as medical hospitalization, not psychiatric hospitalization, charges. No one hospitalized plaintiff at DOCTORS MEDICAL CENTER, located at a completely different address, and plaintiff has never been in that hospital.  In addition, until the very end of her incarceration in DBHC, she never saw a doctor[4], and observed no doctors in the hospital over that holiday week-end.

169. Under federal Medicare law, " the term "psychiatric hospital" means an institution which 1) is primarily engaged in providing, by or under the supervision of a physician, psychiatric services

---

[3]CMS.gov, "Inpatient Psychiatric Services" (Centers for Medicare & Medicaid Services)

[4]Ms. X now believes that the woman purporting to be a psychiatrist, Evelyn Edelmuth, was not a medical doctor at all.

for the diagnosis and treatment of mentally ill persons; and ...[3] maintains clinical records on all patients and maintains such records as the Secretary finds to be necessary to determine the degree and intensity of the treatment provided to individuals entitled to hospital insurance benefits under Part A..."[5]

170. Although DBHC sent a hospital bill to Medicare, billing through DOCTORS MEDICAL CENTER, plaintiff received no psychiatric services, whatsoever, nor did she see any doctors[6], until the very end of her stay. Plaintiff did not need psychiatric services, and her captors used this facility as a place of kidnapping. Further, this facility maintained no clinical records on her stay. This facility did not qualify as a psychiatric hospital under Medicare law, rendering it a jail for her captors' purposes. Submission of medical bills in connection with the kidnapping crimes also constitutes health care fraud, carrying a ten-year sentence.[7]

171. All medical bills submitted to Medicare covering the dates of August 30 to August 31, and September 2 to  September 3, 2019 violated federal law, allowing reimbursement for actual costs only.[8] These facilities incurred no actual costs, because plaintiff never became a patient in these hospitals, nor did any emergency vehicle render services, and co-conspirators submitted fraudulent bills. Her captors used vans, which plaintiff recalls stepping out of, to transport an unconscious plaintiff, in violation of 18 USC section 1958.  Notably, none of the bills include

_____

[5]42 USC section 1395x[c].

[6]Ms. X believes she never saw any doctors at all during her incarceration at this facility, and that Edelmuth was not a medical doctor.

[7]18 USC section 1347(a), (1), (2),

[8]42 USC section 1395x(v)(1)(A).

Sunday, September 1, 2019, although her kidnappers incarcerated plaintiff from early Saturday morning, August 31, 2019, to Tuesday afternoon, September 3, 2019.

172. In addition, Doctors Behavioral Health Center, an unaccredited facility, failed to meet the definition of an acute psychiatric hospital, a health facility with an organized medical staff that is supposed to provide "24-hour inpatient care for persons with mental health disorders...including the following basic services: medical[9], nursing, rehabilitative, pharmacy, and dietary services."[10] During her five-day incarceration, she never saw a doctor. Evelyn Edelmuth, who met with plaintiff just prior to plaintiff's release on the afternoon of Tuesday, September 3, 2019, may not be a medical doctor; the California Medical Board removed Edelmuth's name from their website for some period of time, and then mysteriously added it again.

173. Plaintiff later received a bill from Doctors Behavioral Health Center, not a legal entity, and not an accredited facility, for the purported services of Evelyn Edelmuth, M.D., on September 3, 2019, the day of plaintiff's release. The bill totaled $450.00, with an alleged $175.00 paid by insurance. The mailing of this fraudulent billing constituted federal mail fraud. The bill reflects adjustments in the amount of $229.65. Plaintiff has no record of Medicare paying any part of this bill. The bill, dated October 14, 2019, and mailed to plaintiff, attempted to collect $44.79. Plaintiff denied payment. Edelmuth's billing reflects that, even if she qualified as a medical doctor, she saw plaintiff only once during her incarceration, just before plaintiff's release on the afternoon of September 3, 2019. This one-time visit fails to meet Medicare requirements for this

---

[9]"Medical" is not defined in the Health & Safety Code, but means "of, relating to, or concerned with physicians or the practice of medicine." Merriam Webster Dictionary

[10]California Health & Safety Code section 1250(b)

type of hospitalization.

174. DBHC sent the $44.79 billing to a collection agency, Rash Curtis & Associates, in Vacaville, CA, who mailed plaintiff a bill in the amount of $46.43 (apparently including interest charges) on January 15, 2020. Plaintiff disputed this billing as fraud, and Rash Curtis dropped the bill.

175. On March 13, 2020, Medicare issued a Summary Notice covering the time period of 12-14-2019 to March 13, 2020, reflecting a submission of DOCTORS MEDICAL CENTER billing, in the total amount of $15,918.57. DOCTORS billed for services allegedly provided on August 30, 2019 to August 31, 2019. This notice reflects DOCTORS' address as 825 Delbon Avenue, Turlock CA 95382, actually the street address for Emanuel Hospital, not a legal entity, and unaccredited. Plaintiff was never a patient at Emanuel. The Notice from Medicare reflects charges made for the following alleged services: 1) IV-solutions, $192.67; 2) Insertion of needle into vein for collection of blood sample–$121.15; 3) blood test, comprehensive group of blood chemicals–$1,836.75; 4) testing for presence of drug–$465.14; 5) complete blood cell count–$501.48; 6) manual urinalysis test with examination using microscope–$649.71; 7) hydration infusion into a vein 31 minutes to 1 hour–$2,268.89; 8) Emergency department visit, problem with significant threat to life or function--$9,066.06; 9) non-covered item or service–$193.82; 10) routine electrocardiogram–$622.00. Medicare paid nothing on this billing. The submission of this fraudulent billing constitutes access device fraud.

176. Plaintiff received repeated fraudulent billings, showing an open-ended continuity of crime, including federal mail fraud, mailed to plaintiff from Emanuel Hospital, dated December 3, 2019, and January 2, 2020 in the amount of $4,433.00, for services allegedly rendered from

August 30, 2019 to August 31, 2019. Emanuel, not a legal entity, attempted to collect some money on a claim denied by Medicare. Plaintiff paid nothing on this bill, sent via U.S. mail, *nor did she ever enter this hospital as a patient, or visitor*. The billing reflected a purported "insurance adjustment" of $11,485.57, subtracted from $15,918.57, with an alleged balance of $4,443.00. Medicare paid nothing on this bill.

177.   While allegedly in Emanuel Hospital, Robert Barandica, M.D., briefly met with plaintiff. Plaintiff believes this meeting took place in a private home, not a hospital. Barandica stated, "You look pretty good for someone thrown out of an airplane."   Barandica then billed Medicare for $988.00, charging $940.00 for his alleged examination, described as "Emergency Department High Severity."  This billing, dated May 6, 2020 (some eight months after the kidnapping) came via U. S. Mail (additional federal mail fraud) through CEP America, a company originated by emergency room physicians. CEP is part of "Virtuity", a large health care company. The billing shows Medicare allowed $146.45, leaving a balance of $36.83, which plaintiff never paid. Plaintiff has no record of any billings submitted to Medicare.

178. On June 14, 2021, plaintiff filed a complaint against Emanuel Hospital with the California Department of Public Health in Fresno, California. Plaintiff never received a response;  this letter probably became the subject of federal mail theft.

179.   On July 26, 2021, nearly two years after the kidnapping, Westside Community Ambulance, c/o Quick Med Claims, Pittsburgh, PA, mailed plaintiff a billing in the total amount of $5,876.00, claiming Advanced Life Support ambulances charges in the amount of $3,000.00, ambulance mileage in the amount of $2,576.00, and a night charge in the amount of $300.00. The bill, another count of federal mail fraud, claims a date of service on August 30, 2019. The

56

billing also claims Medicare paid $371.02, and $243.14 as "other payments." Out of a billing

allegedly totalling nearly $6,000.00, Westside sought $169.00 from plaintiff. Plaintiff's Medicare

records show no payments to this business, and Medicare billings submitted after one year

following the alleged services are disallowed. Westside alleged they transported plaintiff to

Emanuel, an unaccredited facility, at plaintiff's request. Plaintiff never made any such request,

and had no communications whatsoever with anyone working for Westside. Westside also falsely

claimed that plaintiff had been a patient at Emanuel in the past.

180. On August 16, 2021, after receiving a series of telephone calls from "Quick Med Claims",

(all federal wire fraud) in Pittsburgh PA, plaintiff filed a complaint with the Pennsylvania

Attorney General. After writing to the Pennsylvania Attorney General, Plaintiff then received two

billings from a collection agency, Credence, in Dallas, TX, dated October 1, 2021 and 11-17-

2021, and all constituting federal mail fraud.  Plaintiff disputed these charges in writing. On

October 12, 2021, plaintiff also reported Credence to the Texas Attorney General, and received

only a form letter in response.

181. As the probable result of bribery, the Pennsylvania AG's office diverted plaintiff's

complaint into a "mediation", without plaintiff's participation. On December 9, 2021, more than

two years post-kidnapping, Westside Ambulance submitted a  report to the AG via facsimile,

(federal wire fraud) detailing alleged events of August 30, 2019. Their "Patient Care Report"

claims they transported plaintiff to Emanuel Hospital in Turlock, California.  Plaintiff was a

"knocked-out victim" most of the evening of Friday, August 30, 2019 to Saturday morning,

August 31, 2019, as alleged in paragraphs 110 through 115, and incorporated herein by reference.

The events as portrayed by Westside did not take place, and Westside submitted false statements

57

via facsimile to the Pennsylvania Attorney General, constituting wire fraud.

182. Plaintiff alleges that Robert Barandica, M.D., who submitted a billing for alleged (and false) emergency care, purported at Emanuel, and possibly other doctors, maintained plaintiff in a mostly unconscious condition during the evening of August 30, 2019 to the early morning hours of August 31, 2019.

183. On the night/early morning of August 30, 2019 to August 31, 2019, Plaintiff specifically recalls three periods of consciousness, the first two very brief: 1) stepping out of a van, when a CHP officer stated, "You've been altered"; 2) while dressed in a hospital gown, lying on a gurney, when Barandica stated, "you look pretty good for someone thrown out of an airplane", and 3) stepping out of the middle of a van, in the back of Doctors Behavioral Center, in the middle of the night, August 31, 2019. A medical doctor would have rendered plaintiff repeatedly unconscious throughout the night. On information and belief, plaintiff alleges an anesthesiologist, such as Doctors Henry, Daar, Sheth, or Johnson, who had committed crimes against plaintiff in the past, may have acted as her attacker or attackers, repeatedly rendering plaintiff unconscious, then waking her, without plaintiff's awareness. Accomplishing these extremely dangerous states, would require considerable expertise, and an anesthesiologist would have had these qualifications, used to commit crime in this case. These physicians may have also ridden in the van which transported plaintiff to Doctors Behavioral Center. Plaintiff alleges that co-conspirators Johnson, Ford, and Costner also occupied the van, along with an unconscious plaintiff.

184. In June, 2022, plaintiff received a Medicare Summary Notice reflecting a re-submission of DOCTORS MEDICAL CENTER billing, in the total amount of $15,918.57. DOCTORS billed

again for services allegedly provided on August 30, 2019 to August 31, 2019. This notice again

reflects DOCTORS' address as 825 Delbon Avenue, Turlock CA 95382, actually the street

address for Emanuel Hospital, not a legal entity. Medicare paid nothing on this billing, which

someone resubmitted without plaintiff's knowledge or consent, again using her Medicare

number. This constitutes further access device fraud.

RICO CONSPIRACY (18 USC SECTION 1962[d])

185. As set forth above, defendants DOCTORS MEDICAL CENTER OF MODESTO, INC., and

TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA,

and the other co-conspirators associated with this enterprise agreed and conspired to violate 18

USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the

conduct of the affairs of the kidnapping/murder and health care fraud enterprises through a

pattern of racketeering activity, in violation of 18 USC section 1962[d].

186.  Defendants DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET

CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA and co-

conspirators committed and caused to be committed a series of overt acts in furtherance of the

conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

187. As a proximate result of defendants' and co-conspirators' violations of 18 USC section

1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and

mailed to plaintiff, and the Medicare premiums indirectly financed bribery, and the other

predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud, access device

fraud, money launder, bank fraud, and violent crimes committed in aid of racketeering in

violation of 18 USC section 1959.  Defendants also stole plaintiff's personal property including

59

her pets, her car, and her intellectual property.

188. As a direct and proximate result of the conspiracy, between and among Defendants DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA and co-conspirators, plaintiff suffered damages, in an amount to be determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages, plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

FOURTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : HEALTH CARE FRAUD (18 USC SECTION 1347; MAIL FRAUD (18 USC SECTIONS 1341; 1961; 18 USC section 1029(e)(1); (2)-(3). ACCESS DEVICE FRAUD (18 USC SECTION 1961;18 USC section 1029(e)(1); (2)-(3); BRIBERY (18 USC SECTION 1961); CA Penal Code § 641.3 (Commercial Bribery): MONEY LAUNDERING 18 USC §1956; BANK FRAUD (18 USC §1344); KIDNAPPING

(AGAINST DEFENDANTS REGENTS OF UNIVERSITY OF CALIFORNIA, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, STANFORD HEALTH CARE)

189. Plaintiff repeats and realleges paragraphs 1 through 188, and incorporates same by reference herein, as though set forth in full.

PATTERN OF RACKETEERING ACTIVITY:

190. On or about March 20, 2020, plaintiff suffered a second severe injury to her lower back. On March 28, 2020, plaintiff sought treatment at the emergency room at STANFORD HEALTH CARE in Palo Alto, California. Plaintiff suffered pain so excruciating she could hardly move. In the Emergency Room, plaintiff purportedly underwent an MRI. Kelly Nicole Roszczynialski,

M.D., diagnosed plaintiff's condition as "lumbar radiculopathy," the same condition allegedly

diagnosed by UC DAVIS and UCSF physicians. No one signed the radiology report, and Kelly

Nicole Roszczynialski, M.D., an emergency medicine physician, is not a radiologist. Upon

leaving the hospital, a hospital employee gave plaintiff a brochure with information about a

"herniated disc." However, Roszczynialski, M.D., had not diagnosed this condition.

191. STANFORD submitted a $25,000 bill to Medicare. Accordingly to their bill, STANFORD

personnel performed the MRI "with and without contrast." No one ever injected plaintiff, awake

and conscious at all times, with contrast dye during the alleged MRI. Out of a $25,000 bill,

STANFORD charged $11,000 for a purported MRI. Medicare paid approximately $1,000.00

toward the entire bill. Although plaintiff suffered excruciating pain, and could barely move,

STANFORD released plaintiff from the hospital without pain medication, and without offering

plaintiff any other services, including consultation with a surgeon, while plaintiff visited the

emergency room.

192. STANFORD billed Medicare for services never rendered to plaintiff, including any type of

magnetic resonance imaging (MRI), committing access device fraud and health care fraud, all

predicate acts under RICO. All of this formed part of the conspiracy to pretend to provide health

care to plaintiff, but to commit fraud, including the failure to perform an MRI, a critical

diagnostic procedure, and the failure to provide accurate diagnoses, and to "dump" plaintiff as a

patient, showing an open-ended continuity of crime, and the ongoing threat of future and

continuing criminal activity.

193. On May 21, 2021, plaintiff wrote to Stanford CEO, David Entwhistle, regarding concerns

about her emergency room visit. She received no response from him, and on information and

belief alleges the letter became another subject of federal mail theft.

194. On September 16, 2021, plaintiff wrote to the following addressees: 1) Joshua Adler, M.D., UCSF; 2) Mark Laret, CEO., UCSF; 3) Rod Hochman, M.D., President and CEO, Providence Medical Foundation, 4) Doug McMillion, CEO, Walmart, Inc., 5) David Entwhistle, CEO, Stanford. These letters listed the following suspects for crimes committed against plaintiff and those businesses 1) Kevin Costner; 2) Don Johnson, 3) Harrison Ford, and 4) Spencer Wright. Plaintiff received no response from any of the addressees, and believes each copy of this letter became the subject of federal mail theft.

195. On July 25, 2022, plaintiff sent a follow-up to David Entwhistle, CEO, Stanford, via certified mail, return receipt requested.  Plaintiff never received a response to this letter, nor did she receive the return receipt in the mail. On information and belief, plaintiff alleges all of these letters also became the subjects of federal mail theft, to prevent corporate officials from learning of these crimes.

196. As a direct and proximate result of defendants' illegal conduct as alleged herein, plaintiff suffered damages to her property in that defendants fraudulently billed plaintiff, and Medicare benefits and Medicare number (plaintiff's property); plaintiff's Medicare premiums (also her property) were used to finance access device fraud, and health care fraud, in violation of these statutes, both predicate acts under RICO. In short, defendants converted plaintiffs' Medicare premiums and benefits into health care fraud and access device fraud. Defendants also stole plaintiff's personal property, including her pets, her car, and intellectual property. Plaintiff has also suffered permanent disability as a result of the "health care fraud and violent crimes in aid of racketeering activity" enterprise.

RICO CONSPIRACY (18 USC SECTION 1962[d])

197. As set forth above, defendants STANFORD HEALTH CARE, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, REGENTS OF UNIVERSITY OF CALIFORNIA, and the other co-conspirators associated with the kidnapping/murder and health care fraud enterprises, agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the kidnapping/murder and health care fraud enterprises through a pattern of racketeering activity, and violent crimes in aid of racketeering actvity, in violation of 18 USC section 1962[d] and 18 USC section 1959(a).

198. Defendants STANFORD HEALTH CARE, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE and co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

199. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff was denied, and lost, all fraudulently billed benefits from Medicare. In addition, plaintiff's Medicare premiums indirectly financed bribery, and other predicate acts, including health care fraud, access device fraud, mail fraud and wire fraud.

200. As a direct and proximate result of the conspiracy, between and among STANFORD HEALTH CARE, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, REGENTS OF UNIVERSITY OF CALIFORNIA, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial.

201. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

FIFTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, MAIL FRAUD, WIRE FRAUD, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319;  MONEY LAUNDERING (18 USC section 1956); BANK FRAUD (18 USC section 1344)

(AGAINST DEFENDANTS DIGNITY HEALTH MEDICAL FOUNDATION, TENET CALIFORNIA, DOCTORS HOSPITAL OF MODESTO, INC., RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE)

202. Plaintiff repeats and realleges paragraphs 1 through 201, and incorporates same by reference herein, as though set forth in full. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Health Care Fraud", and "Kidnapping /Murder for Hire " Enterprises described herein.

203. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c], and through the misuse and theft of health care insurance funds, and

theft of personal and intellectual property.   The overarching purpose of the "Kidnapping/Murder Enterprise", as part of the "Health Insurance Enterprise": to murder plaintiff, and place plaintiff's life in constant jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits for procedures and tests never performed, and services never provided.  Defendants also stole plaintiff's personal property, consisting of her pets, her car, and intellectual property. Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping/Murder Enterprise" and Health Care Fraud Enterprise" described herein.

PATTERN OF RACKETEERING ACTIVITY:

204. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive plaintiff of health care benefits, and health care, defendants have engaged in the following pattern of racketeering activity:

205. As alleged in paragraphs 107 through 139, and incorporated by reference herein, plaintiff was a kidnap victim from August 30, 2019 to September 3, 2019, at an apparently unaccredited facility purportedly part of D  OCTORS MEDICAL CENTER of MODESTO, and owned by TENET CALIFORNIA.

206. On June 18, 2020, plaintiff met with Sidney Supit, M.D.. of Mercy Medical Group in Sacramento, part of DIGNITY HEALTH. Plaintiff had scheduled an appointment to discuss her recent back injury, which occurred in March, 2020.

207. Plaintiff's new patient form indicated her concerns about hypothyrodism, and asked for a possible referral to an endocrinologist. Supit sent her for an x-ray of her back, and ordered blood tests. Plaintiff received a referral to Andrew Linn, a pain management specialist, with whom she met in a virtual visit on June 20, 2020. Linn claims he discussed results of the x-ray with plaintiff; she has no recollection of this discussion. Although Linn discussed an MRI, when she called to schedule it, she was told it would take six weeks to get an appointment. Plaintiff declined to schedule an appointment at that time. *Linn's records do not show an order for an MRI.* No appointment for a MRI with Mercy was ever scheduled.

208. The records sent to plaintiff from Supit's office show a synthetized list of of blood tests purportedly performed. This list was prepared on April 30, 2021, after plaintiff requested records, on April 9, 2021. The blood test results from Quest Labs show high cholesterol values. Although Supit's records show an order for fasting blood sugar test, Quest records show a non-fasting blood sugar glucose test reflecting high blood sugar content.

209. No one  from Supit's office ever contacted plaintiff about blood test results, and there is no indication these test results were ever reviewed by anyone in Supit's office, or anyone else working at Mercy Medical Group.  Plaintiff gave up on Supit and instead schedule a visit with another doctor, Lawrence Cooper M.D in Santa Rosa.

210.  On information and belief, Supit became part of the "Health Care Fraud/attempted murder conspiracy", accepting bribes not to offer any medical care. At a later time, Van Nguyen., a physician's assistant, wrote a number of prescriptions for plaintiff, without any supervision from Supit. Nguyen's name does not appear anywhere in the Mercy Medical Group records. Nguyen accepted bribes to issue these prescriptions.

66

211. Supit's records do not show he ever wrote any prescriptions himself. Instead, a Physician's Assistant, Van Nguyen, issued prescriptions for levothyroxine.

212. In California, a physician's assistant may prescribe drugs under the supervision of a physician.[11] A PA also acts under a "Practice Agreement" which defines the medical services the physician assistant is authorized to perform, as part of an organized health care system.[12]

213. The PA involved in plaintiff's case prescribed medication without supervision by a medical doctor, in violation of the law.[13] In addition, California law requires performance of a medical examination before a PA prescribes medication.[14] Plaintiff never met this physician's assistant, and this PA never performed any examination.

214. Mercy Medical Group billed Medicare for the office visit. Plaintiff got nothing out of this visit, nor was any diagnosis ever rendered by Supit's office.  Records reveal no one reviewed her blood test results, and Mercy's records do not include copies of Quest Lab reports.

215. As a direct and proximate result of defendants' illegal conduct as alleged herein, plaintiff suffered damages to her property in that defendants fraudulently billed  Medicare benefits and Medicare number (plaintiff's property), and plaintiff's premiums (also her property) were used to finance access device fraud, and health care fraud, in violation of these statutes, both predicate act under RICO, instead of medical care. In short, defendants converted plaintiffs' Medicare premiums and benefits into health care fraud and access device fraud. Defendants also stole her

---

[11]B & P section 3502.1[c]

[12]B & P sections 3501(k); 3502.3.

[13]B & P section 3502.1[c].

[14] B & P section 3502(c)(2).

67

personal property, including her pets, her car, flash drives, and intellectual property. These crimes show an open-ended continuity of crime, with ongoing threats of continuing criminal activity. Although not compensable in this litigation, plaintiff has also suffered a serious permanent disability as a result of the "health care fraud and violent crimes in aid of racketeering activity" enterprise.

RICO CONSPIRACY (18 USC SECTION 1962[d])

216. As set forth above, defendant DIGNITY HEALTH  and other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, and violent crimes in aid of racketeering activity, in violation of 18 USC section 1962[d] and 18 USC section 1959(a).

217. Defendants DIGNITY HEALTH, STANFORD HEALTH CARE, TENET CALIFORNIA, RAY STONE INC., DOCTORS MEDICAL CENTER OF MODESTO, REGENTS OF UNIVERSITY OF CALIFORNIA and co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

218. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff was denied, and lost, all fraudulently billed benefits from MediCal and Medicare. In addition, the premiums indirectly financed bribery, and the other predicate acts, including health care fraud and access device fraud.

219. As a direct and proximate result of the conspiracy, between and among Defendant DIGNITY HEALTH, STANFORD HEALTH CARE, TENET CALIFORNIA, RAY STONE

INC., DOCTORS MEDICAL CENTER OF MODESTO, REGENTS OF UNIVERSITY OF

CALIFORNIA, and co-conspirators, plaintiff suffered damages, in an amount to be proven/

determined at the time of trial.

220. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her

damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

SIXTH CAUSE OF ACTION–PROVIDENCE MEDICAL FOUNDATION

CIVIL RICO (18 USC §1964[c])-- BRIBERY, WIRE FRAUD, MAIL FRAUD

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, KIDNAPPING, USE OF

INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE

[18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section

106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY

LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

221.  Plaintiff repeats and realleges paragraphs 1 through 220 and incorporates same by reference

herein, as though set forth in full.

222. During the relevant time periods, defendants and plaintiff were and are each a "person", as

this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a

person injured in her business or property, by reason of a violation of RICO within the meaning

of 18 USC section 1964[c], and through the misuse of health care insurance funds, theft of health

care insurance funds, and theft of personal and intellectual property.  Plaintiff further alleged that

the co-conspirators and defendants herein accepted bribes from other co-conspirators, including

Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping

69

1  Enterprise" described herein

2  PATTERN OF RACKETEERING ACTIVITY:

3
4  223. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive

5  plaintiff of health care benefits, and health care, defendants have engaged in the following pattern

6  of racketeering activity:

7  224. As alleged in paragraphs 107 through 139, and incorporated by reference herein, plaintiff

8  was a kidnap victim from August 30, 2019 to September 3, 2019, at a facility purportedly part of

9  DOCTORS MEDICAL CENTER of MODESTO, and owned by TENET CALIFORNIA.
10
11  225.  As alleged in paragraph 209, incorporated herein by reference, plaintiff gave up on Supit

12  and instead scheduled a visit with another doctor, Lawrence Cooper M.D, a physician employed

13  by St. Joseph Health Medical Group, part of PROVIDENCE MEDICAL FOUNDATION,  in
14
15  Santa Rosa, California, on April 15, 2021.

16  226. At the time of her office visit, Cooper ordered blood tests.  When plaintiff went to Quest

17  Labs for the tests, the lab informed her that Cooper had used codes and diagnoses for two tests,

18  one a test for diabetes, and the other for Vitamin D,  that Medicare would not cover. Plaintiff

19  declined these tests.

20
21  227. On or about April 28, 2021, plaintiff obtained and reviewed the blood test results from

22  Quest Labs. Quest records showed numerous abnormal test results, including high glucose, high

23  cholesterol, high triglycerides, high LDL-Cholesterol, high red blood cell count, high

24  hemoglobin, and high hematocrit. No one from Cooper's office ever contacted plaintiff about

25  these tests results. Plaintiff also had extreme difficulty obtaining thyroid medication prescriptions

26  from Cooper's office, and wrote several letters regarding same.

27

28                                                    70

228. On May 8, 2021, plaintiff wrote to Rod Hochman, CEO of PROVIDENCE, informing him of the problems plaintiff had encountered with Dr. Cooper and St. Joseph Health Medical Group. This letter mentioned plaintiff's problems with obtaining a prescription for levothyroxine, which Cooper had not then provided. Plaintiff never received a response, and believes USPS employees stole the letter to Hochman.

229. On June 19, 2021, plaintiff filed a complaint against St. Joseph Health Medical Group, part of PROVIDENCE HEALTH FOUNDATION, with the Department of Public Health in Santa Rosa, CA. Plaintiff never received a response and believes USPS employees also stole this letter.

230. On June 20, 2021, plaintiff filed a complaint against Cooper with the California Medical Board. As alleged infra, the Board has never ruled on this complaint.

231. As a direct and proximate result of defendants' illegal conduct as alleged herein, plaintiff suffered damages to her property in that defendants fraudulently billed Medicare benefits and Medicare number (plaintiff's property), and plaintiff's premiums (also her property) were used to finance access device fraud, and health care fraud, in violation of these statutes, both predicate act under RICO. In short, defendants converted plaintiffs' Medicare premiums and benefits into health care fraud and access device fraud. Defendants also stole her personal property, including flash drives, intellectual property, pets, and car. Plaintiff has also suffered permanent disability as a result of the "health care fraud and violent crimes in aid of racketeering activity" enterprise.

RICO CONSPIRACY (18 USC SECTION 1962[d])

232. As set forth above, defendant Defendants STANFORD HEALTH CARE, TENET CALIFORNIA, RAY STONE INC., DOCTORS MEDICAL CENTER OF MODESTO, REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, and

71

other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC

section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct

of the affairs of the health care fraud and kidnapping/murder enterprises through a pattern of

racketeering activity, and violent crimes in aid of racketeering actvity, in violation of 18 USC

section 1962[d] and 18 USC section 1959(a).

233. Defendants STANFORD HEALTH CARE,TENET CALIFORNIA, RAY STONE INC.,

DOCTORS MEDICAL CENTER OF MODESTO, REGENTS OF UNIVERSITY OF

CALIFORNIA, DIGNITY HEALTH, PROVIDENCE,  and other co-conspirators associated with

this enterprise committed and caused to be committed a series of overt acts  in furtherance of the

conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

234. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d],

plaintiff was denied, and lost, all fraudulently billed benefits from Medicare. In addition, the

premiums indirectly financed bribery, and the other predicate acts, including health care fraud

and access device fraud.  Defendants also stole plaintiff's personal property, including her car,

her flash drives, her pets, and her intellectual property.

235. As a direct and proximate result of the conspiracy, between and among Defendants

STANFORD HEALTH CARE, DIGNITY, TENET CALIFORNIA, RAY STONE INC.,

DOCTORS MEDICAL CENTER OF MODESTO, REGENTS OF UNIVERSITY OF

CALIFORNIA, DIGNITY HEALTH, PROVIDENCE,  and other co-conspirators associated with

this enterprise,  plaintiff suffered damages, in an amount to be proven/ determined at the time of

trial.

236. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her

72

damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

SEVENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, [Commercial bribery, Penal

Code section 641.3]; KIDNAPPING, MAIL FRAUD, ACCESS DEVICE FRAUD, USE OF

INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE

[18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section

106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319, MONEY

LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

AGAINST DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF

MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY

OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE

237. Plaintiff repeats and realleges paragraphs 1 through 236, inclusive, and incorporates same

by reference, as though set forth in full herein.  Plaintiff further alleged that the co-conspirators

and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don

Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping /Murder for Hire "

and "Health Care Fraud" Enterprises described herein.

238. This cause of action asserts claims against defendants for violations of 18 USC section

1962[c] for conducting the affairs of the "Health Care Fraud Enterprise" and "Kidnapping/

Murder" Enterprise through a pattern of racketeering activity. Plaintiff alleges a continuing

conspiracy between and among all of the defendants,  commencing in or about July, 2014, and

continuing into 2023.

PATTERN OF RACKETEERING ACTIVITY:

239. On December 3, 2020, Walmart Pharmacy on Marconi Avenue in Sacramento, California, by a pharmacist with the initials, "AH", filled a prescription for plaintiff for levothyroxine, a thyroid medication. No refills were given for this prescription, which plaintiff requested from the provider, Sidney Supit, M.D., of Sacramento. A physician's assistant, Van Nguyen, who worked for Supit, authorized the prescription. Plaintiff never had any contact with Nguyen.

240. On March 29, 2021, the pharmacy ("ASC") filled a prescription for the same drug. Again, no refills were given, but Van Nguyen of Supit's office authorized the prescription.

241. On April 15, 2021, plaintiff saw a new doctor, Lawrence Cooper, M.D., of Santa Rosa, California. In a follow up letter to Dr. Cooper, plaintiff requested prescriptions for two medications, including levothyroxine.

242. On May 7, 2021, plaintiff phoned the pharmacy to check on the status of the new prescription for levothyroxine from Dr. Cooper. The pharmacy told plaintiff they had the prescription and would prepare it for pickup.

243. Upon plaintiff's arrival, a clerk in the pharmacy gave plaintiff three small boxes of a medication. The clerk stated they were out of levothyroxine. However, the name of the medication on the boxes was apparently "Erythrox." Plaintiff told the clerk she did not want this and stated she wanted the usual generic for levothryoxine. At the time, plaintiff thought this was a different generic for levothyroxine, which is generic for synthroid. As alleged infra, plaintiff later learned this drug was not a generic for synthroid, but an antibiotic medication, deliberately switched by the pharmacy.

244. The clerk stated he was giving plaintiff the three boxes because they were out of the other

74

medication, which comes in a plastic bottle. Plaintiff stated again she would not accept the three boxes. The pharmacist ,"JT", then told plaintiff he would fill the prescription in the plastic bottle. However, the prescriber for this medication was not Dr. Cooper, but Dr. Supit, who again had a physician's assistant, Van Nguyen, issue the prescription.  Plaintiff did not ask for another prescription from Dr. Supit, but asked specifically about a new prescription from Dr. Cooper. Although plaintiff saw the name of the drug on the three boxes, plaintiff does not know who allegedly prescribed this drug; i.e., whether it was Cooper, or Supit, or Physicians Assistant Van Nguyen.  Plaintiff did not expect another prescription from Dr. Supit, but a new prescription from Cooper.

245. Plaintiff later learned that the drug used may have been erythrox. Plaintiff conducted research and learned  "erythrox" is not a generic for levothyroxine, but a separate medication used for a different purpose. The pharmacy made the switch deliberately, a pharmacy that had filled the same prescription correctly on two prior occasions. Further, despite the clerk's claims that plaintiff take the three small boxes, the pharmacist promptly filled the prescription using the small plastic bottle. The manufacturer of the levothyroxine plaintiff was given on all three occasions is Alvogen.

246. Levothyroxine is an essential medication for thyroid replacement therapy. Plaintiff suffers from hypothryoidism, and without this medication would eventually die. The pharmacy switched the drug intentionally, and had plaintiff agreed to accept it, would have suffered fatal results.

247. Defendant WALMART, INC uses either the U.S. mail or some other means of interstate or foreign commerce to obtain the drugs it sells at their pharmacies. In this case, defendants intended plaintiff to die as a result of the intentional switching of her usual medication,

previously dispensed by this pharmacy.  Through the use of interstate commerce, defendants and each of them planned plaintiff's murder, in violation of 18 USC section 1958(a).

248. The personnel in the WALMART pharmacy, whom plaintiff identified by initials to WALMART herein and the PHARMACY BOARD (as reflected on the prescriptions)  accepted bribes to switch this medication, hoping she would take it. On information and belief, plaintiff alleges WALMART pharmacists, experts in pharmacology, came up with a drug to try to substitute for the levothyroxine they had previously dispensed.

249. On May 10, 2021, plaintiff wrote to Doug McMillon, CEO of Walmart, sending the letter via Priority Mail. Plaintiff received no response from McMillon, but instead got a letter from the WALMART Claims Department, concluding WALMART Pharmacy made no errors.  Plaintiff alleges theft or diversion of the McMillon letter, in violation of postal laws, and someone within the WALMART claims department accepted a bribe or bribes to write a letter denying plaintiff's claim.  Personnel within that department would not have the expertise to analyze a pharmaceutical case.

250. On June 21, 2021, plaintiff filed a complaint with the California Board of Pharmacy. Plaintiff also filed a complaint with the Physicians Assistant Board on the same date. Jessica Cudmore, Pharm.D, an expert with a doctoral degree in pharmacology and an Inspector with the Pharmacy Board,, became involved in the case. She identified two similar drugs: "euthyrox", and "erythrox". Only one, euthrox, is a generic for synthroid. Although Dr. Cudmore correctly identified the problem, Cudmore disappeared from the case.

251. On April 15, 2022, plaintiff received a letter from the California Pharmacy Board closing the case. Joshua Monforte, an "Enforcement Analyst", signed the letter closing the case,

1   allegedly on behalf of Julie Ensel, Chief of Enforcement. On information and belief, plaintiff

2   alleges Monforte and other personnel with the Pharmacy Board accepted bribes not to prosecute

3   this case.

4

5   252. The Physicians' Assistant Board acknowledged plaintiff's complaint, but never ruled on it.

6   <u>RICO CONSPIRACY (18 USC SECTION 1962[d])</u>

7   253. As set forth above, defendants WALMART, DOCTORS MEDICAL CENTER OF

8   MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF

9   CALIFORNIA, STANFORD HEALTH CARE, DIGNITY HEALTH CARE, PROVIDENCE,

10  and other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC

11  section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct

12  of the affairs of the health care fraud and kidnapping/murder enterprises through a pattern of

13  racketeering activity in violation of 18 USC section 1962[d].

14

15  254. Defendants WALMART, DOCTORS MEDICAL CENTER OF MODESTO, TENET

16  CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA,

17  STANFORD HEALTH CARE, DIGNITY HEALTH CARE, PROVIDENCE, and the co-

18  conspirators committed and caused to be committed a series of overt acts in furtherance of the

19  conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

20  255. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d],

21  defendant stole plaintiff's Medicare benefits, submitted fraudulent claims to Medicare; the

22  premiums indirectly financed bribery, and the other predicate acts, including health care fraud,

23  kidnapping, wire fraud, mail fraud, money laundering, bank fraud, and access device fraud.

24  Defendants stole plaintiff's personal property, including her pets, flash drives, car, and

25

26

27

28                                              77

intellectual property. WALMART employees also stole and adulterated plaintiff's prescriptions.

256. As a direct and proximate result of the conspiracy, between and among Defendants WALMART, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, DIGNITY HEALTH CARE, PROVIDENCE, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment against defendants, and each of them, as set forth below.

EIGHTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY [California Penal Code section 641.3 (Commercial Bribery] KIDNAPPING, MAIL FRAUD, WIRE FRAUD, ACCESS DEVICE FRAUD, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

AGAINST CALIFORNIA BOARD OF PHARMACY, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE, STANFORD HEALTH CARE

78

PATTERN OF RACKETEERING ACTIVITY:

257. Plaintiff repeats and realleges paragraphs 1 through 256 and incorporates same by reference herein, as though set forth in full. Plaintiff further alleged that the co-conspirators accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping /Murder for Hire " and "Health Care Fraud" Enterprises described herein.

RICO CONSPIRACY (18 USC SECTION 1962[d])

258. As set forth above, defendants DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, WALMART, PHARMACY BOARD, and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the health care fraud and kidnapping/murder enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d].

259. Defendants DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, DIGNITY HEALTH, PROVIDENCE, WALMART, PHARMACY BOARD and the co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

260. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud,

kidnapping, wire fraud, mail fraud, use of interstate commerce facilities in the commission of murder for hire [18 USC section 1958(a)]; and access device fraud.  Defendants also stole plaintiff's personal property, including her pets, her car, flash drives, and intellectual property. WALMART employees stole and adulterated plaintiff's prescriptions.

261. As a direct and proximate result of the conspiracy, between and among Defendants , DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, DIGNITY HEALTH, PROVIDENCE, WALMART, PHARMACY BOARD,  and co-conspirators, plaintiff suffered damages, in an amount to be determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment against defendants, and each of them, as set forth below.

NINTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY [California Penal Code section 641.3 (Commercial Bribery] KIDNAPPING, MAIL FRAUD, WIRE FRAUD, ACCESS DEVICE FRAUD, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

AGAINST DEFENDANTS CALIFORNIA PHYSICIANS ASSISTANT BOARD,

PHARMACY BOARD, WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE

PATTERN OF RACKETEERING ACTIVITY:

262. Plaintiff repeats and realleges paragraphs 1 through 261 and incorporates same by reference herein, as though set forth in full. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Health Care Fraud", and "Kidnapping /Murder for Hire " Enterprises described herein.

263. On December 3, 2020, Walmart Pharmacy on Marconi Avenue in Sacramento, California filled a prescription by pharmacist "AH", for plaintiff for levothyroxine, a thyroid medication. No refills were given for this prescription, which I requested from the provider, Sidney Supit, M.D., of Mercy Medical Group, Sacramento. Although medical records from Mercy Medical Group do not mention her name at all, a physician's assistant, Van Nguyen, authorized the prescription. Plaintiff never met, and had no contact with, Van Nguyen.

264. On June 21, 2021, plaintiff filed a complaint with the California Board of Pharmacy. Plaintiff also filed a complaint with the Physicians Assistant Board on the same date. The Physicians Assistant Board acknowledged the complaint via a form letters. On and asked for medical authorization forms, which plaintiff had already provided. A "control number" was assigned to the complaint.   On June 29, 2021, Armando E. Melendez, a "customer services analyst" asked for medical authorization, which plaintiff provided when she filed the complaint.  Plaintiff heard nothing further from the Physicians Assistant Board.

265. On April 15, 2022, plaintiff received a letter from the California Pharmacy Board closing the case. The letter closing the case was signed by Joshua Monforte, an "Enforcement Analyst", allegedly on behalf of Julie Ensel, Chief of Enforcement. On information and belief, plaintiff alleges that Monforte and other personnel with the Pharmacy Board, together with personnel from the Physicians Assistant Board, including Armando E. Melendez, accepted bribes not to prosecute this case.

RICO CONSPIRACY (18 USC SECTION 1962[d])

266. As set forth above, defendants CALIFORNIA PHYSICIAN'S ASSISTANT BOARD, CALIFORNIA BOARD OF PHARMACY, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the health care fraud and kidnapping enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d].

267. Defendants CALIFORNIA PHARMACY BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, WALMART, DIGNITY HEALTH, PROVIDENCE, and the co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

268. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud, and access device fraud. Defendants also stole plaintiff's personal property, including prescriptions, flash drives, her pets, her car, and intellectual property.

269. As a direct and proximate result of the conspiracy, between and among Defendants PHYSICIAN'S ASSISTANT BOARD, CALIFORNIA BOARD OF PHARMACY, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment against defendants, and each of them, as set forth below.

TENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY [California Penal Code section 641.3 (Commercial Bribery] KIDNAPPING, MAIL FRAUD, WIRE FRAUD, ACCESS DEVICE FRAUD, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956); BANK FRAUD (18

USC section 1344)

(AGAINST CALIFORNIA DENTAL BOARD, PHYSICIAN'S ASSISTANT BOARD, CALIFORNIA BOARD OF PHARMACY, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE)

270. Plaintiff repeats and realleges paragraphs 1 through 269 and incorporates same by reference herein, as though set forth in full. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping /Murder for Hire " and "Health Care Fraud" Enterprises described herein.

271. This cause of action asserts claims against defendants for violations of 18 USC section 1962[c] for conducting the affairs of the "Kidnapping/Murder for Hire" and "Health Care Fraud" Enterprises, through a pattern of racketeering activity. Plaintiff alleges a continuing conspiracy between and among all of the defendants, commencing in or about July, 2014, and continuing into 2023.

PATTERN OF RACKETEERING ACTIVITY:

272. Plaintiff was under the care of Michael Lai, DDS, in San Ramon, California, for approximately five years. Plaintiff's last visit with Lai took place in or about July, 2019. On information and belief, plaintiff alleges that during the time plaintiff saw Lai, he accepted bribes to conduct purported teeth cleaning himself, instead, deliberately scraping plaque into specified areas in the front teeth, ultimately resulting in severe tooth decay. intended to result in death.

273. In March, 2020, plaintiff suffered a severe back injury which prevented her from seeking outside health care. On September 5, 2020, plaintiff consulted Emil Tanasse D.D.S. , in Sacramento, California. Tanasse purportedly cleaned her teeth, instead again scraping plaque into specified areas, worsening existing dental decay. Tanasse had specific recommendations for several teeth. At the time of this appointment, plaintiff asked how soon the work was needed. He said it could wait.

274. Tanasse deliberately made false recommendations. Plaintiff saw another dentist she had consulted in the past, Neil Green, DDS, who recommended major work including two root canals. One of the root canals failed and the tooth fell out, resulting major work involving placement of a "bridge" in the front teeth. According to Dr. Green, tooth #7 had decay which had calcified and which built up over a period of time.

275. Tanasse failed to recommend what was actually needed. Instead, he minimized the problems with tooth #7 and included recommendations for other teeth. Dr. Green did not recommend any work on those teeth (numbers 5, 6, and 12.)

276. On information and belief, Lai and Tanasse accepted bribes to cause intentional dental harm, with the result that major and extensive restorative work was required. With regard to tooth #11, Green informed plaintiff that the decay was almost to the bone, which would have required major oral surgery and resulted in possible facial disfigurement. Plaintiff was required to undergo bone replacement as part of the dental treatment.

277. On May 24, 2021, plaintiff reported both Emil Tanasse D.D.S. and Michael Lai, D.D.S. to the California Dental Board. The Dental Board acknowledged only the complaint against Lai, assigning it a case number. Plaintiff received several form letters, unsigned, from the Dental

85

Board. Plaintiff never received an acknowledgment of the complaint against Tanasse.

278. On information and belief, plaintiff alleges employees of the Dental Board accepted bribes to "drop" the complaint filed by plaintiff against Lai, not to process the complaint or create a complaint file, against Tanasse, and to "bury" the case so that no Board members ever reviewed either complaint. As of the filing of this complaint, the Dental Board has never ruled on the complaints, and the last correspondence plaintiff received was dated July 13, 2021. Plaintiff also sent supplemental information to the Dental Board on August 18, 2021, never acknowledged by the Board.

279. Tanasse and Lai engaged in a scheme to defraud plaintiff of her money, considered personal property under California law, which plaintiff paid for dental examinations, dental cleanings, and purported treatment, that led to permanent dental damage. Tanasse and Lai deliberately misled plaintiff as to her dental health, engaging in a scheme to defraud plaintiff through imposing fees and charges plaintiff would not otherwise have paid. Rather than take legal action against either Tanasse or Lai, DENTAL BOARD accepted bribes, and acted as co-conspirators in the scheme to defraud.

RICO CONSPIRACY (18 USC SECTION 1962[d])

280. As set forth above, defendants CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE and other co-conspirators associated with this enterprise and agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct

and participate, directly and indirectly, in the conduct of the affairs of the health care fraud and kidnapping/murder enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d], and commit violent crimes in aid of racketeering activity, in violation of 18 USC 1959(a).

281. Defendants CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

282. As a direct and proximate result of the conspiracy, between and among Defendants Defendants CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, and co-conspirators, plaintiff suffered damages, in an amount to be determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

283. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff was denied, and lost, all benefits billed to and paid from MediCal and Medicare, and the premiums indirectly financed bribery, and other predicate acts, including health care fraud,

access device fraud, and kidnapping.  Plaintiff received no health care, and was placed in danger of death, as a result of a murder for hire enterprise, including health care fraud and violent crimes in aid of racketeering activity enterprise. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud,  and access device fraud.  Defendants also stole plaintiff's personal property, including prescriptions, flash drives, her pets, her car, and intellectual property.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

ELEVENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY [California Penal Code section 641.3 (Commercial Bribery] KIDNAPPING, MAIL FRAUD, WIRE FRAUD, ACCESS DEVICE FRAUD, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

AGAINST CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY

88

OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE

284. Plaintiff repeats and realleges paragraphs 1 through 283 and incorporates same by reference herein, as though set forth in full. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping /Murder for Hire " and "Health Care Fraud" Enterprises described herein.

285. This cause of action asserts claims against defendants for violations of 18 USC section 1962[c] for conducting the affairs of the "Kidnapping/Murder for Hire" and "Health Care Fraud" Enterprises, through a pattern of racketeering activity. Plaintiff alleges a continuing conspiracy between and among all of the defendants, commencing in or about July, 2014, and continuing into 2023.

286. On May 26, 2021, plaintiff filed a formal complaint against Nona Zandinejad, a hairdresser who played a key role in the kidnaping of plaintiff. Plaintiff included a detailed statement, as set forth below:

"STATEMENT OF FACTS REGARDING INVOLVEMENT OF NONA ZANDINEJAD IN KIDNAPING PLOT: "This is an abbreviated version of events surrounding a kidnapping plot which occurred over the Labor Day week-end, 2019. The information here concerns beautician Nona Zandinejad's involvement which took place in a medivac van believed to be owned by Pro Transport 1. I have filed the enclosed complaint against them. Nona Zandinejad has a current beautician's license under #490213. On Friday, August 30, 2019, my car stopped "cold" on the I-5 Freeway somewhere in the Modesto, California area. I got out of the car on the side of the road. As I remember it, a police officer approached me and took the position that I was not in control of my faculties. I disagreed but said nothing as it was clear I was in no position to argue.
After being falsely told that my car had exploded, my next memory is finding myself in a medical van. I later realized that while in the van, I had been rendered unconscious the entire time, and brainwashed to make certain statements. In addition, I was subjected to a "bikini wax" performed while I was unconscious. This constitutes a sexual battery in California. I was later told by actor Don Johnson, who was involved in the kidnapping.

that "Nona" had performed the bikini wax in the van.  Johnson also told me that in Nona's opinion, I "needed work." I was unconscious the entire time. In addition, she performed some type of hair styling, all while I was unconscious. Nona was paid by someone, and probably bribed, to perform these illegal and unauthorized services. Nona provided hair styling services for me at two different locations of DiPietro Todd Salon, in Walnut Creek, and San Francisco, California.   She never performed a bikini wax...The bikini wax was performed while I was unconscious and would have involved removal of my underwear and jeans. I don't know who else was in the van when this was done but I believe several people may have witnessed her actions. I never saw Nona but the evidence of the biking wax were red marks on my thighs where pubic hair had been removed.

My two pets, which were in my car, were removed by unknown persons. Upon waking up in the van, I heard someone say, "Get those rabbits." The rabbits were never accounted for, nor returned. I was later told that they had been tortured and killed. Nona may have seen my pets and may have knowledge of what happened to them.

There are other details of the kidnapping which are omitted here. I enclose a copy of my complaint to the Emergency Medical Service Authority.

I never saw Nona and have no knowledge of any other activities in which she might have been involved. However, she is part of a group of people who planned and carried out a kidnapping. All of Nona's activities were illegal and conducted without my authorization or permission."

287. On June 18, 2021, plaintiff received a response from Jennifer Porcalla, of the "Enforcement Division" of the Board of Barbering and Cosmetology. Porcalla informed plaintiff that the Board had no jurisdiction over the complaint, and suggested plaintiff report the matter to the police department. Porcalla took no steps to do this herself, and ignored the serious crimes involved, including kidnapping, probable rape, and animal torture leading to death.

288.  Porcalla misrepresented the authority and jurisdiction of the Board, ignoring the fact that Zandinejad had no esthetician's license, and the fact that Zandinejad acted as a co-conpsirator in a kidnapping. Porcalla also erroneously described Zandinejad as an "esthetician." Zandinejad neither has nor had no such license. Of greater concern, Zandinejad is of Iranian descent, and may not be an American citizen, or possess a green card.

289. On information and belief, Porcalla accepted bribes not to process or prosecute a case

90

1  involving multiple violent crimes. Instead, the BOARD allowed Zandinejad to keep her

2  cosmetologist's license, the only license she had at the time. As of the time of the filing of this

3
4  complaint, Zandinejad had a current cosmetologist's license in the State of California.

5  RICO CONSPIRACY (18 USC SECTION 1962[d])

6  290. As set forth above, defendants CALIFORNIA BOARD OF BARBERING AND

7  COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS

8  ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,

9
10  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY

11  STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,

12  PROVIDENCE, STANFORD HEALTH CARE and other co-conspirators associated with this

13  enterprise and agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct

14
15  and participate, directly and indirectly, in the conduct of the affairs of the health care fraud and

16  kidnapping/murder enterprises through a pattern of racketeering activity in violation of 18 USC

17  section 1962[d], and commit violent crimes in aid of racketeering activity, in violation of 18

18  USC 1959(a).

19  291. Defendants CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY,

20  CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD,

21
22  PHARMACY BOARD, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER

23  OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF

24  UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD

25  HEALTH CARE CALIFORNIA DENTAL BOARD REGENTS OF UNIVERSITY OF

26
27  CALIFORNIA, committed and caused to be committed a series of overt acts in furtherance of the

28  91

conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

292. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff was denied, and lost, all benefits billed to and paid from MediCal and Medicare, and the premiums indirectly financed bribery, and other predicate acts, including health care fraud and access device fraud. Plaintiff received no health care, placed in constant danger of death, as a result of a murder for hire enterprise, including health care fraud and violent crimes in aid of racketeering activity enterprise. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud, bank fraud, money laundering, and access device fraud. Defendants also stole plaintiff's personal property, including prescriptions, flash drives, her pets, her car, and intellectual property.

293. As a direct and proximate result of the conspiracy, between and among Defendants CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, DIGNITY HEALTH, PROVIDENCE, PHARMACY BOARD, PHYSICIANS ASSISTANT BOARD, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment against defendants, and each of them, as set forth

below.

TWELFTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY [California Penal Code section 641.3 (Commercial Bribery] KIDNAPPING, MAIL FRAUD, WIRE FRAUD, ACCESS DEVICE FRAUD, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

AGAINST DEFENDANTS CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD,  PHARMACY BOARD,  WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC.,  REGENTS OF UNIVERSITY OF CALIFORNIA,  STANFORD HEALTH CARE,  DIGNITY HEALTH,  PROVIDENCE

294. Plaintiff repeats and realleges paragraphs 1 through 293, inclusive, and incorporates same by reference, as though set forth in full herein.

295. This cause of action asserts claims against defendants for violations of 18 USC section 1962[c] for conducting the affairs of the "Health Care Fraud Enterprise" and "Kidnapping/Murder Enterprise", through a pattern of racketeering activity. Plaintiff alleges a continuing conspiracy between and among all of the defendants, commencing in or about July, 2014, and continuing into 2023.

PATTERN OF RACKETEERING:

296. On June 20, 2021, plaintiff filed a complaint against Lawrence Cooper, M.D., a physician in Santa Rosa, California, who worked for PROVIDENCE MEDICAL GROUP, with Defendant MEDICAL BOARD OF CALIFORNIA. On June 25, 2021, plaintiff received a letter from the MEDICAL BOARD acknowledging her complaint, and assigning a "control number" of 8002021079137.

297. On August 5, 2021, plaintiff received another letter from the MEDICAL BOARD, informing her the complaint would be forwarded to the Department of Consumer Affairs, Health Quality Investigations Unit, Concord, California, for further investigation. This letter also referenced the same control number.

298. On February 1, 2022, two letters were sent to plaintiff from the Division of Health Quality Investigations Unit in San Bernardino, California. The letters were typed by sender Kathryn Ochi-Norman, and stated, "I am an investigator working on behalf of the Medical Board of California. I would like to speak with you regarding the care you received from Dr. Lawrence Cooper. Please give me a call at _____." The letter failed to reference a case number, but included a business card from Ochi-Norman.

299. In or about March, 2022, Staci Barerra, another investigator from the Division of Health Quality Investigations Unit, this time in Sacramento, contacted plaintiff by making a personal visit to her home., both unscheduled and very intrusive. Plaintiff informed Barerra she had already provided all available information with her original complaint sent to the MEDICAL BOARD.

300. Barerra left a business card on plaintiff's front door, giving an address of 2535 Capitol Oaks

94

Drive, Suite 225, Sacramento CA 95833. After this visit, plaintiff sent an e-mail to the e-mail address listed on the business card for Ochi-Norman. Plaintiff cannot locate this email and believes it was hacked.

301. Thereafter, plaintiff received notification from the State Bar of California that Barerra had filed a complaint against her. Barerra had never been, and has never been, a client of plaintiff's. The alleged complaint with the State Bar failed to include the required form, and instead claimed that plaintiff had filed a frivolous lawsuit with the court at an earlier time. Plaintiff responded to this bogus complaint, by writing to the State Bar. In December, 2022, plaintiff received notification that the State Bar had closed this complaint, concluding it had no merit.

302. The MEDICAL BOARD never assigned a case number to the complaint plaintiff filed against Lawrence Cooper M.D. and contact from Barerra and Ochi-Norman constituted sheer harassment. These representative of the Department of Consumer Affairs never any intention of actually investigating this case; they never assigned a no case number, and in the nineteen months since plaintiff filed the complaint, the MEDICAL BOARD has never ruled on it.

303. Consistent with other conspiracies, these employees accepted bribes, not to investigate the complaint against Cooper, a physician with a previous record of discipline by the BOARD. Since the February 1, 2022 letters sent to plaintiff, she has heard nothing further from the MEDICAL BOARD OF CALIFORNIA, and the Board has never ruled on plaintiff's complaint.

RICO CONSPIRACY (18 USC SECTION 1962[d])

304. As set forth above, defendants CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART,

95

INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE and other co-conspirators associated with this enterprise and agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the health care fraud enterprise through a pattern of racketeering activity in violation of 18 USC section 1962[d], and commit violent crimes in aid of racketeering activity, in violation of 18 USC 1959(a).

305. Defendants CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

306. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff was denied, and lost, all benefits billed to and paid from MediCal and Medicare, and the premiums indirectly financed bribery, and other predicate acts, including health care fraud and access device fraud. Plaintiff received no health care, and was placed in danger of death, as a result of a murder for hire enterprise, including health care fraud and violent crimes in aid of racketeering activity enterprise. Defendants also stole plaintiff's personal property, including prescriptions, flash drives, her pets, her car, and intellectual property.

307. As a direct and proximate result of the conspiracy, between and among Defendants CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment against defendants, and each of them, as set forth below.

THIRTEENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c])-- BRIBERY, WIRE FRAUD, MAIL FRAUD

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956); BANK FRAUD (18 USC section 1344) (AGAINST MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET

CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE)

308. Plaintiff repeats and realleges paragraphs 1 through 307, inclusive, and incorporates same by reference, as though set forth in full herein.

309. This cause of action asserts claims against defendants for violations of 18 USC section 1962[c] for conducting the affairs of the "Health Care Fraud Enterprise" and "Kidnapping/Murder Enterprise" through a pattern of racketeering activity. Plaintiff alleges a continuing conspiracy between and among all of the defendants,  commencing in or about July, 2014, and continuing into 2023, a continuing pattern of organized crime, and open-ended continuity of crime, with the ongoing threat of continuing criminal activity.

310. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Health Care Enterprise" and "Kidnapping /Murder for Hire " Enterprise described herein.

311. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c]. The overarching purpose of the "Kidnapping Enterprise", as part of the "Health Care Fraud Enterprise": to murder plaintiff, and place plaintiff's life in constant jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits for procedures and tests never performed, and services never provided. Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18

98

USC section 1964[d], commencing in or about 2014 and continuing, and suspected by plaintiff in or about 2022.

PATTERN OF RACKETEERING ACTIVITY:

312. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive plaintiff of health care benefits, and health care, and as part of the murder/kidnapping enterprise, defendants have engaged in the following pattern of racketeering activity:

313. As alleged in paragraphs 107 through 139, and incorporated by reference herein, plaintiff was a kidnap victim from August 30, 2019 to September 3, 2019, at a facility purportedly part of DOCTORS MEDICAL CENTER of MODESTO, and owned by TENET CALIFORNIA.

314. On August 4, 2022, plaintiff met with journalist Glen Faison in Fairfield, California, near Travis AFB. Faison is and or was, at all material times alleged herein, a managing editor of The Daily Republic, a newspaper owned by defendant MCNAUGHTON NEWSPAPERS, INC. Plaintiff asked this journalist to contact Travis AFB to report the kidnapping crimes, and gave this journalist a number of documents. Faison stated he would talk to Matt Miller, a reporter, about the story. According to their website, Miller covered Travis AFB, which is why plaintiff contacted this newspaper.

315. Plaintiff first handed Faison a letter addressed to Scott Lebar, Managing Editor of the Sacramento Bee. Plaintiff told Faison she had not been able to reach Lebar. Plaintiff's many attempts to reach Lebar via U.S. mail had failed, the result of numerous counts of federal mail theft.

316. Plaintiff has never heard from Faison, and he never returned the documents she gave him. On information and belief, plaintiff alleged this journalist accepted a bribe, or series of bribes,

99

not to pursue the story. Wire transfers paid the bribes.

317. On information and belief, Faison sent the documents plaintiff gave him to Kevin Costner, via U.S. mail, committing federal mail fraud.

RICO CONSPIRACY (18 USC SECTION 1962[d])

318. As set forth above, defendants MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE, STANFORD HEALTH CARE, and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the kidnapping enterprise through a pattern of racketeering activity in violation of 18 USC section 1962[d], including the acceptance of bribes.

319. Defendants MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE, and co-conspirators committed and caused to be committed a series of overt

100

acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

320. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud, bank fraud, money laundering, and access device fraud. Defendants also stole plaintiff's personal property, including letters and other documents, prescriptions, flash drives, her pets, her car, and intellectual property.

321. As a direct and proximate result of the conspiracy, between and among Defendants MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment against defendants, and each them, as set forth below.

FOURTEENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344) (AGAINST DEFENDANTS ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC.. REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE, STANFORD HEALTH CARE)

322. Plaintiff repeats and realleges paragraphs 1 through 321, inclusive, and incorporates same by reference, as though set forth in full herein.

323. This cause of action asserts claims against defendants for violations of 18 USC section 1962[c] for conducting the affairs of the "Health Care Fraud Enterprise" and "Kidnapping/Murder Enterprise" through a pattern of racketeering activity. Plaintiff alleges a continuing conspiracy between and among all of the defendants,  commencing in or about July, 2014, and continuing into 2023, a continuing pattern of organized crime. and open-ended continuity of crime, with the ongoing threat of continuing criminal activity.

324. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from

102

other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Health Care Fraud" and "Kidnapping /Murder for Hire " enterprises described herein.

325. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c]. The overarching purpose of the "Kidnapping Enterprise", as part of the Health Insurance Enterprise": to murder plaintiff, and place plaintiff's life in constant jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits for procedures and tests never performed, and services never provided. Plaintiff alleges a continuing conspiracy between and among these defendants. pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing into 2023.

PATTERN OF RACKETEERING ACTIVITY:

326. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive plaintiff of health care benefits, and health care, and as part of the murder/kidnapping enterprise, defendants have engaged in the following pattern of racketeering activity:

327. As alleged in paragraphs 107 through 139, and incorporated by reference herein, plaintiff was a kidnap victim from August 30, 2019 to September 3, 2019, at a facility purportedly part of DOCTORS MEDICAL CENTER of MODESTO, and owned by TENET CALIFORNIA.

328. On February 29, 2021, plaintiff sent a letter to Steven Wells, Director, Animal LEGAL DEFENSE FUND, in Cotati, California.  The letter described several animal torture and animal cruelty crimes committed against plaintiff's own pets, two rabbits. Plaintiff send this letter via

103

Priority Mail, with tracking, but received no response.

329. According to actor Don Johnson, plaintiff's two pets had been tortured to death, as part of a kidnapping committed against plaintiff over the Labor Day week-end, August 30, 2019 to September 3, 2019.

330. On August 4, 2022, plaintiff hand-delivered another copy of the February 29, 2021 letter to the ALDF and gave this copy to an employee, Eliot Cirivello. At the same time, plaintiff gave Cirivello a copy of her March 7, 2022 letter to the Cotati Police Department, reporting the apparent theft of the February 29, 2021 letter.

331. Defendant ANIMAL LEGAL DEFENSE FUND is a non-profit California corporation allegedly dedicated to animal rights and animal welfare. Their extensive website includes the following language: "In order to maximize the impact of donations from our supporters, the Animal Legal Defense Fund staff focuses our resources on programs to protect the lives and advance the interests of animals through the legal system."

332. The ALDF website also states: "The Animal Legal Defense Fund's mission is to protect the lives and advance the interests of animals through the legal system. The ALDF accomplishes this mission by filing high impact lawsuits to protect animals from harm, providing free legal assistance and training to prosecutors to assure that animal abusers are held accountable for their crimes, supporting tough animal protection legislation, and providing resources and opportunities to law students and professionals to advance the emerging field of animal law."

333. ALDF actively solicits extensive donations, and on information and belief, has been heavily supported by the "Hollywood" community, including actors and others within the entertainment industry.

334. On behalf of the ALDF, in the recent past, actor Joaquin Phoenix conducted investigations into abuses suffered by farm animals. Phoenix knows nothing about these crimes, which plaintiff repeatedly attempted to report to the Academy, SAG/AFTRA, and the DGA.

335. ALDF's website also touts an "Anti-Cruelty and Environmental Policy", reading in part as follows: "It is the mission of the Animal Legal Defense Fund to protect the lives and advance the interests of animals through the legal sytem...It is our goal through this policy to minimize actual harm done to all animals..."

336. According to the 2021 "Return of Organization Exempt from Income Tax" IRS form, filed in 2022, as appears on their website, the ALDF obtained donations of approximately fourteen million dollars. Executive Director Stephen Wells signed this federal income tax form.

337. Using August 30, 2019 as the date plaintiff's pets were tortured to death, the three-year statute of limitations for animal torture crimes under California Penal Code section 597 ran on August 30, 2019.  Plaintiff's visit to the ALDF in early August of last year took place approximately three weeks before the running of this statute of limitations.

338. Following her in person visit to the ALDF on August 4, 2019, plaintiff heard nothing further from the ALDF. A follow-up letter she sent to them on September 15, 2019 received no response.

339. On information and belief, someone within the ALDF accepted a bribe or bribes not to act on plaintiff's hand-delivered letter. As a result, the California statute of limitations ran on the animal cruelty crimes committed against plaintiff's pets.

340. The ALDF has made ongoing false representations to the public by falsely claiming on its website that it is in the business of protecting animals. Plaintiff's experiences prove otherwise.

By acting against the interests of animals, and failing to take any legal action before the statutes of limitations ran on the animal cruelty crimes committed against plaintiff and her pets, the ALDF has falsely represented that donations are used to advance animal rights.

341. Because plaintiff's letters to California authorities have been ignored, plaintiff has no other recourse in this case except to bring suit against the ALDF and other defendants for civil RICO violations.  The ALDF aided and abetted the killers of plaintiff's pets by failing to take immediate action to prosecute the case.   Plaintiff's pets, her personal property, were deliberately and maliciously tortured and killed by a group of co-conspirators led by actors Johnson, Ford, and Costner.

RICO CONSPIRACY (18 USC SECTION 1962[d])

342. As set forth above, defendants ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE, STANFORD HEALTH CARE),  MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344) and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the murder/kidnapping enterprise through a pattern of racketeering activity in violation of 18 USC section 1962[d], including the acceptance of bribes.

343. Defendants ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE), and co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

344. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d],

As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud,  and access device fraud.  Defendants also stole plaintiff's personal property, including prescriptions, flash drives, her pets, her car, and intellectual property.

345. As a direct and proximate result of the conspiracy, between and among Defendants ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE), and co-

conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment against defendants, and each them, as set forth below.

FIFTEENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319, MONEY LAUNDERING (18 USC section 1956); BANK FRAUD (18 USC section 1344) · (AGAINST DEFENDANTS THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE)

346. Plaintiff repeats and realleges paragraphs 1 through 345, inclusive, and incorporates same by reference, as though set forth in full herein.

347. This cause of action asserts claims against defendants for violations of 18 USC section 1962[c] for conducting the affairs of the "Health Care Fraud Enterprise" and

"Kidnapping/Murder Enterprise" through a pattern of racketeering activity. Plaintiff alleges a continuing conspiracy between and among all of the defendants, commencing in or about July, 2014, and continuing into 2023, a continuing pattern of organized crime, and open-ended continuity of crime, with the ongoing threat of continuing criminal activity.

348. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of violations of RICO within the meaning of 18 USC section 1964[c].

349. The overarching purpose of the "Kidnapping Enterprise", as part of the "Health Care Enterprise": to murder plaintiff, and place plaintiff's life in constant jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits for procedures and tests never performed, and services never provided. Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing until 2023. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping Enterprise" described herein.

PATTERN OF RACKETEERING ACTIVITY:

350. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive plaintiff of health care benefits, and health care, defendants have engaged in the following pattern of racketeering activity:

351. As alleged in paragraphs 107 through 139 plaintiff was a kidnap victim from August 30,

109

2019 to September 3, 2019, at a facility purportedly part of DOCTORS MEDICAL CENTER of MODESTO.

352.  On November 28, 2022, at a UPS STORE located at 3308 El Camino Avenue, #300, Sacramento CA 95821, plaintiff attempted a facsimile transmission to Jon Lawhead, General Manager, WKRC-TV Cincinnati, a CBS affiliate, through a local UPS STORE. Plaintiff had attempted facsimile transmissions from her home, which were jammed. Although the owner of this location of THE UPS STORE represented that the transmission had been successful, the facsimile confirmation showed a diversion to an e-mail address, and plaintiff has never heard from Lawhead or anyone else, including anyone with CBS. On information and belief, plaintiff alleges that the owner of this UPS STORE, located at 3308 El Camino Avenue, Suite 300, Sacramento CA 95821, accepted a bribe or series of bribes to divert the facsimile to an e-mail address, believed to belong to actor Kevin Costner, knowing WKRC Cincinnati would never receive the transmission.

353.  The WKRC fax followed plaintiff's several earlier attempts to reach Lawhead by mail, attempts made because Nick Clooney, father of George Clooney and father-in-law to Amal Clooney, might be able to reach the Clooneys about the kidnapping crimes which plaintiff had attempted to report to Amal Clooney at earlier times.  Plaintiff's investigation showed that Nick Clooney had worked for this CBS affiliate at one time; plaintiff also wanted CBS to investigate the case, and had made numerous attempts to reach them via U.S. mail, without success.

RICO CONSPIRACY (18 USC SECTION 1962[d])

354. As set forth above, defendants  THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA

BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE,  STANFORD HEALTH CARE,  and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the kidnapping enterprise through a pattern of racketeering activity in violation of 18 USC section 1962[d].

355. Defendants  THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE, STANFORD HEALTH CARE, and co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

356. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and other predicate acts, including health care fraud, kidnapping, attempted murder through the use of interstate commerce, wire fraud, mail fraud, access device fraud, bank fraud, and money laundering.

357. As a direct and proximate result of the conspiracy, between and among Defendants THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

SIXTEENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956); BANK FRAUD (18 USC section 1344) (AGAINST DEFENDANTS LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF

MODESTO. INC.. TENET CALIFORNIA.   RAY STONE. INC.. REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE)

358.  Plaintiff repeats and realleges paragraphs 1 through 357 and incorporates same by reference herein, as though set forth in full.

359. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c], and through the misuse of health care insurance funds.  The overarching purpose of the "Kidnapping/Murder Enterprise", as part of the Health Care Fraud Enterprise": to place plaintiff's life in jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits for procedures and tests never performed, and services never provided.  Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing.  Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Health Care Fraud" and "Kidnapping/Murder" Enterprises described herein.

PATTERN OF RACKETEERING ACTIVITY:

360. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive plaintiff of health care benefits, and health care, and subject plaintiff to a kidnapping, defendants have engaged in the following pattern of racketeering activity:

361. As alleged in paragraphs 107 through 139, and incorporated by reference herein, plaintiff

1   was a kidnap victim from August 30, 2019 to September 3, 2019, at a facility purportedly part of

2   DOCTORS MEDICAL CENTER OF MODESTO.

3   362. On October 10, 2022,  plaintiff joined the Sacramento Press Club, also open to members of

4

5   the public, for the purpose of facilitating attempts to meet with members of the press, and ask

6   them to investigate the crimes committed against her. Prior to joining the Press Club, plaintiff

7   made extensive efforts to contact Scott Pelley of CBS News, via U.S. Mail, beginning on March

8   6, 2020. Plaintiff also sent a series of letters to others with CBS News, including anchor Norah

9   O'Donnell, as well as CBS corporate executives, and never got a response. In addition, plaintiff's

10

11   efforts to successfully meet with Glen Faison of the Daily Republic Newspaper had failed.

12   363.  Plaintiff also sent letters to other journalists, including Scott Lebar of the Sacramento Bee,

13   former CNN Anchor Jeanne Meserve, [a former college friend of plaintiff's] and CNN

14   commentator and consultant, journalist Miles O'Brien, but received no responses. Plaintiff

15   alleges all of this correspondence became the subjects of federal mail theft.

16

17   364. In November, 2022, plaintiff received an e-mail informing her of Sacramento Press Club's

18   annual meeting, held at a local bar. Plaintiff received notification of this event as a member of the

19   Club.  Plaintiff hoped to have the opportunity to speak personally with one or more journalists.

20   Plaintiff had already attempted to reach two journalists with the Los Angeles Times via e-mail;

21

22   she believes her e-mails were hacked.

23   365. On March 4, 2021, plaintiff had also sent e-mails to LA TIMES editors Scott Kraft and

24   Chris Argentieri in Los Angeles, and received no response. Again, she believes these e-mails

25   were hacked. Plaintiff also sent e-mails to other journalists, including Cameron Barr at the

26   Washington Post, and Katie Dowd of the San Francisco Chronicle (both sent on 3-4-2021). On

27

28                                          114

October 15, 2022. Plaintiff also sent an e-mail to Sophia Bollag in the Sacramento Bureau of the Chronicle. All e-mails were hacked; plaintiff received no responses.

366.  On December 4, 2022, plaintiff met with Lauren Rosenhall, a journalist then employed as LOS ANGELES TIMES Sacramento Bureau Chief, while Rosenhall attended the annual "mixer". Plaintiff learned about Rosenhall through an on-line seminar offered by the Press Club, presented by Rosenhall and other journalists. Rosenhall acknowledged receiving plaintiff's e-mail, sent to another journalist, and seemed enthusiastic about the story. Rosenhall stated they had responded to plaintiff's e-mail, but plaintiff did not receive this communication.

367. Plaintiff had prepared a lengthy letter to Rosenhall, together with a number of documents. Among other requests, because plaintiff had been unable to do so, plaintiff's cover letter asked this journalist to contact the U.S. Military, and Attorney Jeffrey Baraban. Plaintiff has never heard from this journalist, and documents given to her never returned. On information and belief, plaintiff alleges that this journalist accepted a bribe or series of bribes, not to pursue this story.

368. On information and belief, plaintiff also alleges that the documents given to Rosenhall were in fact returned to co-conspirator Kevin Costner via U.S. mail, as part of an extensive pattern of federal mail fraud. Documents addressed and/or intended for another addressee were redirected to Costner instead.

RICO CONSPIRACY (18 USC SECTION 1962[d])

369. As set forth above,  LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY

BOARD, DEFENDANTS WALMART, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE, and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the health care and kidnapping enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d].

370.  LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE,  and co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

371. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud, money laundering, bank fraud,  and access device fraud. Defendants also stole plaintiff's personal property, including letters and other documents, prescriptions, flash drives, her pets, her car, and intellectual property.

372. As a direct and proximate result of the conspiracy, between and among Defendants LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE;  and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

SEVENTEENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

(AGAINST LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET

117

CALIFORNIA, RAY STONE, INC, REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH, PROVIDENCE, STANFORD HEALTH CARE)

373. Plaintiff repeats and realleges paragraphs 1 through 372 and incorporates same by reference herein, as though set forth in full.

374. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c], and through the misuse of health care insurance funds and theft of personal property including pets, her car, flash drives, and intellectual property.

375. The overarching purpose of the "Kidnapping/Murder Enterprise", as part of the "Health Care Fraud Enterprise": to place plaintiff's life in jeopardy, and ultimately murder plaintiff, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits for procedures and tests never performed, and services never provided. Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping/Murder Enterprise" described herein.

PATTERN OF RACKETEERING ACTIVITY:

376. As alleged in paragraphs 107 through 139, plaintiff was a kidnap victim from August 30, 2019 to September 3, 2019, at a facility purportedly part of Defendant DOCTORS MEDICAL CENTER OF MODESTO.

377. In January, 2023, plaintiff researched the UC Berkeley School of Journalism website, searching for the name of journalist Lowell Bergman.  Plaintiff learned about Bergman via the 1999 film "The Insider", which dramatized Bergman's attempts to air a story involving 'Big Tobacco." At the time, Bergman worked as a producer for CBS 60 Minutes, a television show plaintiff frequently watched.

378. At some point plaintiff learned of Bergman's association with the UC Berkeley School of Journalism. Bergman joined the UC Berkeley School of Journalism as a faculty member in or about 1998, and became the founder of their "Investigative Journalism" program. Bergman is still prominently figured on the school's website, and plaintiff believed he might still be actively teaching at UC Berkeley.  The title of "Distinguished Chair in Investigative Journalism" was bestowed on him by Chicago philanthropists David and Reva Logan.

379. In or about 2015, Bergman vacated this position. At that time, David Barstow, allegedly a four-time Pulitzer Prize winner formerly with the New York Times, assumed the position of Distinguished Chair, again given by David and Reva Logan.  Plaintiff's research also disclosed that David Barstow currently manages the Investigative journalism program, with Bergman apparently still active even though on emeritus status.

380.  Despite plaintiff's extensive attempts, over a period of nearly three years,  to report the violent crimes, all of her efforts failed. She wanted to contact Bergman because of his reputation as an ethical journalist, and because of his previous employment with CBS News. Plaintiff prepared a letter, addressed to Barstow and Bergman, for delivery  to the Investigative Journalism Program. A class in Investigative Journalism, possibly taught by Bergman, was to start on January 18, 2023 at 2:00 p.m.

381. On that date, January 18, 2023, plaintiff traveled to the UC Berkeley, School of Journalism, Investigative Journalism Program, in the hopes of meeting with the head of that program, David Barstow. Plaintiff prepared a letter addressed to both Barstow and Bergman. In this letter, plaintiff again attempted to report the kidnapping and other crimes, with a request that Barstow contact the U.S. Military. Plaintiff arrived early and spoke briefly with a few of the students. She then met briefly with Barstow, who asked her to leave the letter with the front desk, stating he would take a look at it. Plaintiff handed her letter to an employee, who gave it to another employee, "Ayesha." A name plate with this name was placed on the front desk within this building.

382. As of the filing of this complaint, plaintiff has heard nothing from Barstow, nor was the letter she left returned to her. On information and belief, plaintiff alleges Barstow accepted a bribe or series of bribes, not to respond to or help plaintiff, and returned the letter to the briber, Kevin Costner, via U.S. mail,  instead. She has also never heard from Lowell Bergman, and has no way of reaching him.

RICO CONSPIRACY (18 USC SECTION 1962[d])

383. As set forth above, defendants  LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE,

and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the kidnapping/murder and health care fraud enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d].

384. LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE, and the co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

385. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud,  and access device fraud.  Defendants also stole plaintiff's personal property, including letters and other documents, prescriptions, flash drives, her pets, her car, and intellectual property.

386. As a direct and proximate result of the conspiracy, between and among Defendants  LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA

BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE, and co-conspirators, plaintiff suffered damages, in an amount to be determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

EIGHTEENTH CAUSE OF ACTION

FRAUD–SUPPRESSION OF FACT

(AGAINST DEFENDANT GAGNON VISION MEDICAL GROUP, INC.,

dba VALLEY EYE CARE)

387.  Plaintiff repeats and realleges paragraphs 1 through 81, and incorporates same by reference herein, as though set forth in full.

388. Plaintiff is informed and believes that at all times herein mentioned, defendant GAGNON VISION MEDICAL GROUP, dba VALLEY EYE CARE INC. , acted and as agent for co-conspirators Don Johnson, Harrison Ford, and Kevin Costner, and in doing the things hereinafter alleged was acting within the course and scope of said agency and with the permission and knowledge of co-defendant GAGNON VISION MEDICAL GROUP, dba VALLEY EYE CARE INC.

389. At all times herein mentioned, Defendant GAGNON VISION MEDICAL GROUP INC., doing business as Valley Eye Care, was and is a business incorporated in California, and is a

122

business establishment engaged in providing professional vision care including eyeglasses, and contact lenses, and doing business in Livermore and Pleasanton, Alameda County, California.

390.   In 2020,  plaintiff ordered  a replacement contact lens through Gina Trentacosti, O.D., of Valley Eye Care. Plaintiff did not immediately check this lens. When plaintiff finally did so, she discovered  the lens was unwearable.  Because this left plaintiff without a usable spare, she contacted the Livermore office and requested the earliest appointment. Plaintiff was seen by Dr. Trentacosti on Friday, January 14, 2022 at 12:15 p.m. at the Pleasanton office. Plaintiff ordered a replacement contact lens during the course of her visit.

391. At the front desk, plaintiff spoke with a young male, at the #2 position, and asked for the AARP discount, which plaintiff had been given before. This young man stated the discount was no longer being offered. He checked with someone else, and then stated they would give me a $5.00 discount.  He never gave plaintiff a receipt, but charged plaintiff $204.00 for a visit which included a vision exam, a contact lens exam, and a $39.00 fee for special photographs of the eye (in lieu of dilation).

392.  Plaintiff then spoke with the optician, who told plaintiff the lab would send the lens directly to plaintiff, free of charge. Although plaintiff paid $100 in 2020 for a replacement lens, Valley Eye Care charged plaintiff  $165.00 for this lens.

393. The replacement lens was not sent from the lab, but from the Pleasanton location of Valley Eye Care.  When plaintiff received the replacement lens, she noticed the lens was stored in a brown liquid within the case. Plaintiff tried the lens on and found it extremely uncomfortable. She had extreme difficulty removing it. Plaintiff decided to return to the office to talk to Dr. Trentacosti, because of plaintiff's concern that two different contact lenses were unwearable.

Plaintiff had problems with an earlier lens from Trentacosti. Plaintiff has been wearing contact lens since 1965, and had never experienced this type of problem. Plaintiff scheduled an appointment for Friday, January 28, 2022, at 11:00 a.m.

394. After making the appointment, plaintiff contacted Eyemed Vision Care, the company that provides the discount to AARP, who informed her the Pleasanton office of Valley Eye Care was a party to this agreement, under Plan #3209160. Under this plan, there is a $55.00 co-pay for the exam; and a ten percent discount on contact lenses. Plaintiff did not ask about the co-pay for the contact lens exam. Plaintiff was given no receipt for the contact lenses.

395. Upon arrival on Friday, January 28, 2022, Dr. Trentacosti informed plaintiff she wanted to talk to the optician, to get a copy of the contact lens order form. She was gone at least ten minutes. When she returned, without a copy of the contact lens order form, plaintiff had extreme difficulty in her communications with Dr. Trentacosti as plaintiff explained the problem. She tried to get plaintiff to put the defective lens in her eye. Plaintiff did not want to do this, because of extreme difficulty in removal, and extreme discomfort. Plaintiff brought the other lens with her. Trentacosti used optical equipment, not a microscope, to look at the contact lens most recently prescribed. She stated she saw nothing wrong with it. Trentacosti acted angry, annoyed, and as if she did not want to be bothered. She also appeared unfamiliar with the most recent history, and claimed plaintiff had replaced both lenses. Trentacosti made no definite commitment about replacing this lens again, and plaintiff left the lens in the original mailing envelope, with Trentacosti.

396. On January 31, 2022, plaintiff reported the above facts to Michael Gagnon, M.D., and sent a letter to the corporate office for Gagnon Vision Medical Group.

124

397. On February 8, 2022, plaintiff again wrote to Michael Gagnon, M.D. Although she had no discussion with Trentacosti about replacing the lens at the time of plaintiff's office visit of January 28, 2022, Plaintiff received another lens from Valley Eye Care via U.S. mail. Plaintiff did not open the envelope and sent it to Gagnon instead. Plaintiff has never heard from Gagnon.

398. At each of plaintiff's visits to Valley Eye Care, most recently January 14, and January 28, 2022, Trentacosti failed to inform plaintiff and suppressed the fact that Valley Eye Care would not sell plaintiff wearable contact lenses, and that any lens she received would be adulterated. Trentacosti further failed to inform plaintiff and suppressed the fact that any vision prescriptions would not be accurate. These suppressions of fact were made with the intention that plaintiff would order contact lenses from Valley Eye Care which would be unwearable and a danger to the eye, and make the mistake of relying on vision prescriptions from Trentacosti.  Plaintiff had been a patient of Valley Eye Care since 2006, seeing other doctors, and therefore had no way of knowing she would be treated differently, or be sold adulterated lenses.

399. The failures to disclose information and suppressions of information were made with the intent to induce plaintiff to act in the manner herein alleged in reliance thereon.

400. Plaintiff, at the time these failures to disclose and suppressions of fact occurred, and at the time plaintiff took the actions herein alleged, was ignorant of the existence of the facts which defendant suppressed and failed to disclose. If plaintiff had been aware of the existence of these facts not disclosed by defendant, plaintiff would not have, as she did, made an appointment with this practitioner, or relied on VALLEY EYE CARE or in particular, Gina Trentacosti, O.D., for optical or vision care.   Plaintiff had been a patient of this business since 2006, under the care of other practitioners. Plaintiff obtained superb care under these other optometrists,  and had no

125

reason to believe she would receive otherwise from another optometrist in the same practice.

401. As a proximate result of the fraudulent conduct of the defendants as herein alleged, plaintiff has been forced to forego the regular use of contact lenses because of the loss of one of the lenses, and wears the contact lenses for driving only, leaving them off at home, and foregoing all vision correction at home, since she does not have eyeglasses she can wear, and suffers a chronic disability as a result of the failure of GAGNON to provide either a contact lens, or a current and accurate prescription for contact lenses.

402. As a further proximate result of the fraudulent conduct of the defendants as herein alleged, plaintiff has been forced to expend time and energy in an attempt to find another eye care practitioner who can assist plaintiff with her vision care needs. Plaintiff has also been forced to file this lawsuit, since this is part of a pattern of interference with attempts to obtain vision care from a licensed eye care professional, due to the commission of bribery.

403. On October 3, 2022, plaintiff mailed a letter to Robert Califf, M.D., Commissioner, FDA, in Silver Spring, M.D., with a copy also addressed to Hilary Marston, M.D., also of the FDA. This letter did not include plaintiff's e-mail address.   The e-mail concerned the adulterated lens sold by VALLEY EYE CARE.  A contact lens is considered a "medical device", under the supervision of the FDA.

404. On October 14,  2022, plaintiff received an e-mail purportedly from the FDA, suggesting that plaintiff write to someone else within the FDA. On information and belief, plaintiff alleges this e-mail was a forgery, prepared co-conspirators Johnson, and/or Ford, and/or Costner, who used computer hacking to send this e-mail to plaintiff.

405. The actual letter to the FDA may have been stolen from the mailstream, and never received

126

by the FDA. Because plaintiff has been the victim of federal mail theft hundreds of times, she has

no way of contacting the FDA about this critical matter.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set

forth below.

NINETEENTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]; BRIBERY; WIRE FRAUD

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, KIDNAPPING, USE OF

INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE

[18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section

106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319, MONEY

LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

AGAINST DEFENDANT GAGNON VISION MEDICAL GROUP, INC., dba VALLEY EYE

CARE INC. , LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE

FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD,

CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL

BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD,

DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC.,

TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF

CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE.

406.  Plaintiff repeats and realleges paragraphs 1 through 386 and incorporates same by reference

herein, as though set forth in full.

407. During the relevant time periods, defendants and plaintiff were and are each a "person", as

127

this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c], and through the misuse of health care insurance funds.  The overarching purpose of the "Kidnapping Enterprise", as part of the Health Insurance Enterprise": to place plaintiff's life in jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits or her own financial resources for procedures and tests never performed, and services never provided.  Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing, and suspected by plaintiff in or about 2022.  Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping Enterprise" described herein.

PATTERN OF RACKETEERING ACTIVITY:

408. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive plaintiff of health care, and subject plaintiff to kidnapping, defendants have engaged in the following pattern of racketeering activity

409. At all times herein mentioned, Defendant GAGNON VISION MEDICAL GROUP INC., doing business as Valley Eye Care, was and is a business incorporated in California, and is a business establishment engaged in providing professional vision care including eyeglasses, and contact lenses, and doing business in Livermore and Pleasanton, Alameda County, California.

410. In 2020,  plaintiff ordered  a replacement contact lens through Gina Trentacosti, O.D., of Valley Eye Care. Plaintiff did not immediately check this lens. When plaintiff finally did so, she

128

discovered, the lens was unwearable. Because this left plaintiff without a wearable spare, she contacted the Livermore office and requested the earliest appointment. Plaintiff was seen by Dr. Trentacosti on Friday, January 14, 2022 at 12:15 p.m. at the Pleasanton office. Plaintiff ordered a replacement contact lens during the course of her visit.

411. At the front desk, plaintiff spoke with a young male, at the #2 position, and asked for the AARP discount, which plaintiff had been given before. This young man stated the discount was no longer being offered. He checked with someone else, and then stated they would give me a $5.00 discount. He never gave plaintiff a receipt, but charged plaintiff $204.00 for a visit which included a vision exam, a contact lens exam, and a $39.00 fee for special photographs of the eye (in lieu of dilation).

412. Plaintiff then spoke with the optician, who told plaintiff the lab would send the lens directly to plaintiff, free of charge. Although plaintiff paid $100 in 2020 for a replacement lens, Valley Eye Care charged plaintiff $165.00 for this lens.

413. The replacement lens was not sent from the lab, but from the Pleasanton location of Valley Eye Care. When plaintiff received the replacement lens, she noticed the lens was stored in a brown liquid within the case. In plaintiff's experience, contact lenses are stored in clear liquid only. Plaintiff tried the lens on and found it extremely uncomfortable. She had extreme difficulty removing it. Plaintiff decided to return to the office to talk to Dr. Trentacosti, because of plaintiff's concern that two different contact lenses were unwearable. Plaintiff had problems with an earlier lens from Trentacosti. Plaintiff has been wearing contact lens since 1965, and had never experienced this type of problem. Plaintiff scheduled an appointment for Friday, January 28, 2022, at 11:00 a.m.

414. After making the appointment, plaintiff contacted Eyemed Vision Care, the company that provides the discount to AARP, who informed her the Pleasanton office of Valley Eye Care was a party to this agreement, under Plan #3209160. Under this plan, there is a $55.00 co-pay for the exam; and a ten percent discount on contact lenses. Plaintiff did not ask about the co-pay for the contact lens exam.

415. Upon arrival on Friday, January 28, 2022, Dr. Trentacosti informed plaintiff she wanted to talk to the optician, to get a copy of the contact lens order form. She was gone at least ten minutes. When she returned, without a copy of the contact lens order form, plaintiff had extreme difficulty in her communications with Dr. Trentacosti as plaintiff explained the problem. She tried to get plaintiff to put the defective lens in her eye. Plaintiff did not want to do this, because of extreme difficulty in removal, and extreme discomfort. Plaintiff brought the other lens with her. Trentacosti used optical equipment, not a microscope, to look at the contact lens most recently prescribed. She stated she saw nothing wrong with it. Trentacosti acted angry, annoyed, and as if she did not want to be bothered. She also appeared unfamiliar with the most recent history, and claimed plaintiff had replaced both lenses. Trentacosti made no definite commitment about replacing this lens again, and the lens was left in the original mailing envelope, with her.

416. On January 31, 2022, plaintiff reported the above facts in a letter to Michael Gagnon, M.D., sent to the corporate address for Gagnon Vision Medical Group.

417. On February 8, 2022, plaintiff again wrote to Michael Gagnon, M.D. Although there was no discussion with Trentacosti about replacing the lens at the time of plaintiff's office visit of January 28, 2022, Plaintiff had received another lens from Valley Eye Care via U.S. mail. Plaintiff did not open the envelope and sent it to Gagnon instead. Plaintiff has never heard from

130

Gagnon.

418. At each of plaintiff's visits to Valley Eye Care, most recently January 14, and January 28, 2022, Trentacosti failed to inform plaintiff and suppressed the fact that Valley Eye Care would not sell plaintiff wearable contact lenses, and that any lens she received would be adulterated. These suppressions of fact were made with the intention that plaintiff would order contact lenses from Valley Eye Care which would be unwearable and a danger to the eye. Plaintiff had been a patient of Valley Eye Care since 2006, seeing other doctors, and therefore had no way of knowing she would be treated differently, or be sold adulterated lenses.

419. On information and belief, Trentacosti, a licensed optometrist, and other employees of GAGNON, accepted a series of bribes, agreeing to attempt to damage plaintiff's eyesight, through providing adulterated contact lenses, and agreeing not to provide wearable contact lenses. Trentacosti also agreed not to provide accurate vision correction prescriptions.

RICO CONSPIRACY (18 USC SECTION 1962[d])

420. As set forth above, defendants GAGNON VISION MEDICAL GROUP, INC., dba VALLEY EYE CARE INC. , LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE, and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC

section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the health care and kidnapping enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d].

421. Defendants GAGNON VISION MEDICAL GROUP, INC., dba VALLEY EYE CARE INC., LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY, CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD, PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD HEALTH CARE, and the co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

422. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's personal property including flash drives, her pets, her car, and her intellectual property, were stolen, contact lenses and prescriptions were not provided plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and Medicare premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud,  and access device fraud.

423. As a direct and proximate result of the conspiracy, between and among defendants, GAGNON MEDICAL VISION CARE, INC.,  LOS ANGELES TIMES, THE UPS STORE, ANIMAL LEGAL DEFENSE FUND, MCNAUGHTON NEWSPAPERS, INC., CALIFORNIA

MEDICAL BOARD, CALIFORNIA BOARD OF BARBERING AND COSMETOLOGY,

CALIFORNIA DENTAL BOARD, CALIFORNIA PHYSICIANS ASSISTANT BOARD,

PHARMACY BOARD, DEFENDANTS WALMART, INC.,  DOCTORS MEDICAL CENTER

OF MODESTO, INC., TENET CALIFORNIA,   RAY STONE, INC., REGENTS OF

UNIVERSITY OF CALIFORNIA, DIGNITY HEALTH,  PROVIDENCE,  STANFORD

HEALTH CARE, and co-conspirators, plaintiff suffered damages, in an amount to be determined

at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover

threefold her damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

TWENTIETH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, KIDNAPPING, USE OF

INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE

[18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section

106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319,CIVIL RICO-

-CIVIL RICO (18 USC §1964[c]; BRIBERY; WIRE FRAUD BRIBERY, WIRE FRAUD,

MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344)

AGAINST CALIFORNIA BOARD OF OPTOMETRY

AND ALL OTHER CO-DEFENDANTS

423.  Plaintiff repeats and realleges paragraphs 1 through 386, 407-422, and incorporates same by

reference herein, as though set forth in full.

424. During the relevant time periods, defendants and plaintiff were and are each a "person", as

this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a

133

person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c], and through the misuse of health care insurance funds. The overarching purpose of the "Kidnapping Enterprise", as part of the Health Care Fraud Enterprise": to place plaintiff's life in jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits or her own financial resources for procedures and tests never performed, and services never provided. Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing, and suspected by plaintiff in or about 2022. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping Enterprise" described herein.

PATTERN OF RACKETEERING ACTIVITY:

425. On October 1, 2022, plaintiff filed an on-line complaint against Gina Trentacosti, O.D., with the California Board of Optometry. Pink M. Crosby, Enforcement Technician, acknowledged this complaint, with a case number, 4202023000079. Plaintiff was e-mailed a letter asking her to sign medical authorization forms. Plaintiff informed the Board her outgoing mail was stolen, and asked if she could bring the forms to their office in person. Plaintiff never received a response to this e-mail.

426. As part of a pattern with other California Boards with which plaintiff had filed complaints, Pink Crosby and/or other employees of the Board accepted a bribe or bribes not to process or prosecute this complaint. The bribe or bribes were paid via wire transfer(s).

RICO CONSPIRACY (18 USC SECTION 1962[d])

427. As set forth above, defendants BOARD OF OPTOMETRY, GAGNON MEDICAL VISION CARE, MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, UPS STORE, LOS ANGELES TIMES, CALIFORNIA MEDICAL BOARD, BOARD OF BARBERING AND COSMETOLOGY, PHARMACY BOARD, PHYSICIAN'S ASSISTANT BOARD, DIGNITY HEALTH, PROVIDENCE, and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the health care and kidnapping enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d].

428. Defendants BOARD OF OPTOMETRY, GAGNON MEDICAL VISION CARE, MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, UPS STORE, LOS ANGELES TIMES, CALIFORNIA MEDICAL BOARD, BOARD OF BARBERING AND COSMETOLOGY, PHARMACY BOARD, PHYSICIAN'S ASSISTANT BOARD, DIGNITY HEALTH, PROVIDENCE, and the co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

429. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the

premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud, and access device fraud. Defendants also stole plaintiff's personal property, including prescriptions, flash drives, her pets, her car, and intellectual property.

430. As a direct and proximate result of the conspiracy, between and among all defendants, and co-conspirators, plaintiff suffered damages, in an amount to be determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

TWENTY-FIRST  CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, WIRE FRAUD, MAIL FRAUD, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344); INTERSTATE OR FOREIGN SHIPMENT BY CARRIER (18 USC section 659)

(AGAINST DEFENDANT FEDERAL EXPRESS COMPANY,

AND ALL OTHER DEFENDANTS)

431. Plaintiff repeats and realleges paragraphs 1 through 386, and 407-430, and incorporates same by reference as though set forth in full herein.

136

432. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c], and through the misuse of health care insurance funds. The overarching purpose of the "Kidnapping/Murder Enterprise", as part of the "Health Care Fraud Enterprise":  to place plaintiff's life in jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits or her own financial resources for procedures and tests never performed, and services never provided. Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing, and suspected by plaintiff in or about 2022. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping Enterprise" described herein.

PATTERN OF RACKETEERING ACTIVITY:

433. On June 26, 2020, plaintiff made the first of several attempts to reach Former President Barach Obama via U.S. mail. The letter was mailed via Priority Overnight to a post office box in Washington, D.C., apparently belonging to the Former President. Plaintiff received no response to this letter.

434. On September 10, 2020, plaintiff send a second letter to the Former President via certified mail, return receipt requested. Plaintiff never received the return receipt and believes these two letters, as well as subsequent letters sent to Barach Obama, became the subjects of federal mail theft

435. On February 9, 2021, plaintiff made the first of several attempts to reach Amal Clooney, wife of actor George Clooney, and part of the Clooney Foundation, formed to address violence against women.  Plaintiff sent her first letter to Amal Clooney via International Mail, with tracking, and allegedly delivered in London, UK. Plaintiff received no response to this letter, and believes it never left the local post office, near plaintiff's home.

436. On December 31, 2021, plaintiff again sent a letter to Amal Clooney in London, via International Mail. Plaintiff received no response top this letter, and believes it never left the local post office, near plaintiff's home.

437.  On October 1, 2022, in an effort to circumvent hundreds of instances of federal mail theft, committed against plaintiff, plaintiff took a letter and several documents to a local Fed Ex store, located at 1795 Arden Way, Sacramento CA 95825, to be delivered to Amal Clooney in London. Fed Ex charged plaintiff $94.77 for this international shipment, but never completed a customs declaration.  Although the Fed Ex website shows the shipment as delivered in London, plaintiff received no response and believes Fed Ex employees stole this shipment, sending it via U.S. mail to Kevin Costner instead. Plaintiff also alleges the website was hacked to erroneously show the shipment as delivered

438. On October 4, 2022, before realizing the previous Fed Ex shipment had been stolen, and still believing Fed Ex might work, plaintiff took a letter and a number of documents to the same Fed Ex store, located at 1795 Arden Way, Sacramento CA 95825. Plaintiff purchased a box for the thirteen-page letter and enclosures, consisting of one hundred documents. The box was to be shipped to the Obama Foundation at an address in Chicago, IL.

439. On information and belief, plaintiff alleges that FedEx employees at that location accepted

bribes to prevent delivery of this package to Barach Obama, instead using the US Mail to send the box to Kevin Costner at a post office box designated for this purpose. Approximately ten people work at this location of Fed Ex; on information and belief, plaintiff alleges all of them accepted bribes to intercept the delivery and instead mail it to someone else. Plaintiff never received a response from Barach Obama, and on information and belief, alleges that the Fed Ex delivery was stolen by a Fed Ex employee, and never sent to Chicago.

440. On information and belief, plaintiff alleges the same clerk involved in the Amal Clooney transaction also accepted a bribe not to make this delivery to the Former President.

441. Although the Fed Ex website shows the box as delivered, plaintiff has never heard from Barach Obama. Plaintiff attempted a follow-up letter to Barach Obama, via U.S. mail, on October 6, 2022. Again, plaintiff received no response, and believes USPS employees stole the letter.

442. In addition, on October 5, 2022, plaintiff sent correspondence to the Secret Service, addressed as follows: Kimberly Cheatle, Director, U.S. Secret Service, 245 Murray Lane SW Bldg. T-5, Washington DC 20223. The letter informed the Secret Service of what plaintiff believed was a theft of a Fed Ex shipment intended for Former President Obama. Plaintiff received no response to this letter, probably also stolen by USPS employees.

443. On November 3, 2022, Plaintiff also attempted to mail a letter to Fed Ex, at 3875 Airways Module H3, Department 4634, Memphis TN 38116. The letter referenced both the Amal Clooney and Barach Obama shipments: RE: Transaction # 94034726714; tracking #278753305679 (Barach Obama); Transaction #940347043548; tracking #278635967260 (Amal Clooney). Plaintiff received no response from Fed Ex and believes the letter became yet another

subject of federal mail theft.

RICO CONSPIRACY (18 USC SECTION 1962[d])

444. As set forth above, defendants FED EX, BOARD OF OPTOMETRY, GAGNON MEDICAL VISION CARE, MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, UPS STORE, LOS ANGELES TIMES, CALIFORNIA MEDICAL BOARD, BOARD OF BARBERING AND COSMETOLOGY, PHARMACY BOARD, PHYSICIAN'S ASSISTANT BOARD, DIGNITY HEALTH, PROVIDENCE, and the other co-conspirators associated with this enterprise agreed and conspired to violate 18 USC section 1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the health care and kidnapping enterprises through a pattern of racketeering activity in violation of 18 USC section 1962[d].

445. Defendants FED EX, BOARD OF OPTOMETRY, GAGNON MEDICAL VISION CARE, INC., MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, THE UPS STORE, LOS ANGELES TIMES, CALIFORNIA MEDICAL BOARD, BOARD OF BARBERING AND COSMETOLOGY, PHARMACY BOARD, PHYSICIAN'S ASSISTANT BOARD, DIGNITY HEALTH, PROVIDENCE, and the co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

140

446  As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d]

plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the

premiums indirectly financed bribery, and the other predicate acts, including health care fraud,

kidnapping, wire fraud, mail fraud,  and access device fraud.  As a result of defendants' and co-

conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen,

fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the

other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud, money

laundering, bank fraud, and access device fraud.  Defendants also stole plaintiff's personal

property, including prescriptions, flash drives, her pets, her car, and intellectual property.

447. As a direct and proximate result of the conspiracy, between and among Defendants FED

EX, BOARD OF OPTOMETRY, GAGNON MEDICAL VISION CARE, INC., DOCTORS

MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  MCNAUGHTON

NEWSPAPERS, INC., dba Daily Republic Newspaper, RAY STONE, INC., REGENTS OF

UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, THE UPS STORE,  LOS

ANGELES TIMES, CALIFORNIA MEDICAL BOARD, BOARD OF BARBERING AND

COSMETOLOGY, PHARMACY BOARD, PHYSICIAN'S ASSISTANT BOARD, DIGNITY

HEALTH, PROVIDENCE, and co-conspirators, plaintiff suffered damages, in an amount to be

proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is

entitled to recover threefold her damages plus costs.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set

forth below.

TWENTY-SECOND CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, WIRE FRAUD,

KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION

OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT

INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961,

18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18

USC section 1344); INTERSTATE OR FOREIGN SHIPMENT BY CARRIER

(18 USC section 659)

  AGAINST DEFENDANTS LIVERMORE OPTOMETRY INC., BOARD OF OPTOMETRY,

GAGNON VISION MEDICAL GROUP, INC., dba VALLEY EYE CARE INC. DOCTORS

MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  Defendant

MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, RAY STONE, INC.,

REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, THE UPS

STORE, LOS ANGELES TIMES, CALIFORNIA MEDICAL BOARD, BOARD OF

BARBERING AND COSMETOLOGY, PHARMACY BOARD, PHYSICIAN'S ASSISTANT

BOARD.

448.  Plaintiff repeats and realleges paragraphs 1 through 386 and 407-447 and incorporates same

by reference herein, as though set forth in full.

449. During the relevant time periods, defendants and plaintiff were and are each a "person", as

this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a

person injured in her business or property, by reason of a violation of RICO within the meaning

of 18 USC section 1964[c], and through the misuse of health care insurance funds.  The

142

overarching purpose of the "Kidnapping Enterprise", as part of the Health Insurance Enterprise": to place plaintiff's life in jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits or her own financial resources for procedures and tests never performed, and services never provided. Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing, and suspected by plaintiff in or about 2022. Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping Enterprise" described herein.

PATTERN OF RACKETEERING ACTIVITY:

450. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive plaintiff of health care benefits, and health care, and subject plaintiff to a kidnapping, defendants have engaged in the following pattern of racketeering activity

451. On August 24, 2022, plaintiff contacted defendant LIVERMORE OPTOMETRY, INC., via e-mail, asking if they could fill a contact lens prescription from another doctor. Plaintiff specified that the prescription requested an '"Oxyflow Paragon HDS." Plaintiff received a return e-mail from "Jessica", stating they could do so. Plaintiff managed to e-mail the prescription to LIVERMORE OPTOMETRY. Plaintiff received several e-mails indicating they could fill this prescription.

452. Plaintiff mailed a check to Livermore Optometry in the amount of $150.00 with a cover letter reading in part as follows: "This lens replaced an adulterated lens sold to me by another practitioner."

453. Shortly thereafter, plaintiff reviewed the prescription, from Gina Trentacosti, O.D., of GAGNON VISION MEDICAL GROUP, dba VALLEY EYE CARE INC., and became concerned that the contact lens prescription might be wrong. Plaintiff scheduled an appointment with Steven Faith, O.D., which she later cancelled and rescheduled at a later date.

454. On October 3, 2022, plaintiff mailed a letter to Robert Califf, M.D., Commissioner, FDA, in Silver Spring, M.D., with a copy also addressed to Hilary Marston, M.D., also of the FDA. This letter did not include plaintiff's e-mail address.   The e-mail concerned the adulterated lens sold by VALLEY EYE CARE.  A contact lens is considered a "medical device", under the supervision of the FDA.

455. On October 14, 2022, plaintiff received an e-mail purportedly from the FDA, suggesting that plaintiff write to someone else within the FDA. On information and belief, plaintiff alleges this e-mail was a forgery, prepared co-conspirators Johnson, and/or Ford, and/or Costner, who used computer hacking to send this e-mail to plaintiff.

456. The actual letter to the FDA was stolen from the mailstream, and never received by the FDA. Plaintiff has no way of contacting the FDA about this matter.

457.  On or about December 23, 2022, plaintiff was seen by optometrist Steven Faith, O.D., at Livermore Optometry in Livermore, California.   Plaintiff had been a former patient of this practice, with services provided by Clark Abramson, O.D., for approximately ten years. At the time of the December 23, 2022 appointment plaintiff was given an eye exam and contact lens exam. Plaintiff was charged $345.00 for these services. Plaintiff also wanted to order a left contact lens. At the time plaintiff paid the $345.00, plaintiff was informed that data from Dr. Faith "had not downloaded", and the woman with whom plaintiff spoke could not process a

contact lens order at that time. The receipt given to plaintiff notes a payment # of 34860865. The receipt was processed by an employee who did not give her name. Plaintiff also was not given prescriptions, which included two eye glass prescriptions, and contact lens prescriptions.

458. This left contact lens was mailed to plaintiff approximately two weeks after that appointment. Livermore Optometry did not bill plaintiff for the contact lens, and plaintiff voluntarily sent them a check in the amount of $150.00. This check was negotiated by plaintiff's bank.

459. On January 19, 2023, plaintiff developed an eye infection and was seen by Dr. Pamela Jetter at LIVERMORE OPTOMETRY, who prescribed eye drops. Dr. Jetter followed up via telephone and text message the following day. Via text message, plaintiff informed Dr. Jetter that her eye was improving and that she would defer any follow-up. Medical records show that Jetter acknowledged her text message, "electronically signed" on February 3, 2023. No one from L.O. demanded a further office visit at that time.

460. On Friday, January 20, 2023, plaintiff discovered that she had lost a right eye contact lens, and placed a telephone order for this lens with "Norman" of L.O. Plaintiff used a debit card to place this order, and the order was processed within plaintiff's bank on Monday, January 23, 2023.

461. On Thursday, February 2, 2023, plaintiff became concerned about the length of time that had passed since she had placed the contact lens order and attempted follow up by phone with L.O. The person she spoke with by phone informed plaintiff that "the contact lens order was in process", and transferred her to the contact lens department. Plaintiff received only voice mail and did not leave a message. Plaintiff sent several e-mails to "info@livermoreoptometry.com"

Plaintiff sent a final e-mail on February 2, 2023, at 4:16 p.m., summarizing the previous e-mails

462. On February 2, 2023, Plaintiff had two different conversations with "Becky", who informed her the contact lens order would not be processed unless okayed by Dr. Faith. Plaintiff explained that she needed the right contact lens, not the left, and that her left eye had completely healed. Plaintiff was also never informed that there would be any delay in processing the contact lens order which she placed and paid for on Friday, January 30, 2023.

463. On February 2, 2023, at 4:18 p.m., plaintiff sent a text message to a telephone number recently used by Dr. Jetter in connection with an eye injury Dr. Jetter had treated. This text message was intended for Dr. Jetter, but was intercepted by "Becky." Plaintiff's text message read as follows: "There is a serious problem with a contact lens order for the right eye which I placed two weeks ago. My left eye has completely healed. Please have someone in authority look into this and let me know. Thank you."

464. On February 2, 2023, at 4:18 p.m., plaintiff received an immediate response via text message from "Becky", reading as follows:

465. "Hello Diane. This is Becky and we spoke earlier. I have e-mailed Dr. Faith for confirmation on the order for your right contact lens. I will inform you when I have more information. Thank you."

466. On February 3, 2023, plaintiff received an e-mail communication stating that she was dropped as a patient and that defendant LIVERMORE would not fill an order for a contact lens, although the records established this as a replacement lens.

467. The medical records e-mailed to plaintiff did not include prescriptions, and none were ever provided by LIVERMORE OPTOMETRY.

146

468.  The records also indicated Faith's concerns about the history of plaintiff's current contact lens prescription, and that it was impossible to determine the design of the lens, or who prescribed them. "Disc impossible to know without prior records." The records also stated "very vague history of CLS hx. and design." The records make these statements despite the fact that plaintiff had provided an earlier prescription from Gina Trentacosti. O.D., sent to that office and acknowledged via e-mail. The records also falsely stated that plaintiff was "adamant against a pair" [of contact lenses] at the time of the visit.

469.  On February 15, 2023, plaintiff received a check in the amount of $150.00 from LIVERMORE OPTOMETRY, purportedly refunding the money she had voluntarily paid for a contact lens mailed to her. The manila envelope, sent via certified mail, also included the same records previously e-mailed to plaintiff, as well as the e-mail dropping plaintiff as a patient.

470. As a proximate result of the fraudulent conduct of the defendants as herein alleged,  plaintiff has been forced to forego the regular use of contact lenses because of the loss of one of the lenses, and wears the contact lenses for driving only, leaving them off at home, and foregoing all vision correction at home, since she does not have eyeglasses she can wear, and suffers a chronic disability as a result of the failure of GAGNON to provide either a contact lens, or a current and accurate prescription for contact lenses.

471. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff was defrauded into paying for services she never received. In addition, plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud,  and access device fraud. Plaintiff's personal property was also stolen,

147

including her pets, her car, and intellectual property.

472. As a direct and proximate result of the conspiracy, between and among Defendants LIVERMORE OPTOMETRY INC., GAGNON MEDICAL VISION CARE, INC., DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE, THE UPS STORE,  LOS ANGELES TIMES, CALIFORNIA MEDICAL BOARD, BOARD OF BARBERING AND COSMETOLOGY, PHARMACY BOARD, PHYSICIAN'S ASSISTANT BOARD, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

TWENTY-THIRD CAUSE OF ACTION

FRAUD–SUPPRESSION OF FACT

(AGAINST DEFENDANT LIVERMORE OPTOMETRY INC.)

473.  Plaintiff repeats and realleges paragraphs 1 through 81, and 387-406,  and incorporates same by reference as though set forth in full herein.

474. Plaintiff is informed and believes that at all times herein mentioned, defendant LIVERMORE OPTOMETRY GROUP INC. acted as agent for defendant GAGNON VISION MEDICAL GROUP, dba VALLEY EYE CARE INC. , and as agent for co-conspirators Don Johnson, Harrison Ford, and Kevin Costner, and in doing the things hereinafter alleged was acting within the course and scope of said agency and with the permission and knowledge of co-

defendant GAGNON VISION MEDICAL GROUP, dba VALLEY EYE CARE INC.

475. At all times herein mentioned, Defendant LIVERMORE OPTOMETRY INC., was and is a business incorporated in California, and is a business establishment engaged in providing professional vision care including eyeglasses, and contact lenses, and doing business in Livermore, Alameda County, California.

476. As set forth by the California Department of Consumer Affairs, Board of Optometry website, pursuant to 16 CFR Part 456.2(a), it is an unfair act or practice to fail to provide a patient one copy of the patient's prescription immediately after an eye exam is completed. Plaintiff needs two eyeglass prescriptions; LIVERMORE never provided either one.

477. On or about December 23, 2022, at the time of a scheduled office visit, Optometrist Steven Faith, O.D., failed to inform plaintiff that he and LIVERMORE OPTOMETRY INC. would not provide plaintiff with prescriptions for either eyeglasses or contact lenses, and has never done so.

478. On information and belief, plaintiff alleges the failure to provide prescriptions constituted part of a conspiracy, in part to prevent plaintiff from comparing these prescriptions with those provided by Valley Eye Care, through Gina Trentacosti, O.D., since plaintiff fears those prescriptions are wrong.

479. On or about December 23, 2022, Optometrist Steven Faith, O.D., failed to inform plaintiff that he and LIVERMORE OPTOMETRY INC. would not provide plaintiff with continuing vision care, and would "drop" plaintiff as a patient in the immediate future.

480. On or about February 3, 2023,  Optometrist Steven Faith, O.D., informed plaintiff via e-mail that he and LIVERMORE OPTOMETRY INC. would not provide plaintiff with a contact lens, even though she had ordered and paid for this contact lens on January 20, 2023.  By refusing to

149

provide a contact lens. Faith and LIVERMORE OPTOMETRY left plaintiff without a "spare" contact lens for the right eye. Plaintiff has no eyeglass prescriptions, and no eyeglasses to wear, without contact lenses, facts known by Faith and LIVERMORE OPTOMETRY. Thus, should plaintiff lose the one right contact lens she has, plaintiff would suffer impaired vision.

481. The failures to disclose information and suppressions of information were made with the intent to induce plaintiff to act in the manner herein alleged in reliance thereon.

482. Plaintiff, at the time these failures to disclose and suppressions of fact occurred, and at the time plaintiff took the actions herein alleged, was ignorant of the existence of the facts which defendant suppressed and failed to disclose. If plaintiff had been aware of the existence of these facts not disclosed by defendant, plaintiff would not have, as she did, made an appointment with this practitioner, or relied on LIVERMORE OPTOMETRY or in particular, Steven Faith, O.D., for optical or vision care.   Plaintiff had been a patient of this business for approximately ten years, under the care of another practitioner, Clark Abramson, O.D., whose name still appears on the front door of the business.   Plaintiff obtained superb care under Abramson, and had no reason to believe she would receive otherwise from the next senior member of the business, Faith.

483.  As a proximate result of the fraudulent conduct of the defendants as herein alleged, plaintiff has been forced to forego the regular use of contact lenses because of the loss of one of the lenses, and wears the contact lenses for driving only, leaving them off at home, and foregoing all vision correction at home, since she does not have eyeglasses she can wear, and suffers a chronic disability as a result of the failure of LIVERMORE to provide either a contact lens, or a current and accurate prescription for contact lenses.

484. As a further proximate result of the fraudulent conduct of the defendants as herein alleged,

plaintiff has been forced to expend time and energy in an attempt to find another eye care practitioner who can assist plaintiff with her vision care needs. Plaintiff has also been forced to file this lawsuit, since this is the second time plaintiff has experienced severe interference with attempts to obtain vision care from a licensed eye care professional, due to the commission of bribery.

WHEREFORE, plaintiff prays judgment against defendants and each of them, as set forth below.

TWENTY-FOURTH CAUSE OF ACTION

FRAUD–SUPPRESSION OF FACT

(AGAINST DEFENDANT LIVERMORE OPTOMETRY INC.)

485. Plaintiff repeats and realleges paragraphs 1 through 81, and 387-406, and 474-483, and incorporates same by reference as though set forth in full herein.

486. Plaintiff is informed and believes that at all times herein mentioned, defendant LIVERMORE OPTOMETRY GROUP INC. acted as agent for defendant GAGNON VISION MEDICAL GROUP, dba VALLEY EYE CARE INC. , and as agent for co-conspirators Don Johnson, Harrison Ford, and Kevin Costner, and in doing the things hereinafter alleged was acting within the course and scope of said agency and with the permission and knowledge of co-defendant GAGNON VISION MEDICAL GROUP, dba VALLEY EYE CARE INC.

487. At all times herein mentioned, Defendant LIVERMORE OPTOMETRY INC., was and is a business incorporated in California, and is a business establishment engaged in providing professional vision care including eyeglasses, and contact lenses, and doing business in Livermore, Alameda County, California.

151

488. As set forth by the California Department of Consumer Affairs, Board of Optometry website, pursuant to 16 CFR Part 456.2(a), it is an unfair act or practice to fail to provide a patient one copy of the patient's prescription immediately after an eye exam is completed. Plaintiff needs two eyeglass prescriptions; LIVERMORE has never provided either one.

489. On December 23, 2022, plaintiff underwent an eye exam and contact lens exam conducted by optometrist Steven Faith, O.D. At the conclusion of the examinations, and at no time since, has defendant LIVERMORE provided plaintiff with either eyeglass prescriptions or contact lens prescriptions. Pursuant to 15 USC section 7601(a)(1), LIVERMORE should have provided plaintiff with contact lens prescriptions at the conclusion of the examinations on that date. Plaintiff has never received such prescriptions. Pursuant to 15 USC section 7608(a), any violation of these rules constitute unfair or deceptive acts or practices.

490. On or about December 23, 2022, at the time of a scheduled office visit, Optometrist Steven Faith, O.D., failed to inform plaintiff that he and LIVERMORE OPTOMETRY INC. would not provide plaintiff with prescriptions for either eyeglasses or contact lenses, and has never done so.

491. On or about December 23, 2022, Optometrist Steven Faith, O.D., failed to inform plaintiff that he and LIVERMORE OPTOMETRY INC. would not provide plaintiff with continuing vision care, including contact lenses, and would "drop" plaintiff as a patient in the immediate future.

492. On or about January 20, 2023, plaintiff contacted LIVERMORE OPTOMETRY and spoke with "Norman" to place an order for a contact lens. Norman asked for, and plaintiff provided, credit card information over the phone. The $150.00 charge cleared her bank account on January 23, 2023.

152

493. On February 3, 2023, after attempting extensive phone and e-mail follow up as to the status of the January 20, 2023 contact lens order, she received an e-mail from Steven Faith informing plaintiff that the contact lens order would not be placed, even though she had ordered and paid for this contact lens on January 20, 2023. By refusing to provide a contact lens, Faith and LIVERMORE OPTOMETRY left plaintiff without a "spare" contact lens for the right eye. Plaintiff has no eyeglass prescriptions, and no eyeglasses to wear, without contact lenses, facts known by Faith and LIVERMORE OPTOMETRY. Thus, should plaintiff lose the one right contact lens she has, plaintiff would suffer impaired vision.

494. The failures to disclose information and suppressions of information were made with the intent to induce plaintiff to act in the manner herein alleged in reliance thereon.

495. Plaintiff, at the time these failures to disclose and suppressions of fact occurred, and at the time plaintiff took the actions herein alleged, was ignorant of the existence of the facts which defendant suppressed and failed to disclose. If plaintiff had been aware of the existence of these facts not disclosed by defendant, plaintiff would not have, as she did, made an appointment with this practitioner, or relied on LIVERMORE OPTOMETRY or in particular, Steven Faith, O.D., for optical or vision care.

496. From approximately 1993 to 2004, plaintiff had been a patient of this business, under the care of another practitioner, Clark Abramson, O.D., whose name still appears on the front door of the business. Plaintiff obtained superb care under Abramson, and had no reason to believe she would receive otherwise from the next senior member of the business, Faith, or that this business would renege on the contact lens order, and drop her as a patient from the practice.

497. As a proximate result of the fraudulent conduct of the defendants as herein alleged,

plaintiff has been forced to forego the regular use of contact lenses because of the loss of one of the lenses, and wears the contact lenses for driving only, leaving them off at home, and foregoing all vision correction at home, since she does not have eyeglasses she can wear, and suffers a chronic disability as a result of the failure of LIVERMORE to provide either a contact lens, or any prescription for contact lenses.

498. As a further proximate result of the fraudulent conduct of the defendants as herein alleged, plaintiff has been forced to expend time and energy in an attempt to find another eye care practitioner who can assist plaintiff with her vision care needs. Plaintiff has also been forced to file this lawsuit, since this is the second time plaintiff has experienced severe interference with attempts to obtain vision care from a licensed eye care professional, due to the commission of bribery.

499.  As a further proximate result of the fraudulent conduct of the defendants as herein alleged, plaintiff mailed a complaint form concening Steven Faith, O.D., to the BOARD OF OPTOMETRY on February 16, 2023. As of the time of filing of this lawsuit, Plaintiff has received no response to this complaint. The complaint either never reached the BOARD, the result of federal mail theft, or someone within the BOARD accepted bribes not to process the complaint.

500. The aforementioned conduct of the defendants was an intentional misrepresentation, deceit, or concealment of material facts known to the defendants of thereby depriving plaintiff of property or other legal rights or otherwise causing injury, and was despicable conduct that subjected plaintiff to a cruel and unjust hardship in conscious disregard of plaintiff's rights, so as to justify an award of exemplary and punitive damages.

154

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

TWENTY-FOURTH CAUSE OF ACTION

CIVIL RICO (18 USC §1964[c]) : PREDICATE ACTS: BRIBERY, WIRE FRAUD, KIDNAPPING, USE OF INTERSTATE COMMERCE FACILITIES IN THE COMMISSION OF MURDER FOR HIRE [18 USC section 1958(a)]; AND CRIMINAL COPYRIGHT INFRINGEMENT 17 USC section 106(3), 17 USC section 506(a)(1)(A); 18 USC section 1961, 18 USC section 2319; MONEY LAUNDERING (18 USC section 1956);  BANK FRAUD (18 USC section 1344); INTERSTATE OR FOREIGN SHIPMENT BY CARRIER (18 USC section 659)

  AGAINST DEFENDANTS LIVERMORE OPTOMETRY INC., BOARD OF OPTOMETRY, GAGNON VISION MEDICAL GROUP, INC., dba VALLEY EYE CARE INC. DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  Defendant MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE; THE UPS STORE, LOS ANGELES TIMES, CALIFORNIA MEDICAL BOARD, BOARD OF BARBERING AND COSMETOLOGY, PHARMACY BOARD, PHYSICIAN'S ASSISTANT BOARD

501.  Plaintiff repeats and realleges paragraphs 1 through 81, 107-386, 406-472, and incorporates same by reference herein, as though set forth in full.

502. During the relevant time periods, defendants and plaintiff were and are each a "person", as this term is defined in 18 USC section 1961[3]. During the relevant time periods, plaintiff was a

155

person injured in her business or property, by reason of a violation of RICO within the meaning of 18 USC section 1964[c], and through the misuse of health care insurance funds.  The overarching purpose of the "Kidnapping Enterprise", as part of the Health Insurance Enterprise": to place plaintiff's life in jeopardy, while billing Medicare for services purportedly rendered, billing and using plaintiff's Medicare benefits or her own financial resources for procedures and tests never performed, and services never provided.  Plaintiff alleges a continuing conspiracy between and among these defendants, pursuant to 18 USC section 1964[d], commencing in or about 2014 and continuing, and suspected by plaintiff in or about 2022.  Plaintiff further alleged that the co-conspirators and defendants herein accepted bribes from other co-conspirators, including Kevin Costner, Don Johnson, and Harrison Ford, as inducements to enter into the "Kidnapping Enterprise" described herein.

PATTERN OF RACKETEERING ACTIVITY:

503. As set forth below, to carry out, or attempt to carry out, its scheme to defraud, and deprive plaintiff of health care benefits, and health care, and subject plaintiff to a kidnapping, defendants have engaged in the following pattern of racketeering activity:

504. In December, 2015, plaintiff moved to an apartment located in Sacramento, California, owned and operated by defendant RAY STONE, INC. (hereinafter, "RAY STONE.") She signed a one-year lease for this apartment, part of a complex known as "Castle Hill Apartments".  The one bedroom apartment included a kitchen with three appliances: a stove, a refrigerator, and a dishwasher.

505.  On information and belief, plaintiff alleges that in or around the time she entered into this first lease with RAY STONE, third parties (the "co-conspirators") entered into a separate

agreement with the management of this apartment, and over time, planned to commit violent crimes against plaintiff, including attempted murder and kidnapping.

506. The agreement also included a promise on the part of the apartment management with the co-conspirators that the old appliances within her apartment would not be maintained, and would never be replaced. Although Castle Hill Management conducted annual or semi-annual inspections of her apartment, and other units in the apartment complex, the appliances within her apartment would not be inspected for safety or wear. With only one exception, none of these appliances were ever inspected, and continued to age.

507. The ground floor unit occupied by plaintiff was and still is accessible via a gate or fence that allows entry into plaintiff's back yard and patio. There is a padlock on this gate. Beginning in or about July, 2018, and continuing until 2022, plaintiff experienced frequent and repeated disturbances in and around her apartment, consisting of different types of serious disturbances, including, but not limited to, loud, repeated, and unnecessary knocking and pounding on plaintiff's front door, windows in the front and back, the use of special equipment allowing groups of people to peer into plaintiff's bedroom, repeatedly and at all hours of the night.

508. On or about July 18, 2018, plaintiff sent an e-mail to Gina Garcia, then manager of "Castle Hill", informing her of serious problems with intruders, and asking about installing a fence to keep intruder out of her yard. Garcia never answered this e-mail. At a much later time, Garcia informed her that "upper management" would not allow installation of a fence.

509. On or about October 8, 2018, plaintiff became the victim of an attempted murder, when an intruder entered her yard outside her bedroom window, firing a loaded gun within one to two inches from her head. Plaintiff reported this crime to both the Sacramento County Sheriff's

157

Department and the FBI; neither responded.

510. Her ground-floor apartment unfortunately provided easy access for intruders, due to a gate behind the property which allows entrance into her back yard. Plaintiff repeatedly reported these crimes to the Sacramento County Sheriff's Department (SCSD) and the FBI, and never received a response. Although plaintiff also reported these events and the dangerous condition (gate leading to back yard) to the management of the apartment complex, her e-mails were ignored, and as of the filing of this complaint, the dangerous condition remains.

511. On or about October 8, 2018, an intruder wearing a "pig" costume, entered the back yard of her apartment, and, from a distance of approximately ten feet from her bed, fired a loaded gun. The bullet came within one to two inches of her head. Following this attempted murder, plaintiff reported these crimes to the Sacramento County Sheriff's Department (SCSD) and the FBI. Neither the SCSD nor the FBI responded to this correspondence, or to any of the several dozen letters plaintiff wrote to them regarding this and other crimes committed against her during that period of time.  Plaintiff later identified her shooter as SCSD Deputy Sheriff Spencer Wright. Wright gained access to the back of her aparment, the yard and patio area, through a padlocked gate opened for him by RAY STONE employees.

512. On a repeated basis, agents of RAY STONE, INC., including employees of the Sacramento County Sheriff's Department, and Deputy Spencer Wright, subjected plaintiff to holographic images that projected into her bedroom, including the following: a creature who appeared right next to plaintiff's bed, and who looked something like "E.T." ; the use of projected images within her apartment, included a death mask, and the repeated appearance of costumed individuals on her patio. In addition, masked and costumes individuals appeared regularly on the

158

roof above plaintiff's apartment, again using special equipment to pierce through walls and ceilings above plaintiff's bed. These costumes included an angel, with fangs.

513. In order to access plaintiff's backyard, these individuals either unlocked the padlock, or had, on information and belief, the manager or maintenance man, unlock and remove the padlock for them.  The manager, Gina Garcia, acting at all material times as agent for defendant RAY STONE, accepted a series of bribes from the co-conspirators, to allow these individuals to access not only the roof of plaintiff's building, but the yard behind her apartment. On information and belief, plaintiff alleges that a former Castle Hill maintenance man, "William", also facilitated entry of these individuals. The intruders also gained access to the roof of plaintiff's apartment building by using special passes to access the property; gated at night and on the week-ends; passes given in part to law enforcement personnel to enter the property at night, and on an emergency basis.

514. Co-conspirators hired persons to commit a series of crimes against plaintiff, including repeated burglaries, trespasses, and elder abuses. On information and belief, at least one of the individuals hired by co-conspirators, Spencer Wright, worked as a deputy sheriff with the Sacramento County Sheriff's Department.

RICO CONSPIRACY (18 USC SECTION 1962[d])

515. As set forth above, defendants  DEFENDANTS LIVERMORE OPTOMETRY INC., BOARD OF OPTOMETRY, GAGNON VISION MEDICAL GROUP, INC., dba VALLEY EYE CARE INC. DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, Defendant MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS

OF UNIVERSITY OF CALIFORNIA. STANFORD HEALTH CARE DOCTORS MEDICAL

CENTER OF MODESTO, INC. THE UPS STORE, LOS ANGELES TIMES, CALIFORNIA

MEDICAL BOARD, BOARD OF BARBERING AND COSMETOLOGY, PHARMACY

BOARD, PHYSICIAN'S ASSISTANT BOARD MCNAUGHTON NEWSPAPERS, INC., dba

Daily Republic Newspaper, DOCTORS MEDICAL CENTER OF MODESTO, TENET

CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA,

STANFORD HEALTH CARE, UPS STORE, LOS ANGELES TIMES, and the other co-

conspirators associated with this enterprise agreed and conspired to violate 18 USC section

1962[c]; that is, agreed to conduct and participate, directly and indirectly, in the conduct of the

affairs of the health care enterprise and kidnapping/murder enterprise through a pattern of

racketeering activity in violation of 18 USC section 1962[d].

516. Defendants  DEFENDANTS LIVERMORE OPTOMETRY INC., BOARD OF

OPTOMETRY, GAGNON VISION MEDICAL GROUP, INC., dba VALLEY EYE CARE INC.

DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA,  Defendant

MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, DOCTORS

MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS

OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE DOCTORS MEDICAL

CENTER OF MODESTO, INC. THE UPS STORE, LOS ANGELES TIMES, CALIFORNIA

MEDICAL BOARD, BOARD OF BARBERING AND COSMETOLOGY, PHARMACY

BOARD, PHYSICIAN'S ASSISTANT BOARD MCNAUGHTON NEWSPAPERS, INC., dba

Daily Republic Newspaper, DOCTORS MEDICAL CENTER OF MODESTO, TENET

CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA,

STANFORD HEALTH CARE. THE UPS STORE. LOS ANGELES TIMES. and co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

517. As a result of defendants' and co-conspirators' violations of 18 USC section 1962[d], plaintiff's Medicare benefits were stolen, fraudulent claims submitted to Medicare, and the premiums indirectly financed bribery, and the other predicate acts, including health care fraud, kidnapping, wire fraud, mail fraud, access device fraud, money laundering, bank fraud, and copyright infringement.

518. As a direct and proximate result of the conspiracy, between and among Defendants DOCTORS MEDICAL CENTER OF MODESTO, INC., TENET CALIFORNIA, Defendant MCNAUGHTON NEWSPAPERS, INC., dba Daily Republic Newspaper, DOCTORS MEDICAL CENTER OF MODESTO, TENET CALIFORNIA, RAY STONE, INC., REGENTS OF UNIVERSITY OF CALIFORNIA, STANFORD HEALTH CARE DOCTORS MEDICAL CENTER OF MODESTO, INC. THE UPS STORE, LOS ANGELES TIMES, and co-conspirators, plaintiff suffered damages, in an amount to be proven/ determined at the time of trial. Pursuant to RICO, 18 USC section 1964[c], plaintiff is entitled to recover threefold her damages plus costs.

WHEREFORE plaintiff prays judgment as set forth below.

TWENTY-FIFTH CAUSE OF ACTION

BREACH OF WRITTEN CONTRACT

AGAINST DEFENDANT RAY STONE, INC.

519. Plaintiff repeats and realleges paragraphs 1 through 81, and incorporates same by reference,

1 as though set forth in full herein.

2 520. At all times mentioned herein, defendant RAY STONE, INC. was the owner of the

3 apartment complex known as "Castle Hill Apartments", with rental office located at 2725 Elvyra

4 Way, Castle Hill Court, Sacramento CA 95821. At all times mentioned herein, plaintiff has

5

6 resided within this apartment complex.

7 521. On or about December 15, 2015, plaintiff and RAY STONE entered into the first of series

8 of written leases by the terms of which defendant RAY STONE rented the premises to plaintiff

9 on either an annual or semi-annual basis. On June 11, 2019, plaintiff entered into the most recent

10

11 lease, which has been renewed on a month to month basis to the present date, attached as Ex. A.

12 522. Plaintiff has performed all conditions, covenants, and promises required on her part to be

13 performed in accordance with the contract. Pursuant to Clause 23(i), plaintiff herein reports, and

14 again reports, the following problems: a) dysfunctional stove/oven; b) leaks around the kitchen,

15

16 sink, caused by running the dishwasher; c) leaks under the kitchen sink; d) leaks from kitchen

17 faucet; e) a "running" toilet; f) leak from bathroom sink; g) damage to kitchen counter, requiring

18 replacement of at least part of counter; h) damage to kitchen flooring, requiring partial

19 replacement; i) bathroom sink faucet needs repairs.

20

21 523. Plaintiff has repeatedly requested that defendant perform their obligations under the

22 agreement, including maintenance of the apartment in a usable and safe condition, and removal

23 of dangerous conditions. These dangerous conditions include a gate that allows access to the

24 patio and back yard of her apartment, and a non-functioning oven that recently ignited.

25 524. Beginning on or about December 15, 2015, defendant breached the contract, and continues

26 to breach the contract, by failing to perform their contractual obligations as set forth above.

27

28

525. As a result of defendant's breach of the contract, plaintiff has sustained damages according to proof at the time of trial.

Wherefore, plaintiff prays for damages as set forth below.

TWENTY-SIXTH CAUSE OF ACTION

DECLARATORY RELIEF–MULTIFAMILY UTILITY COMPANY BILLINGS

AGAINST DEFENDANT RAY STONE, INC.

526. Plaintiff repeats and realleges paragraphs 1 through 81 and 520-525, and incorporates same by reference, as though set forth in full herein.

527. An actual controversy has arisen and now exists between plaintiff and defendant concerning their respective rights and duties in that plaintiff contends that the utility bill issued by "Multifamily Unit Company" is unconscionable and not a part of the lease between plaintiff and RAY STONE  the information provided to plaintiff in a letter dated July 26, 2021 stated plaintiff (and other tenants) would be responsible for monthly payments of water, sewer, and garbage bill rendered as one billing. The information failed to state when the billing would be due or how the amount of the billing would be calculated. On information and belief, California law does not permit this type of billing for the combined services of water, sewer and garbage.

528. Pursuant to California Public Utilities Code section 2705.5, submetered water is legal "if each user of the submeter service system is charged at the rate which be applicable if the user were receiving the water directly from the water corporation." Defendant RAY STONE has made no effort to comply with this statute, and there is no similar legal authority in California for charging tenants for garbage and sewer.

529. Plaintiff further contends that the utility bills do not even approximate what defendant itself

pays for these services, and plaintiff is not provided with a water meter. Under those circumstances, these bills are unconscionable. Plaintiff has no control over the quality or frequency of garbage pickup, (which at times, is allowed to pile up over week-ends and other days) and the water can be turned off at any time, and has been on frequent occasions, without notice, leaving plaintiff without any water in her apartment.

530. The letter further states that "in lieu of a rental increase" plaintiff would be obligated to pay this monthly billing. However, plaintiff was then informed of a rental increase from $925.00 per month to $1,018.00 per month, to take effect on October 1, 2022, with no elimination in the alleged responsibility to pay water, sewer and garbage through MUC. Plaintiff has never signed a lease including a provision regarding payment of billings issued by a separate company, and has never agreed to pay these bills. Plaintiff has no agreement whatsoever with Multi Family Utility Company. Moreover, the terms as set forth in a letter from Manager Jennifer Amaya are vague and unenforceable.

531. Plaintiff desires a judicial determination of her rights and duties, and a declaration as to whether the alleged agreement is invalid. The imposition of this billing is a way of circumventing the annual cap on rental increases in California, pursuant to Civil Code section 1947.12, and should be ruled unenforceable.

532. A judicial declaration is necessary and appropriate at this time under the circumstances in order that plaintiff may ascertain her rights under the lease agreement. Declaratory relief would have the practical effect of lessening plaintiff's financial burden being caused by the unsettled state of affairs.

WHEREFORE, plaintiff prays judgment as follows:

164

TWENTY-SEVENTH CAUSE OF ACTION

DECLARATORY RELIEF–CURRENT LEASE AGREEMENT

AGAINST DEFENDANT RAY STONE, INC.

533. Plaintiff repeats and realleges paragraphs 1 through 81, and 520-532, and incorporates same by reference, as though set forth in full herein.

534. An actual controversy has arisen and now exists between plaintiff and defendant concerning their respective rights and duties in that plaintiff contends that the current lease contains several clauses that are unconscionable and unenforceable. Of particular concern are clauses relating to appliances within the apartment:

"23. CARE, CLEANING, AND MAINTENANCE: "Except as prohibited by law, resident agrees: c) to keep premises and furniture, furnishings and appliances, and fixtures, which are rented for Resident's exclusive use, in good order and condition...that all appliances and fixtures on the premises must be able to be used for their intended purposes...e) to occupy the premises as a residence, to utilizing the portions thereof for living, sleeping, and cooking purposes..."

25. LARGE APPLIANCES: Resident shall not move or remove any large appliances..without prior written consent of the Owner/Agent."

535. These clauses imply that plaintiff as resident is solely responsible for the maintenance of large appliances, but plaintiff cannot more or remove them. Plaintiff cannot comply with Clause 23.(c), because the oven is no longer functional, a condition caused by defendant RAY STONE's failure to maintain the appliance. Plaintiff is not responsible for maintaining appliances that she does not own, and the oven, as well as the dishwasher and refrigerator, was/were old at the time

165

plaintiff took possession of the unit in December, 2015.

536. Since that time, the condition of the oven has deteriorated; the heating element ignited in December, 2022, almost causing a deadly fire. Although plaintiff informed defendant RAY STONE of the condition of the stove/oven, defendant STONE has refused to take any action to remedy the condition of the stove. Due to the age of this appliance, replacement is necessary. Without a functioning oven, plaintiff is extremely limited as to the food she can prepare, a circumstance that has existed since mid-December, 2022.

537. Pursuant to California law, a tenant may reasonably expect that a living unit is fit for the purpose for which it was obtained and may legitimately expect that the premises will be fit for habitation for duration of term of the lease and such expectations are entitled to formal, legal protection. California public policy compels landlords to bear the primary responsibility for maintaining safe, clean, and habitable housing. Defendant RAY STONE has failed to comply with their legal obligations under California law.

538. Although the lease requires the tenant to promptly notify RAY STONE of any items requiring repair, and plaintiff has complied with this clause, (Clause 23[i]) RAY STONE has failed and refused to replace the oven in the apartment, and never maintained it, instead allowing it to deteriorate, causing a small fire. Although plaintiff no longer uses the oven (it is completely unusable, due to a broken heating element) RAY STONE has no intention of replacing the oven.

539. A judicial declaration is necessary and appropriate at this time under the circumstances in order that plaintiff may ascertain her rights under the lease agreement. Declaratory relief would have the practical effect of lessening plaintiff's financial burden being caused by the unsettled state of affairs.

540. Further, plaintiff has incurred damages, including but not limited to, reduced or non-existent rental value of the unit.

WHEREFORE, plaintiff prays judgment as follows:

TWENTY-EIGHTH CAUSE OF ACTION

BREACH OF IMPLIED WARRANTY OF HABITABILITY

[Civil Code sections 1941.1, 3300]

541. Plaintiff repeats and realleges paragraphs 1 through 81 and 520-540, and incorporates same by reference, as though set forth in full herein.

542. At all times mentioned herein, defendant RAY STONE, INC. was the owner of the apartment complex known as "Castle Hill Apartments", with rental office located at 2725 Elvyra Way, Castle Hill Court, Sacramento CA 95821. At all times mentioned herein, plaintiff has resided in Unit #34, 2769 Castle Hill Court, Sacramento CA 95821.

543. On or about December 15, 2015, plaintiff and RAY STONE entered into a written lease by the terms of which defendant RAY STONE rented the premises to plaintiff on an annual basis, at the agreed rental of $785.00 per month.  This and all subsequent leases impliedly warranted that the premises were habitable. At the time plaintiff entered into the lease, plaintiff took possession of the subject rental, and remains in possession as of the filing of this lawsuit.

544. The unit, a one bedroom apartment, includes a kitchen outfitted with a refrigerator, stove, and dishwasher.  All appliances were old at the time plaintiff took possession of the unit on or about December 15, 2015. A padlocked gate also made plaintiff's ground floor unit accessible by removing the padlock on the gate, allowing entry into plaintiff's back yard and patio. At the time plaintiff took possession of the subject unit, the premises were unfit for human habitation in that

167

it failed to substantially comply with those applicable building and housing code standards that materially affect the tenant's health and safety.

545. Specifically, the fence/gate allowed easy access to the back of plaintiff's ground-floor unit, and a padlock on the gate could easily be removed, and/or someone could jump over the gate. In addition, with the exception of one-time, limited work on the stove, done approximately 4-5 years ago, none of the appliances, including the oven, were ever serviced. Although the oven was old when plaintiff took possession of the apartment, the oven includes a heating element or heating coil that defendant RAY STONE never replaced. None of these conditions were known to plaintiff at the time she took possession.

546. Throughout plaintiff's tenancy, plaintiff has been subjected to annual or semi-annual inspections of her apartment, as part of an inspection of all units in the apartment complex. With the exception of the first inspection, conducted in or around April, 2016, plaintiff was present at these inspections. At no time did anyone conducting these inspections inspect any of the appliances, including the stove/oven. Defendant STONE used these inspections to harass, and did nothing to maintain the property as a result of these inspections. The most recent inspection took place on September 28, 2022, and neither the manager nor the maintenance man did anything to inspect the apartment, again using the notice of inspection to harass. Since plaintiff suffers from a disability, a known fact by defendant RAY STONE, the intent to harass can easily be inferred from their actions.

547. Commencing in or about July, 2018, plaintiff was subjected on a nightly basis to intrusions committed by persons believed to have been employed by the Sacramento County Sheriff's Department. These individuals used special equipment to spy on plaintiff in her bedroom, and

intruded via holographic figures. These individuals also made horrible noise, for hours at a time. Although plaintiff reported these problems to defendant RAY STONE, her reports were ignored. Because the fence was secured with a padlock, RAY STONE , the then apartment complex manager Gina Garcia, and maintenance man, "William", deliberately allowed access to her back yard by removing the padlock on a nightly basis, and replacing it the next morning. This took place over more than a one year period, allowing persons unknown to enter her backyard and patio on a nightly basis.  These individuals also stood on the roof, using special equipment to intrude into plaintiff's bedroom, watching her and engaging in frightening activities, on a nightly basis.

548. On October 8, 2018, an intruder wearing a costume to hide his identity entered her yard, firing a loaded gun at or near plaintiff's head. On information and belief, plaintiff asserts these actions constituted an attempted murder.  Plaintiff reported the attempted murder to RAY STONE, who ignored her e-mails. Plaintiff also reported the attempted murder to the SCSD and the FBI, who never answered her letters.

549. On information and belief, plaintiff alleges that beginning in or about June, 2019, defendant RAY STONE's employee, Manager Gina Garcia, began entering plaintiff's apartment on a regular basis, in plaintiff's absence, for the purpose of poisoning her drinking water, large bottles of water kept in the refrigerator. Garcia had conspired with others, "the co-conspirators",  to commit a kidnapping/murder scheme against plaintiff. In preparation, Garcia was to poison plaintiff's drinking water, which would plaintiff susceptible to brainwashing.  On information and belief, Garcia's entries into plaintiff's apartment, in plaintiff's absence, continued on a regular basis, during the months of June, July and August, 2019.

550. On August 30, 2019, plaintiff was lured out of her apartment through the use of language which she had been brainwashed to follow, as the result of the drugging or poisoning of her drinking water, while she was absent from her apartment. Plaintiff was instructed to leave her apartment with just her pets. She took two of her pets, two pet rabbits, with her in her car. As she attempted to drive, she was subjected to special effects, the result of software or other special equipment installed in her car. Later that night, she was kidnapped by various persons at the side of the road, somewhere in the vicinity of Modesto, California. Her car stopped running. When she stepped out of her car, she was rendered unconscious and taken to several different places, ending up at a hospital in Modesto, California.

551. From the time of the attempted murder on, plaintiff became increasingly aware of the hazards presented through the failure to block off the fence, remove the fence, and replace it with a brick wall. Despite the facts that plaintiff repeatedly informed RAY STONE of the dangers presented by the fence or gate, leading into the back yard, defendant RAY STONE never took any steps to remove or replace this wall, and it remains in the same condition as when plaintiff took possession of the apartment, on or about December 15, 2015.

552. On or about December 14, 2022, the heating coil in the oven ignited. Plaintiff stopped the fire by turning the oven off. Plaintiff immediately contacted the management office, informing them of that the oven had caught on fire. A maintenance man, "Marty", looked at the heating coil and stated plaintiff was responsible for cleaning this coil, and they would do nothing about the problem. The heating coil at that time was in a blackened condition. When plaintiff touched the coil, it fell apart, and the oven has remained unusable ever since.

553. A few days later, Marty again looked at the oven, stating he was checking the coil to get

information for a replacement part. The part has never been replaced, and despite plaintiff's requests, nothing has been done to replace or repair the oven. Plaintiff's e-mails to the management at the apartment complex have been ignored.

554. On or about December 19, 2022, plaintiff wrote to Chris Costamagna, Fire Chief, Sacramento Metro Fire, reporting the condition of the stove. Plaintiff received a purported telephone call from Supervising Inspector Jenny Smith,  informing her that the Metro Fire did not control the inside of building, and referred her to Sacramento 311. Plaintiff believes the call from Jenny Smith was a hoax, since when plaintiff returned her call, she received a message stating Smith was on vacation.

555. Approximately a week later, plaintiff spoke in person with someone at Metro Fire Headquarters. This person, a male who did not give plaintiff his name, described plaintiff's circumstances as a "landlord-tenant problem", refused to schedule an inspection of plaintiff's oven, or look at photographs she had taken, and suggested she contact the Better Business Bureau.

556.  On or about December 22, 2022, plaintiff reported the condition of the oven to Sacramento County Code Enforcement, and given a report number. The County described the condition reported by plaintiff as "substandard housing." As of the filing of this lawsuit, the County has done nothing further about plaintiff's complaint, nor has defendant RAY STONE. Plaintiff alleges that someone within the County, specifically employee Christa Hull, took bribes to "bury" plaintiff's complaint, so that no inspection would be conducted, and no citation issued compelling RAY STONE to replace the oven. As of the filing of this lawsuit the County has taken no further action. Plaintiff remains without a working oven.

557. Due to the dangerous condition of the apartment, existing since plaintiff took possession in December, 2015, the unit has no rental value. The dangerous and defective condition in which the premises have existed throughout plaintiff's tenancy eliminates any rental value.

558. As a proximate result of defendants' breach of the implied warranty of habitability, and defendant's failure to repair or remedy the dangerous conditions, within a reasonable time or at all, plaintiff has sustained special and general damages according to proof, from the time plaintiff took possession to the time of trial and entry of final judgment in this case. Plaintiff's damages continue as due to health conditions she is not in a position to seek other housing.

　　　　Wherefore, plaintiff prays judgment as set forth below.

TWENTY-NINTH CAUSE OF ACTION

(MAINTENANCE OF NUISANCE)

AGAINST DEFENDANT RAY STONE, INC.,

559. Plaintiff repeats and realleges paragraphs 1 through 81, and 520-558, and incorporates same by reference, as though set forth in full herein.

560. Under the provisions of Civil Code section 1941, defendant RAY STONE had a duty to place the premises in a condition fit for human occupancy before renting them, and to repair all subsequent dilapidations, that rendered the premises unfit for human habitation, or untenantable.

561. The defective and dangerous conditions as alleged in this complaint constituted a nuisance within the meaning of Civil Code section 3479 and CCP section 731 in that they deprived plaintiff of the safe, healthy, and comfortable use of the premises.

562. Commencing on or about July 13, 2018, and continuing through the date of filing of this litigation, plaintiff repeatedly notified defendant both orally and in writing of the defective and

172

dangerous conditions in this complaint and requested that defendant repair these conditions, but defendant has failed and refused to repair within a reasonable time, or at all.

563. As a proximate result of maintenance of nuisance conditions, plaintiff lost the safe and healthy use of her apartment, which as a result has no rental value.

564. As a further proximate result of defendant's maintenance of nuisance conditions, including an unsafe backyard and an oven that caught fire, plaintiff suffered inconvenience in that she is unable to prepare meals in the usual way, and unable to prepare certain meals at all. The stove/oven malfunctioned during the 2022 holiday season, preventing the preparation of holiday meals. Plaintiff suffered additional per diem expenses due to this inability to prepare meals. In addition, the stove itself, and burners, could malfunction at any time. Plaintiff has no assurance that defendant RAY STONE will repair or replace the stove, also containing the oven. Although the apartment includes a kitchen, the kitchen is dysfunctional, rendering the apartment without value as a dwelling.

565. In maintaining the nuisance, defendant acted with full knowledge of the consequences thereof, and of the damage being caused to plaintiff. Despite this knowledge, defendant failed to abate the nuisances by repairing the defective and dangerous conditions of the premises, or causing them to be repaired. Defendant RAY STONE's failure to act was both oppressive and malicious within the meaning of Civil Code section 3294 in that it subjected plaintiff to cruel and unjust hardship in wilful and conscious disregard of plaintiff's rights and safety, thereby entitling plaintiff to an award of punitive or exemplary damages. Defendant's failure to maintain the premises in a habitable condition and their failure to repair the dangerous conditions or have them repaired within a reasonable time after plaintiff notified them, or at all, as alleged above, is

cruel and malicious within the meaning of Civil Code section 3294 in that it subjected plaintiff to cruel and unjust hardship in wilful and conscious disregard of plaintiff's rights and safety, thereby entitling plaintiff to an award of punitive or exemplary damages.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

THIRTIETH CAUSE OF ACTION

CONSPIRACY

(AGAINST DEFENDANT RAY STONE, INC.)

566.  Plaintiff repeats and realleges paragraphs 1 through 81, 520-565, and incorporates same by reference, as though set forth in full herein.

567.  On or about December 15, 2015, defendant RAY STONE INC., and co-conspirators Don Johnson, Harrison Ford, and Kevin Costner, and each of them, knowingly and wilfully conspired and agreed among themselves to render plaintiff's home unsafe and unfit for human habitation.

568. Among other things, defendants agreed that the kitchen appliances in plaintiff's apartment would never be inspected or replaced, allowing the oven to age and catch on fire, ideally resulting in a fatal fire in which plaintiff would be killed.

569. In addition, defendants, and each of them,  knowingly and wilfully conspired and agreed among themselves to make the gate allowing access to plaintiff's back yard and patio available to whoever wanted to enter plaintiff's property from the back, ultimately allowing nightly crime spree to take place, including but not limited to, commission of the following crimes:  .

570. Defendants, and each of them,  knowingly and wilfully conspired and agreed among themselves to make plaintiff's apartment a dangerous place to live, by committing an attempted

174

1  murder against plaintiff, on or about October 8, 2018.

2  571. Defendants, and each of them,  knowingly and wilfully conspired and agreed among

3

4  themselves to make plaintiff's apartment a dangerous place to live, accessing plaintiff's

5  apartment in her absence to poison plaintiff's drinking water, and in so doing render her

6  vulnerable to brainwashing, leading to the capture and kidnapping of plaintiff, in August, 2019.

7  572. Defendant RAY STONE did the acts and things alleged herein pursuant to and in

8  furtherance of the conspiracy and the above-alleged agreement.

9

10  573. Defendant RAY STONE furthered the conspiracy by cooperation and or ratified and

11  adopted the acts of the co-conspirators in that when informed of the serious crimes committed

12  against plaintiff, and the dangerous conditions on the property, defendant RAY STONE did

13  nothing, and ignored plaintiff's written communications, including electronic mail and

14  documents hand delivered to their business address at 550 Howe Avenue, Suite 100, Sacramento

15  CA 95825 in October and December, 2022.

16

17  574. Plaintiff is informed and believes that the last overt act in furtherance of the conspiracy

18  occurred on or about December 14, 2022, when employee and agent "Marty", maintenance man,

19  told plaintiff the oven coil or heating element was her responsibility and she should clean the

20  oven coil, an electrical element, herself, and that "Shelby Rivas", the area manager, agreed that

21  RAY STONE would do nothing further to remedy the broken oven.

22

23          Wherefore, plaintiff prays judgment against defendants, and each of them, as set forth

24  below.

25          FOR THE FIRST, SECOND, THIRD, FOURTH, AND FIFTH CAUSES OF ACTION:

26  1. For compensatory damages, treble damages, and punitive damages, as well as

27

28                                              175

prejudgment and postjudgment interest, in an amount to be determined at trial;

2. For costs of suit, and

3. For such other and further relief as the court may deem just and proper.

FOR THE SIXTH THROUGH SEVENTEENTH, NINETEENTH THROUGH TWENTY-SECOND, AND TWENTY-FOURTH CAUSES OF ACTION:

1. For compensatory damages in the minimum amount of one hundred million dollars, trebled;

2. For punitive damages in an amount to be determined at trial;

3. For costs of suit, and

4. For such other and further relief as the court may deem just and proper.

FOR THE TWENTY-THIRD CAUSE OF ACTION:

1. For special damages according to proof;

2. For general damages according to proof;

3. For punitive damages in an amount appropriate to punish defendant and deter others from engaging in similar misconduct;

4. For costs of suit incurred herein, and

5. For such other and further relief as the court may deem just and proper.

FOR THE TWENTY-FIFTH CAUSE OF ACTION:

1. For compensatory damages in an amount according to proof;

2. For interest at the legal rate from and after December 15, 2015 through entry of judgment;

3. For costs of suit and

4. For such other and further relief as the court may deem just and proper.

FOR THE TWENTY-SIXTH CAUSE OF ACTION:

1. For a declaration that the written instrument hereinabove described is void and of no force or effect;

2. For a declaration that plaintiff owes nothing for these utility bills, and isn't charged upon vacating the apartment;

3. For damages in an amount according to proof;

4. For issuance of a preliminary and permanent injunction restraining defendant from imposing submetered billings, issued by a company with whom plaintiff has no contractual relationship;

5. For costs of suit incurred herein;

6. For such other and further relief as the court may deem just and proper.

FOR THE TWENTY-SEVENTH CAUSE OF ACTION:

1. For a declaration that the written instrument hereinabove described is void and of no force or effect;

2. For a declaration that plaintiff owes nothing for these utility bills, and isn't charged upon vacating the apartment;

3. For damages in an amount according to proof;

4. For issuance of a preliminary and permanent injunction ordering defendant to replace the stove;

5. For costs of suit;

6. For such other and further relief as the court may deem just and proper.

FOR THE TWENTY-EIGHTH CAUSE OF ACTION:

1. For special and general damages in a sum according to proof;

2. For an order that defendant RAY STONE repair or replace the oven/stove;

3. For costs of suit incurred herein;

4. For such other and further relief as the court may deem just and proper

FOR THE TWENTY-NINTH CAUSE OF ACTION:

1. For special and general damages according to proof;

2. For punitive damages in an amount necessary to punish defendants;

3. For an order that defendant RAY STONE INC. abate the nuisance by replacing the stove with a new appliance;

4. For costs of suit incurred herein, and

5. For such other and further relief as the court may deem just and proper.

For the THIRTIETH cause of action:

1. For general damages according to proof;

2. For special damages according to proof;

3 For exemplary and punitive damages;

4. For costs of suit incurred herein, and

5. For such other and further relief as the court may deem just and proper.

DATED: March 6, 2023

_____
DIANE K. GODFREY
Plaintiff in propria persona

178

VERIFICATION

I, Diane K. Godfrey, am the plaintiff in this action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

DATED:

_____
DIANE K. GODFREY
Plaintiff in propria persona

EXHIBIT A

Castle Hill Apartments 

# LEASE AGREEMENT

THIS AGREEMENT is made and entered into this **11th** day of **June**, **2019**, between **Castle Hill**, "Owner/Agent," whose address and phone number are **2725 Elvyra Way, Sacramento, CA  95821, (916) 487-7447** and **Diane K. Godfrey**, "Resident."

THE PARTIES AGREE AS FOLLOWS:

1.  **RENTAL UNIT:**    Subject to the terms and conditions of this Agreement, Owner rents to Resident and Resident rents from Owner, for residential use only, the premises located at: **2769 Castle Hill Ct. #34, Sacramento, CA  95821**.

2.  **TERM:**    The term of this Agreement is for **1 year**, beginning on **July 1, 2019** and ending on **June 30, 2020**, at which time this Lease shall terminate without further notice. Any holding over thereafter shall result in Resident being liable to Owner/Agent for daily rental damages equal to the current market value of the unit, divided by 30. A "month-to-month" tenancy subject to the terms and conditions of this agreement shall be created only if Owner/Agent accepts rent from Resident thereafter, and if so accepted, tenancy may be terminated by Resident after service upon the Owner/Agent of a written 30-day Notice of Termination. Except as prohibited by law, that month-to-month tenancy may be terminated by the Owner/Agent by service upon the Resident of a written 60-day notice of termination of tenancy. However, Civil Code Section 1946.1 provides that "if any tenant or resident has resided in the dwelling for less than one year", the Owner/Agent may terminate the tenancy by service upon the Resident of a written 30-day notice.

3.  **RENT:**    Rent is due in advance on the **1st** day of each and every month, at **$925.00** per month, beginning on **July 1, 2019**, payable to Owner/Agent at **2725 Elvyra Way, Sacramento, CA  95821**. Payments made in person may be delivered to Owner/Agent between the hours of **weekdays, 8:30am-5:30pm**.

    Rent for any partial month shall be prorated at the amount of 1/30th of the monthly rent per day. ❑ The tenancy did not start on the first of the month, therefore Resident is to pay: One month's rent at move-in **$925.00** Prorated rent of **$925.00** for **0** days will be due on **August 1, 2019**.

    Acceptable methods of payment: **Personal Check, Cashier's Check, and Money Order**.

4.  **SECURITY DEPOSIT:**    Resident shall deposit with Owner/Agent, as a security deposit, the sum of **$800.00 prior to taking possession of the unit**.

    Resident shall not use the security deposit to pay any month's rent. Owner/Agent may withhold from the security deposit only such amounts as are reasonably necessary to remedy Resident defaults including, but not limited to, the following:
    **(a)** defaults in the payment of rent,
    **(b)** to repair damages to the premises caused by Resident, exclusive of ordinary wear and tear, and/or
    **(c)** to clean the premises, if necessary, upon termination of the tenancy in order to return the unit to the same level of cleanliness it was in at the inception of the tenancy, and/or
    **(d)** to restore, replace, or return personal property or appurtenances, exclusive of ordinary wear and tear.
    No later than 21 calendar days after Owner/Agent has regained possession of the premises, Owner/Agent shall return any remaining portion of such security deposit to Resident. Any remaining portion of the security deposit shall be returned in the form of a single check made out to all Residents listed above. After either the Owner/Agent or the Resident provides notice to terminate the tenancy, the Owner/Agent and Resident may mutually agree to have the Owner/Agent deposit any remaining portion of the security deposit electronically to a bank account or other financial institution designated by the Resident or to another form or method of return.

5.  **UTILITIES:**    Resident shall pay for all utilities, services and charges, if any, made payable by or predicated upon occupancy of Resident, except: **Trash, Water, and Sewer**. Resident shall have the following utilities connected at all times during the tenancy (check as applicable): ❑ Gas ❑ Electric ❑ Water ❑ Trash ❑ Sewer ❑ Other:_____.

    Disconnection of utilities due to non-payment is a material violation of this Agreement.

    Resident shall not use common area utilities (such as water or electricity) for the Resident's personal use, without prior written permission from the Owner/Agent

6.  **LATE FEES AND INSUFFICIENT FUNDS:**    If rent is paid after the **5th** of the month, there will be a late charge of **$50.00** assessed. This late charge does not establish a grace period. The parties agree that this late fee is presumed to be the amount of damage sustained by late payment of rent. It would be impracticable or extremely difficult to fix the actual damage. This sum represents a reasonable endeavor by the Owner/Agent to estimate fair average compensation for any loss that may be sustained as a result of late payment of rent. Failure to pay the fee is a material breach of this Agreement. Pursuant to California law, if Resident passes a check on insufficient funds, Resident will be liable to Owner/Agent for the amount of the check and a service charge of **$25.00** not to exceed **$25.00** for the first check passed on insufficient funds, and **$35.00** for each subsequent check passed on insufficient funds. The Owner/Agent may refuse a personal check as the





Castle Hill Apartments                                                                RAY STONE

form of rent payment to cure a Three-Day Notice to Pay Rent or Quit.

**7. PAYMENTS:**    Owner/Agent may apply any payment made by Resident to any obligation of Resident to Owner/Agent notwithstanding any dates or other direction from Resident that accompanies any such payment. Any attempt by Resident to allocate a payment in any other way shall be null and void, including the use or application of a restrictive endorsement or limitation on any check or other payment. In the event of roommates, or another form of multiple occupancy, Resident understands and agrees that rent shall be paid with a single payment and that it is up to Resident to collect individual checks or other payments in order to submit a single rent payment. If payment by mail is allowed, Resident bears the risk of loss or delay of any payment made by mail and Owner /Agent must receive mailed rent payments on or before the due date, except as otherwise provided by law. In absence of prior written agreement, Owner/Agent will accept rent payments on or before the due date, except as otherwise provided by law. In absence of prior written agreement, Owner/Agent will accept rent payments only from the Resident. Rent tendered by a Non-Resident shall be deemed rent tendered on behalf of Resident only and not on behalf of the Non-resident. Should the Owner/Agent elect to accept a payment that does not comply with this paragraph, this shall not be construed as a waiver of this provision.

**8. CHANGE TO PAYMENT METHOD:**    The Owner/Agent may refuse certain payment methods listed in the paragraph entitled "RENT," above, as the form of payment to cure a Three-Day Notice to Pay Rent or Quit, Three-Day Notice to Perform Conditions and/or Covenants or Quit, a check passed on insufficient funds or dishonored for any other reason, or a stopped payment and may refuse certain methods for future rent payments thereafter. Notwithstanding the provision above, the Owner/Agent may demand or require cash as the exclusive form of payment of rent or security deposit if the Resident has previously attempted to pay the Owner/Agent with a check drawn on insufficient funds or the Resident has stopped payment on a check, draft, or money order. If the Owner/Agent chooses to demand or require cash payment under these circumstances, the Owner/Agent shall give the Resident a written notice stating that the payment instrument was dishonored and informing the Resident hat the Resident shall pay in cash for a period determined by Owner/Agent, not to exceed three months, and attach a copy of the dishonored instrument to the notice.

**9. RENTAL UNIT AVAILABILITY:**    In the event the unit is not available on the move-in date due to a prior Resident holding over, or other cause not within the control of Owner/Agent, Resident's damages will be limited to a return of the security deposit, any holding or other deposits and any advance payment of rent.

**10. ACCEPTANCE OF PREMISES:**    Resident has inspected the premises, furnishings and equipment, and has found them to be satisfactory. All plumbing, heating and electrical systems are operative and deemed satisfactory.

**11. OCCUPANTS:**    Premises shall be occupied only by the following named person(s): **Diane K. Godfrey (4/16/1952)**.

**12. GUEST(S):**    Except as otherwise provided by prior written agreement, any person who is not listed as an Occupant on this Agreement is a Guest. A Guest may not stay on the premises for more than 14 consecutive days, or a total of 14 days in a 12-month period. At the discretion of Owner/Agent, Guest(s) who overstay this limit may be required to go through the application process, and if approved, must sign a Rental/Lease Agreement. Resident is responsible for any violation of this Rental/Lease Agreement by Resident's Guests.

**13. USE OF PREMISES:**    The premises shall be used as a dwelling for residential purposes only and for no other reason. No retail, commercial, or professional use of the premises shall be made, unless such use conforms to applicable zoning laws and the prior written consent of Owner/Agent is obtained in advance of such proposed use. As a condition for granting such permission, Owner/Agent may require that Resident obtain liability insurance for the benefit of Owner/Agent.

**14. SUBLETTING AND ASSIGNMENT:**    No portion of the premises shall be sublet nor this Agreement assigned. Any attempted subletting or assignment by Resident shall, at the election of Owner/Agent, be an irremediable breach of this Agreement and cause for immediate termination as provided herein and by law. Resident is prohibited from offering all or part of the premises for short-term rental, such as through AirBNB, VRBO or other such sites. Any person who is not an Occupant or Resident, who occupies any portion of the dwelling unit, for any period of time whatsoever, for any compensation or consideration whatsoever (including, without limitation, the payment of money and/or trade and/or barter of other goods, services, or property occupancy rights) is not a Guest. This constitutes attempted subletting or assignment under this Agreement.

**15. RENTERS INSURANCE:**    Resident's property is not insured by Owner/Agent. Owner/Agent recommends that Resident obtain coverage for Resident's personal property. Resident is not a co-insured and is expressly excluded from coverage under any insurance policy held by Owner/Agent which is now in effect or becomes effect during the term of this Agreement. A renter's liability insurance policy such as the one that may be required below, benefits both the Owner/Agent and the Resident. (CHECK ONE BOX)

❑   Resident is required to maintain renters insurance throughout the duration of the tenancy as specified in the attached Renters Insurance Addendum. Resident must provide proof of such insurance to the Owner/Agent within 30 days of the inception of the tenancy. Failure to comply with this requirement is a material violation of the Rental/Lease Agreement.



2



Castle Hill Apartments 

☒  Resident is encouraged but not required to obtain renters insurance.

**16. KEYS:**  Resident has received a set of keys for the premises. If needed, additional keys may be requested from the Owner/Agent. There may be a charge. Keys to the premises are the exclusive property of Owner/Agent. All keys must be returned to Owner/Agent when Resident vacates. Resident shall be charged for the cost of new locks and keys if all keys are not returned. In the event that any keys to the Premises of the Building are lost or consigned, Resident shall be liable for the entire cost of all key and lock replacement, at the discretion of Owner/Agent, as required for the security of the Premises, the Building, and the Building occupants. This may include the costs of re-keying the entire Building if Owner/Agent, at Owner/Agent's sole discretion, deems such action is necessary. Resident should take care not to lock himself/herself out of the Premises. If Owner/Agent is required to assist any Resident in gaining entry to the Premises, Resident may be assessed a charge for the actual costs, including out of pocket expenses, incurred by Owner/Agent and Owner/Agent may require Resident to contract with a professional locksmith.

**17. LANDSCAPING:**  Resident ❏ is ☒ is not (check one) responsible for the upkeep of the yard and maintenance of the landscaping, including watering, mowing, weeding and clipping, or ❏ please see attached Addendum. Resident shall promptly advise Owner/Agent of any problems with the landscaping, including, but not limited to, dead grass, plants or tree limbs, insect infestations, discolored or yellowing of foliage and insufficient irrigation or leaks. Resident may not delegate the responsibilities of this paragraph to any person, including a contractor or other landscaping professional. Resident may not alter the landscaping, or engage in "personal agriculture" without Owner/Agent's prior permission.

**18. STORAGE PROHIBITIONS (CHECK ONE):**

☒ No storage outside of the Resident's unit is authorized, permitted, or provided under this Agreement. Resident agrees to keep personal property inside Resident's unit, unless Owner/Agent has expressly agreed otherwise in writing in an addendum to this Agreement. Resident shall refrain from storing gasoline, cleaning solvent or other flammable liquids in the unit (If neither box is checked, this provision applies.)

❏ Storage is allowed pursuant to the attached CAA Form 63.0 – Storage Addendum.

**19. SMOKING POLICY:**  Smoking of any substance is prohibited everywhere on the premises, including in individual units and interior and exterior common areas, **unless** Owner/Agent has adopted a different policy that is attached as an addendum to this Agreement. Smoking includes the use of e-cigarettes or vaping. The term "smoke" includes vapor from e-cigarettes or other vaping devices. (Check a box if addendum is attached)

☒ This property's policy with respect to smoking is in the attached addendum.

❏ This property is subject to a local non-smoking ordinance. The policy for this property is in the attached addendum.

Resident shall inform his or her guest(s) of this Smoking Prohibition. Resident shall promptly notify Owner/Agent in writing of any incident where tobacco smoke s migrating into Resident's unit from sources outside of Resident's unit. Resident acknowledges that Owner/Agent's adoption of this policy, does not make the Owner/Agent the guarantor of the Resident's health or of the smoke-free condition of the areas listed above. However, Owner/Agent shall take reasonable steps to enforce this provision. Owner/Agent shall not be required to take steps in response to smoking unless Owner/Agent has actual knowledge or has been provided written notice. Owner/Agent and Resident agree that the other residents of the property are the third party beneficiaries of this provision. A resident may sue another resident to enforce this provision but does not have to right to evict another resident. Any lawsuit between residents regarding this provision shall not create a presumption that the Owner/Agent has breached this Agreement. A breach of this provision by the Resident shall be deemed a material breach of the Rental/Lease Agreement and grounds for immediate termination of the Rental/Lease Agreement by the Owner/Agent.

**20. PROHIBITIONS:**  Without Owner/Agent's prior written permission as an addendum to this Agreement, no pets, no pianos, no aquariums, no outside antennae, no space heaters or portable heaters, charcoal burners or other open-flame cooking devices, or liquefied petroleum gas fueled cooking devices ("grills") or **pets, waterbeds, and water-filled furniture** shall be kept or allowed in or about the premises.

Resident shall not engage in any of the actions or conduct related to marijuana, that are otherwise permitted under Health and Safety Code 11362.1, on the premises.

Resident shall refrain from shaking or hanging clothing, curtains, rugs, and other coverings and cloths outside of any window ledge or balcony. No clotheslines or drying racks may be used in outdoor areas, balconies, patios, etc. without the Owner/Agent's prior written permission. Plants and other items may not be placed on balcony railings or ledges, unless Owner/Agent has expressly agreed otherwise in writing in an addendum to this Agreement.

**21. ENTRY AND COOPERATION:**  California law allows Owner/Agent or his/her employee(s) to enter the premises for certain purposes during normal business hours. The Owner/Agent will provide written notice to the Resident prior to the entry of the dwelling unit whenever required by state law. (Civil Code Section 1954.) Resident's non-compliance with





Castle Hill Apartments



Owner/Agent's lawful request for entry is a material breach of this Agreement that may be cause for immediate termination as provided herein and by law.

If the Premises or the Building is required by any government agency, lender or insurer to undergo repairs or alterations, or in case of other necessary or agreed repairs, Resident agrees to cooperate fully with Owner/Agent so that all such repairs or alterations are made in as expeditious and efficient a manner as possible.

**22. REPAIRS AND ALTERATIONS:** Resident shall make a written request to Owner/Agent regarding any repairs, decorations or alterations contemplated. Except as provided by law, no repairs, decorating or alterations shall be done by Resident without Owner/Agent's prior written consent. This includes, but is not limited to, painting, wallpapering, and changing locks. Resident may not make any alterations to cable or telephone inside wiring (such as may occur when changing telecommunications providers or adding phone lines) without prior written consent of the Owner/Agent. The consent request regarding proposed alterations to inside wiring shall include the name, address, and telephone number of any new telecommunications providers. Resident agrees to pay all costs resulting from the alteration and agrees to pay to the Owner/Agent any costs associated with restoring the inside wiring to the condition at the time of move-in, except for reasonable wear and tear. Resident shall hold Owner/Agent harmless and indemnify Owner/Agent as to any mechanic's lien recordation or proceeding caused by Resident.

**23. CARE, CLEANING AND MAINTENANCE:** Except as prohibited by law, Resident agrees:

**(a)** to keep the premises as clean and sanitary as their condition permits and to dispose of all rubbish, garbage and other waste, in a clean and sanitary manner, unless Owner/Agent has expressly agreed otherwise in writing in an addendum to this Agreement. Resident shall ensure that large boxes are broken apart before being placed in trash containers. Resident shall be responsible, at Resident's expense, for hauling to the dump those items too large to fit in the trash containers. Resident shall not dispose of any flammable liquid, rags or other items soaked with flammable liquids or any other hazardous material in trash containers or bins;

**(b)** to properly use and operate all electrical, gas and plumbing fixtures and keep them as clean and sanitary as their condition permits;

**(c)** to keep the premises and furniture, furnishings and appliances, and fixtures, which are rented for Resident's exclusive use, in good order and condition; that all rooms on the premises and all appliances and fixtures on the premises must be able to be used for their intended purpose(s);

**(d)** not to willfully or wantonly destroy, deface, damage, impair or remove any part of the structure or dwelling unit or the facilities, equipment, or appurtenances thereto or to permit any person on the premises, to do any such thing;

**(e)** to occupy the premises as a residence, utilizing portions thereof for living, sleeping, cooking, or dining purposes only which were respectively designed or intended to be used for such purposes.

**(f)** to leave the premises in the same condition as it was received, subject to normal wear and tear, as its condition permits.

**(g)** to return the premises, upon move-out to the same level of cleanliness it was in at the inception of the tenancy.

**(h)** to pay Owner/Agent for costs to repair, replace or rebuild any portion of the premises damaged by the Resident, Resident's guests or invitees.

**(i)** to promptly advise Owner/Agent of any items requiring repair, such as locks or light switches. Resident shall notify the Owner/Agent of any leaks, drips, water fixtures that do not shut off properly, including, but not limited to, a toilet or other problems with the water system, including but not limited to, problems with water-saving devices. Resident shall make repairs requests as soon as after the defect is noted as is practical;

**(j)** to keep doors and windows and access to them unobstructed and to not block them with personal items or otherwise, and to maintain clear pathways into and through each room on the premises. Resident must not otherwise maintain the unit in a manner that prevents necessary access through each room and to all doors and windows, inhibits necessary airflow, acts as a potential haven for pests and mold growth, creates a fire hazard, or prevents rooms from being used for their intended purposes.

**24. PLUMBING:** Cost of repair or clearance of stoppages in waste pipes or drains, water pipes or plumbing fixtures caused by Resident's negligence or improper usage are the responsibility of the Resident. Resident shall reimburse Owner/Agent for these costs on demand.

**25. LARGE APPLIANCES:** Resident shall not move or remove any large appliances provided by Owner/Agent without prior written consent of the Owner/Agent. Resident shall not install or operate any additional refrigerators, freezers, washing machines, clothes dryers, portable dishwashers, air conditioners or other large appliances not approved by the owner, without prior written consent of the Owner/Agent.

**26. QUIET ENJOYMENT:** Resident and Resident's guest(s) shall not violate any criminal or civil law, ordinance or statute in the use and occupancy of the premises, commit waste or nuisance, annoy, molest or interfere with any other person on the property, or neighbor. Any such action may result in the immediate termination of this Agreement as provided herein and by law. Resident shall refrain from creating, or allowing to be created, any noise that is disturbing to other residents. Resident is also responsible for compliance with any local noise ordinances.





Castle Hill Apartments



**27. FINES AND PENALTIES:**    Resident is responsible for any fines or other costs occasioned by violations of the law by Resident or Resident's guests on the premises or property while Resident is in possession. If any such fines or costs are levied against Owner/Agent, Resident agrees to pay such fines or costs attributed to resident's tenancy or the conduct of Resident, Resident's guests or others at the premises, upon receipt of any invoice from Owner/Agent. The obligation to pay fines and costs assessed against Owner/Agent may be in addition to any assessed directly against Resident.

**28. LIABILITY FOR PACKAGES:**    Owner/Agent is not responsible for the delivery, acceptance or receipt of, damage to or loss of messages, packages, mail or other material left at entrances to the premises or elsewhere on the premises.

**29. SMOKE DETECTION DEVICE:**    The premises are equipped with a functioning smoke detection device(s), and Resident shall be responsible for testing the device weekly and immediately reporting any problems, maintenance or need for repairs to Owner/Agent. If battery operated, Resident is responsible for changing the detector's battery as necessary. Resident may not disable, disconnect or remove the detector. Owner/Agent shall have a right to enter the premises to check and maintain the smoke detection device as provided by law.

**30. CARBON MONOXIDE DETECTION DEVICE:**    If the premises are equipped with a functioning carbon monoxide detection device(s), Resident shall be responsible for testing the device weekly and immediately reporting any problems, maintenance or need for repairs to Owner/Agent. If battery operated, Resident is responsible for changing the detector's battery as necessary. Resident may not disable, disconnect or remove the detector. Owner/Agent shall have a right to enter the premises to check and maintain the carbon monoxide detection device as provided by law.

**31. WAIVER OF BREACH:**    The waiver of either party of any breach shall not be construed to be a continuing waiver of any subsequent breach. The receipt by Owner/Agent of the rent with the knowledge of any violation of a covenant or condition of this agreement shall not be deemed a waiver of such breach. No waiver by either party of the provisions herein shall be deemed to have been made unless expressed in writing and signed by all parties to this Agreement.

**32. JOINT AND SEVERAL LIABILITY:**    The undersigned Resident(s), whether or not in actual possession of the premises, are jointly and severally liable for all obligations under this Agreement, and shall indemnify Owner/Agent for liability arising prior to the return of possession to the Owner/Agent for personal injuries or property damage caused or permitted by Resident(s), their guests and invitees. This does not waive "Owner/Agent's duty of care" to prevent personal injury or property damage where that duty is imposed by law.

**33. NOTICE:**    Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**34. CREDIT REPORTS:**    A negative credit report reflecting on your credit history may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. Resident expressly authorizes Owner/Agent (including a collection agency) to obtain Resident's consumer credit report, which Owner/Agent may use if attempting to collect past due rent payments, late fees, or other charges from Resident, both during the term of the Agreement and thereafter.

**35. SALE OF PROPERTY:**    In the event of the sale or refinance of the property: If Owner/Agent presents to Resident a "Resident's Certification of Terms - Estoppel Certification," or other similar Estoppel Certification form, Resident agrees to execute and deliver the certificate acknowledging that this Agreement is unmodified and in full force and effect, or in full force and effect as modified with the consent of Owner/Agent, and stating the modifications, within ten (10) days of written notice. Failure to comply shall be deemed Resident's acknowledgment that the certificate as submitted by Owner/Agent is true and correct and may be relied upon by any lender or purchaser.

**36. DESTRUCTION OF OR DAMAGE TO THE PREMISES:**    In the event the premises are partially or totally damaged or destroyed by fire or other cause, the following will apply:

**(a)** If the premises are totally destroyed by fire, earthquake or other casualty, this Agreement will terminate, as of the date on which the damage occurs. However, if the damage or destruction is the result of the negligence of the Resident, or his or her invitees, then the Agreement will not terminate, unless notice is given by the Owner/Agent, specifying the termination date.

**(b)** If the premises are only partially damaged, or are temporarily uninhabitable, as determined by Owner/Agent, Owner/Agent will use due diligence to begin the process to repair such damage and restore the premises as soon as possible. If only part of the premises cannot be used, there will be a proportionate reduction of rent until the premises are repaired, to be determined solely by Owner/Agent.

**37. HAZARD NOTICE:**    Resident may obtain information about hazards, including flood hazards, that may affect the property from the Internet Web site of the Office of Emergency Service at http://myhazards.caloes.ca.gov/. Owner/Agent's insurance does not cover the loss of the Resident's personal possessions and it is recommended that the Resident consider purchasing renter's insurance and flood insurance to insure his or her possessions from loss due to fire, flood, or other risk of loss. The owner is not required to provide additional information concerning the flood hazards to the property





Castle Hill Apartments 

and the information provided pursuant to this section is deemed adequate to inform the Resident.

**38. SEVERABILITY CLAUSE:**    If any provision of this Agreement is held illegal or unenforceable in a judicial proceeding, such provision shall be severed and shall be inoperative, and the remainder of this Agreement shall remain operative and binding on the Parties.

**39. ENTIRE AGREEMENT:**    This Agreement, which includes all attachments referred to above, constitutes the entire Agreement between the parties and cannot be modified except in writing and signed by all parties, except as permitted by applicable law. Neither Owner/Agent, nor any agent or employee of Owner/Agent has made any representations or promises other than those set forth herein.

**40. ATTORNEY'S FEES:**    If any legal action or proceeding is brought by either party to enforce any part of this Agreement, the prevailing party shall recover, in addition to all other relief, attorneys' fees not to exceed $10,000.00, plus court costs.

**41. MANDATORY BED BUG NOTICE:**    California law requires all Owners/Agents to provide specific information about bed bugs to their Residents. The Bedbug Notification Addendum is attached hereto.

**42. BREACH OF LEASE:**    In the event that Resident breaches this Lease Agreement, Owner/Agent shall be allowed at Owner/Agent's discretion, but not by way of limitation, to exercise any or all remedies provided Owner/Agent by California Civil Code Section 1951.2 and 1951.4. Damages Owner/Agent "may recover" include the worth at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of award, or for any shorter period of time specified in the Lease Agreement, exceeds the amount of such rental loss for the same period that the Resident proves could be reasonably avoided.

The undersigned Resident(s) acknowledge(s) having read and understood the foregoing, and receipt of a duplicate original.



Signed by Diane K. Godfrey
Tue Jun 11 2019 02:09:39 PM PDT
Key: A2809BC9; IP Address: 24.10.4.74

Signed by Gina Garcia
Wed Jun 12 2019 09:36:18 AM PDT
Key: 369B8FEA; IP Address: 73.41.181.135

| Diane K. Godfrey *(Resident)* | Date | *(Authorized Agent)* | Date |



